

FILED

SEP 1 9 2008

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| PAMELA G. CAPPETTA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action |
| | ) | No. 3:08cv288 |
| GC SERVICES, LP | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT

COMES NOW the Plaintiff, PAMELA G. CAPPETTA, (hereafter, "the Plaintiff") by counsel, and as for her First Amended Complaint against the Defendant, she alleges as follows:

1.      This is an action for actual, statutory, and punitive damages, costs and attorney's fees brought pursuant to Fair Debt Collection Practices Act, ("FDCPA"), the Texas Debt Collection Act ("TDCA"), the Fair Credit Reporting Act ("FCRA"), the Credit Repair Organizations Act ("CROA"), and the Virginia Credit Service Businesses Act ("VCSBA").

## JURISDICTION

2.      The jurisdiction of this Court is conferred by 15 U.S.C. § 1692, 15 U.S.C. § 1681, 15 U.S.C § 1679, and 15 U.S.C. §1367.  Venue is proper in this District and Division, as the Defendant's violations of the law occurred in this jurisdiction, and the Defendant's registered office and registered agent is located in Glen Allen, Virginia.

## PARTIES

3.      The Plaintiff is a natural person and resides in the Commonwealth of Virginia. Plaintiff is a "consumer" as defined by the FDCPA, TDCA, FCRA, CROA, and VCSBA.

4.    Upon information and belief, GC SERVICES LIMITED PARTNERSHIP ("GC Services") is a partnership with its primary headquarters in Texas and which does business in the State of Virginia through its registered offices in Glen Allen, Virginia. It is a "debt collector" as defined and governed by the Fair Debt Collection Practices Act and the Texas Debt Collection Act. It is a "credit repair organization" and a "person" as defined and governed by the Credit Repair Organizations Act. It is a "credit services business" as defined by the Virginia Credit Services Businesses Act. It is a "user" of credit reports as defined by the Fair Credit Reporting Act.

## FACTS

5.    In or about May of 2007, the Defendant began the collection of a debt owed to American Express by Plaintiff's estranged husband, Robert Cappetta (hereafter, "the account"), and was unsuccessful in its efforts to persuade Robert Cappetta to pay the account.

6.    The Defendant acted as a debt collector in all of its contacts with the Plaintiff.

7.    Upon information and belief, shortly after its purchase of the account from American Express or another entity, the Defendant accessed a "skip trace" consumer report regarding the Plaintiff which provided the Defendant with various data fields which regarded the Plaintiff such as her social security number, current address, home telephone number, the identity of her employer, her work telephone number, and the fact that she was married to Robert Cappetta.

8.    Using the Plaintiff's social security number obtained thereby, as well as her other personal indicative information, the Defendant then sent an electronic communication to Experian Information Solutions, Inc. requesting that Experian provide it with a consumer report

2

which regarded the Plaintiff, while falsely certifying to Experian that it was collecting on an account which was the result of a credit transaction involving the Plaintiff, specifically, in connection with its review of an existing credit relationship that it had with the Plaintiff, and that the Defendant therefore had a permissible purpose to obtain Plaintiff's credit report.

9.    In response to the electronic communication contained in Paragraph 8, on or about May 21, 2007, Experian furnished to the Defendant a credit report that regarded the Plaintiff.

10.    The Experian credit report revealed Plaintiff's private financial information to the Defendant, a complete stranger to the Plaintiff. The Defendant learned from the Experian credit report that Plaintiff had an excellent credit rating.

11.    On that same day, May 21, 2007, one of the Defendant's representatives, using a false collection alias, called the Plaintiff's place of employment and demanded that Plaintiff pay $10,444.59 on the account.

12.    Plaintiff was never an obligor on the account.

13.    Plaintiff never applied for the account.

14.    Plaintiff never held or used a plastic charge card related to the account.

15.    Upon information and belief, American Express never represented to the Defendant that Plaintiff was obligated on the account.

16.    Upon information and belief, American Express never provided Plaintiff's social security number to the Defendant regarding the account.

17.    Plaintiff's ex-husband had opened the American Express account using a post office box that Plaintiff had no knowledge of.

3

18.    When the Defendant's employee spoke with the Plaintiff, the collector began reciting to the Plaintiff numerous items of personal and private information which regarded the Plaintiff including but not limited to Plaintiff's social security number, home address, previous addresses, the identity of her employer, her employer's phone number, and her date of birth.

19.    Plaintiff was alarmed at the amount of information that the Defendant had obtained regarding her and asked the Defendant where it had obtained the information.

20.    The Defendant told the Plaintiff that the collector was in possession of a copy of the written application for the account, that the Plaintiff's personal information was contained therein, as well as Plaintiff's signature, and that she could prove to the Plaintiff that the Plaintiff had signed the application.

21.    Upon information and belief, the Defendant never possessed a copy of any application with regard to the account.  In the alternative, it possessed a copy of the application which regarded to the account but lied to the Plaintiff when it made the assertions contained in paragraph 20.

22.    Upon information and belief, each of the items of information referenced in paragraph 18 was obtained by the Defendant from the skip trace consumer report described in paragraph 7 and/or the Experian consumer report described in paragraph 8.

23.    The Defendant's employee then began listing each of the charges on the account, which included, but was not limited to, thousands of dollars in motel charges presumably made by Robert Cappetta, and that Plaintiff had no knowledge of and had certainly not made.

24.    The Plaintiff informed the Defendant that she had no knowledge of any of these charges and had no knowledge that this credit account even existed prior to the Defendant's call to her.

4

25.    The Defendant told the Plaintiff that she was nonetheless responsible for paying for all of the charges, interest, and penalties on the account, including, but not limited to Plaintiff's husband's motel charges, and that the debt needed to be paid in full within seven (7) days in the amount of $10,444.59.

26.    The Defendant told the Plaintiff that if she did not comply within 7 days, it would be 'forced' to place a severely derogatory collection notation on her credit report.

27.    Plaintiff asked the Defendant to provide her with the documentation that it claimed to have in its possession regarding the account, including: the copy of the original application from 1994, a complete list of all charges made, and copies of the original account notes made by American Express.

28.    The Defendant promised that it would provide these to her.

29.    The Plaintiff said that she would like to review these documents and discuss them with her attorney prior to paying on the account.

30.    The Defendant then immediately began berating and ridiculing the Plaintiff for her cautious approach and told her that "your lawyer will tell you not to pay this account and your friends will tell you not to pay this account, but what they can't tell you is how horribly this is going to affect your credit rating in the future."

31.    The Defendant then offered advice to the Plaintiff regarding her credit report and credit score, including, but not limited to, the representation that the placement of the threatened collection notation on Plaintiff's credit report would "have the same effect on [her] credit score as if [she] had filed for bankruptcy," but that paying the amount demanded immediately would allow Plaintiff to retain her good credit standing.

32.    The Defendant again reiterated to the Plaintiff that she could only avoid having

this derogatory notation placed on her credit report by paying the full amount of $10,444.59 that it demanded.

33.    The Defendant's employee then 'volunteered' to the Plaintiff that the collector herself had experienced a situation in which the collector's boyfriend had used her credit card without permission and the collector herself ultimately had to personally pay those charges, and that "sometimes you just need to handle it yourself if you want to move on in life."

34.    Upon information and belief, the Defendant's employee manufactured this story in its entirety.

35.    Defendant's representations regarding Plaintiff's status as an obligor were false.

36.    Defendant's representations regarding the effect of the threatened collection notation on Plaintiff's credit score were false.

37.    Defendant's sworn certifications to Experian regarding the Plaintiff were false, including, but not limited to, the certification that the Defendant's access of the Plaintiff's credit report was made in conjunction with a credit transaction involving the Plaintiff, that the Defendant had an existing credit relationship with the Defendant, and that the Defendant had a permissible purpose for accessing her report.

38.    Defendant's representations regarding the 7-day timeframe within which the debt was 'required' to be paid were false.

39.    No such deadline existed, and the Defendant had full discretion over the timing and manner with which it reported credit information regarding its collection targets to third parties.

40.    The 7-day timeframe asserted by the Defendant was intended by it to create a false sense of urgency to extract money from the Plaintiff that she did not owe, in that it knew by

virtue of its review of Plaintiff's Experian credit report that she had an impeccable credit rating and would likely wish to protect it.

    41.    However, Plaintiff was also extremely concerned that the closing date of the refinancing of her home was approaching very shortly, which was contingent on her excellent credit score, and, thus, based on the Defendant's misrepresentations to her, including, but not limited to: (1) its false assertion that Plaintiff was an obligor on the account; (2) that the amount demanded had to be paid within 7 days to avoid the Defendant's "obligation' to severely damage her credit report and credit score; (3) that such damage would have the same impact on her credit score as a bankruptcy notation; and (4) that the Defendant was in possession of a signed application which contained Plaintiff's social security number, date of birth, and other personal information which regarded her, Plaintiff succumbed to the Defendant's extortion efforts and paid $10,444.59 that day over the phone.

    42.    Thus, Plaintiff relied on the Defendant's misrepresentations, specifically including those set forth in the preceding paragraph, to her detriment.

    43.    When Plaintiff concluded the call with the Defendant, she collapsed emotionally in her office, while visibly shaking and crying uncontrollably.

    44.    Plaintiff's officemate, also a therapist as well as a registered nurse, noted that Plaintiff's heartbeat was racing such that she became extremely concerned for Plaintiff's health.

    45.    She then cancelled all of the Plaintiff's appointments for that morning as well as an appointment of her own and provided medical care to the Plaintiff in their office.

    46.    Following this traumatic incident, and upon reflection, Plaintiff later realized after conversations with various people that she had no legal obligation to pay on the account and that the Defendant had fraudulently extracted payment from her.

47.     Plaintiff then contacted the Defendant via telephone and asked that it provide her with a copy of the 1994 credit application that it had supposedly confirmed that she had signed, as well as the account notes and the complete list of account charges that it had previously promised to provide to her.

48.     However, when Plaintiff communicated this request, the Defendant's employee immediately took a belligerent and aggressive tone and refused to let the Plaintiff speak to the female collector who had extracted payment from her.

49.     The Defendant's employee brusquely told the Plaintiff that her file was closed and that they would not provide anything to her other than a letter confirming her payment.

50.     The Defendant told her that it had no legal obligation to provide her with anything but that Plaintiff was legally required to ask American Express for a copy of the application herself.

51.     The Defendant then volunteered that Plaintiff would be wasting her time by doing so, and that its experience with American Express was that American Express would only send her a copy of the application "in response to a subpoena."

52.     Plaintiff nonetheless contacted American Express directly.

53.     When Plaintiff called American Express, she provided her name, address, and social security number, but American Express's employees and agents refused to discuss the account with her, because she was not listed on the account.

54.     Plaintiff spoke to approximately 7 to 10 different people at American Express, and after much time and an exhaustive effort on the phone, she finally reached an individual in the office of the Executive Vice-President in charge of consumer relations.

55.     Initially, even this individual refused to discuss the account with the Plaintiff, but

8

as Plaintiff became emotionally upset and informed this individual of the complete history of what had transpired with GC Services, this individual finally relented.

56.    Plaintiff was informed by American Express that she was not listed as an obligor on the account and that it did not have her social security number or any other information regarding her associated with the account, other than a notation that her name, and her name alone, was noted as an "authorized user" on the account.

57.    American Express confirmed that it had never instructed GC Services that Plaintiff was responsible for the account and had never provided GC Services with Plaintiff's social security number.

58.    On or about August 8, 2007, Plaintiff wrote to GC Services and demanded a refund of the monies paid, because it was not her account.

59.    GC Services thereafter and to this day has refused to return Plaintiff's money to her.

**FIRST CLAIM FOR RELIEF**
**FAIR DEBT COLLECTION PRACTICES ACT**
**§ 15 U.S.C. 1692, et seq.**

60.    The Plaintiff realleges and incorporates paragraphs 1 through 59 above as if fully set forth herein.

61.    Defendant violated the Fair Debt Collection Practices Act in multiple ways, including by example only and without limitation: by failing to provide Plaintiff with the initial notice required by § 1692(g) advising Plaintiff of her right to validation of the debt; by misrepresenting that the Plaintiff was an obligor on the account; and by misrepresenting that American Express had communicated the Plaintiff's social security number to the Defendant and that she was an obligor.

9

62.    As a result of the Defendant's violations of the FDCPA, the Defendant is liable to the Plaintiff for actual and statutory damages, attorney's fees and costs pursuant to 15 U.S.C. § 1692k.

63.    As a result of the Defendant's violation of the FDCPA, the Plaintiff suffered actual damages for emotional and mental anguish, fear, frustration, and anxiety in her attempts to recover the funds that were extorted from her, as well as the loss of use of her funds.  Such damages are recoverable pursuant to 15 U.S.C. § 1692k.

## SECOND CLAIM FOR RELIEF
## TEXAS DEBT COLLECTION ACT
## TEXAS FINANCE CODE § 392.100, et seq.

64.    Plaintiff realleges and reincorporates paragraphs 1-63 above as if fully set out herein.

65.    The Defendant violated the Texas Finance Code, § 392.100, et seq, by its actions which include, but are not limited to:

    a.    using criminal means to cause harm to a person or property of a person, including its successful extortion of money from the Plaintiff by using false pretenses thus committing numerous criminal offenses, including the crime of felony wire fraud pursuant to 18 U.S.C. §1343;

    b.    using language intended to abuse unreasonably the hearer;

    c.    placing telephone calls without disclosing the name of the individual making the call and with the intent to annoy, harass, or threaten a person at the called number;

    d.    using a name other than the true business or professional name or the true personal or legal name of the debt collector while engaged in debt collection; and

    e.    using other false representations and deceptive means to collect a debt or obtain information about a consumer.

66.    As a result of the actions taken by the Defendant, which include but are not limited to its threats made against Plaintiff Cappetta personally and her credit rating, its attempts to collect money which was not properly due and owing, its false representations, verbal abuse,

10

extortion of the Plaintiff, and other violations set forth herein, Plaintiff has experienced severe emotional distress evidenced by one or more of the following: anger, sleeplessness, crying, anxiety, fear, and humiliation. Plaintiff Cappetta has also experienced a loss of concentration and the ability to perform her job properly, as well as other economic and non-economic damages.

67.    The Defendant's conduct, actions, and inaction were committed knowingly and intentionally, rendering it liable for treble damages in an amount to be determined by the Court pursuant to the remedies subsection of the Texas Business and Commerce Code § 17.50(b)(1). In the alternative, they were committed negligently, entitling Plaintiff to an award of actual damages pursuant to Texas Business and Commerce Code § 17.50(h). Plaintiff is also entitled to an award of attorneys' fees and costs in accordance with the statute.

## THIRD CLAIM FOR RELIEF
## CREDIT REPAIR ORGANIZATIONS ACT
### 15 U.S.C. § 1679, et seq.

68.    The Plaintiff reiterates and incorporate the allegations contained in paragraphs 1-67 above as if fully set out herein.

69.    The above-alleged false statements, actions, and omissions of the Defendant, including, but not limited to, its advice to Plaintiff regarding her credit score, as well as its false statements made to the Plaintiff and to Experian, a national credit reporting agency, violated the CROA, 15 U.S.C. § 1679, et seq.

70.    The Defendant is liable to the Plaintiff for all actual damages sustained by the Plaintiff; for punitive damages for such amount as the Court may allow; and for costs and for attorneys' fees, pursuant to 15 U.S.C. § 1679g(a).

71.    The Plaintiff is additionally entitled by statute to declaratory and injunctive relief requiring the Defendant's future compliance with the CROA.

11

## FOURTH CLAIM FOR RELIEF
## VIRGINIA CREDIT SERVICES BUSINESSES ACT
## <u>VIRGINIA CODE §59.1-335.1, et seq.</u>

72.     The Plaintiff reiterates and incorporates the allegations contained in paragraphs 1-71 above as if fully set out herein.

73.     The above-alleged false statements, actions, and omissions of the Defendant, including, but not limited to, its advice to Plaintiff regarding her credit score, as well as its false statements made to the Plaintiff and to Experian, a national credit reporting agency, violated the Virginia Credit Services Businesses Act, Va. Code § 59.1-335.1, et seq.

74.     The Defendant is liable to the Plaintiff for all actual damages sustained by the Plaintiff; for punitive damages for such amount as the Court may allow; and for costs and for attorneys' fees, pursuant to Va. Code § 59.1-335.10, as well as injunctive and declaratory relief.

## FIFTH CLAIM FOR RELIEF
## FAIR CREDIT REPORTING ACT
## <u>15 U.S.C. § 1681b(f)</u>

75.     Plaintiff realleges and reincorporates paragraphs 1 through 74 above as if fully set out herein.

76.     The Defendant willfully and intentionally violated the Fair Credit Reporting Act, 15 U.S.C. § 1681b(f) by using or obtaining Plaintiff's consumer report on at least two occasions without Plaintiff's consent and without a permissible purpose as defined by § 1681b.

77.     As a result of the Defendant's conduct, the Plaintiff suffered various types of damage as set forth herein, including specifically, the intrusion into her privacy, and the emotional distress and anxiety associated with concern about future unauthorized inquiries into her personal financial information and/or the risk of additional instances of identity theft resulting from such inquiries, the threats and misrepresentations made by the Defendant against

12

her credit rating based on the knowledge that it obtained through its unauthorized access, and the loss of money resulting from these threats and misrepresentations, on which Plaintiff relied to her detriment.

78.     The Defendant's conduct was willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, it was negligent, entitling the Plaintiff to recover under 15 U.S.C. § 1681o.

79.     The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and her attorney's fees from the Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o.

WHEREFORE, Your Plaintiff demands judgment to recover statutory damages, treble actual damages, punitive damages, costs, and her attorney's fees from the Defendant in an amount to be determined by the Court pursuant to the Texas statute.  The Plaintiff is entitled to recover statutory damages, liquidated and non-liquidated compensatory damages, costs, and her attorney's fees from the Defendant in an amount to be determined by the Court pursuant to the FDCPA. The Plaintiff also entitled to recover actual, statutory and punitive damages, together with attorney's fees and costs in an amount to be determined by the Court pursuant to the CROA, the VCSBA, and the FCRA.  The Plaintiff also prays for declaratory and injunctive relief, including, but not limited to, an Order forbidding the Defendant from further contact with the Plaintiff and a declaration that the Defendant's conduct with regard to the Plaintiff violated the TDCA, the CROA, the VCSBA, the FCRA and/or the FDCPA.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
**PAMELA G. CAPPETTA,**

_____/s/_____

Matthew J. Erausquin, VSB#65434
_Counsel for the Plaintiff_
CONSUMER LITIGATION ASSOCIATES, P.C.
3615-H Chain Bridge Road
Fairfax, VA 22030
Tel:   703-273-7770
Fax:   888-892-3512
matt@clalegal.com

14