```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    RICHMOND DIVISION

 3   -------------------------------------------

 4   PAMELA G. CAPPETTA,

 5
                             Plaintiff;
 6   v.                                 Civil Action

 7                                      3:08CV288

 8   GC SERVICES LIMITED PARTNERSHIP,

 9
                             Defendant.
10   -------------------------------------------

11                    May 12, 2009
                    Richmond, Virginia
12                     10:35 a.m.

13

14   BEFORE:        HONORABLE JAMES R. SPENCER
                    Chief United States District Judge
15

16   APPEARANCES:   LEONARD A. BENNETT, ESQ.
                    MATTHEW J. ERAUSQUIN, ESQ.
17                  12515 Warwick Boulevard - Suite 100
                    Newport News, Virginia  23606
18
                             Counsel for Plaintiff;
19

20                  JAMES C. SKILLING, ESQ.
                    DAVID M. SCHULTZ, ESQ.
21                  ZEV H. ANTELL, ESQ.
                    100 Shockoe Slip
22                  Richmond, Virginia  23219

23                           Counsel for Defendant.

24

25                    JEFFREY B. KULL
                    OFFICIAL COURT REPORTER
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2            THE CLERK:  If I could ask the attorneys to
 3    identify themselves for me, please?
 4            MR. BENNETT:  Matthew Erausquin and Len Bennett
 5    of Consumer Litigation Associates.
 6            MR. SKILLING:  Jim Skilling on behalf of GC
 7    Services.  And I'm here today with Mr. David Schultz from
 8    the Hinshaw firm in Chicago and my associate, Zev Antell.
 9            THE COURT:  All right.
10            THE CLERK:  Case Number 3:08CV288:  Pamela G.
11    Cappetta versus GC Services Limited Partnership.  The
12    plaintiff is represented by Leonard Bennett and Matthew
13    Erausquin.  The defendant is represented by David Schultz,
14    Jim Skilling, and Zev Antell.  Are counsel ready to
15    proceed?
16            MR. BENNETT:  Plaintiff is, Your Honor.
17            MR. SKILLING:  Defendant is, Your Honor.
18            THE COURT:  All right.  Mr. Bennett?
19            MR. BENNETT:  Thank you, Judge.  If it please
20    the Court, I'm embarrassed to appear before our Chief
21    Judge on a discovery dispute, and I expect that, I'm
22    hopeful that the fact that this is my first appearance
23    before Your Honor on a discovery dispute, and that it is
24    unusual for us to have discovery disputes, will comport
25    with my representation that we have done our best in this
```

1   case to reduce those numbers of disputes.

2          If you imagine, in a perfect case, a greedy

3   plaintiff's counsel, and I have been a greedy plaintiff's

4   counsel at times in other cases, may want 100 percent.  We

5   recognize, if for no other reason the tremendous

6   difficulty imposing on a Magistrate Judge's time, that we

7   have already simplified the vast majority of our disputes.

8   You have two previous orders from Judge Lauck that

9   were -- in my interpretation, they were critical of the

10  defendant's discovery position.  And we have now reduced

11  the dispute, and I can simplify it further, Your Honor, to

12  a single question.  In this case, we began, we filed it,

13  my office, not Mr. Erausquin's, filed a poorly-drafted

14  complaint.  Your Honor properly granted a 12(b)(6) with

15  leave to amend.  It was corrected and proceeded in August

16  of last year.  This is probably the longest case I have on

17  the docket actively being litigated in our state.

18          The discovery was served in August of 2008.  And

19  over a series of months, I think at one point Judge Lauck

20  in her 12/24/08 order details the chronology of these

21  disputes very cleanly.  There were gaps of some 90 days

22  where we were wrestling to try to get the defendant to

23  comport, comply with discovery.

24          The ultimate question that we sought was

25  evidence as to whether the allegation in this case was a

1   systemic problem.  We had no evidence prior to a

2   deposition of American Express, third-party discovery that

3   we were successful at completing, as to whether or not

4   this was an odd, isolated incident.  And we certainly

5   didn't have any basis under Rule 11 to allege otherwise.

6   The allegation, to simplify the case, the most disputed of

7   the claims, the Fair Credit Reporting Act can be

8   explained, I think, as this.  American Express is

9   different than most credit cards.  I learned it new in

10  this case.  A Chase or Capital One credit card, for

11  example, that a consumer may open with their spouse,

12  typically the spouse and the other -- both parties can be

13  co-obligors.  And in conventional contract principles, an

14  obligor is the same as a co-obligor.  American Express has

15  a different system entirely, news to me.  They never have

16  a co-obligor.  There is only in any of its products a

17  single obligor that is referred to as the cardholder.

18          The spouse or the other person that then is

19  provided a convenience card to use is referred to as a

20  supplemental or a supplemental cardholder.  That

21  supplemental, according to American Express, could be

22  liable for charges made by the supplemental and for

23  nothing more.  And the American Express documents referred

24  to it as a quasi-contract concept.  That is, the

25  supplemental doesn't ever receive a contract that says,

1    "Here is what you have to do."  But there would be an

2    argument, maybe an equitable or quasi-contract or open

3    account argument otherwise.

4         We now know that GC Services, one of the largest

5    debt collectors for American Express, and American Express

6    is an innocent in this case here, but the GC Services,

7    Your Honor, collects for supplementals but never receives

8    information from American Express as to whether a

9    supplemental owes any money.  And in fact, as recently as

10   Thursday, GC Services's manager of the facility that

11   handles the American Express accounts testified that GC

12   Services never has authority to attempt to collect from

13   supplementals.  So the question of the quasi-contract, the

14   American Express argument is a red herring, but to provide

15   the background to Your Honor.  So you have a body of

16   supplemental cardholders.  They are identified in the

17   American Express electronic conveyance of information to

18   the defendant to start its collection.

19        American Express -- GC Services, rather, follows

20   a number of tools to obtain, to apply pressure on the

21   obligor on the account, the primary or the cardholder as

22   they refer to.  Significant efforts are spent on location

23   information and gathering personal information.

24   Therefore, account records that says look at their

25   spending habits and if they have a gym they regularly pay

1  to each month, call the gym and leave messages.  If they

2  have a pharmacy they regularly use, call and leave

3  messages at the pharmacy.  One of the tools we are

4  alleging in the complaint is that they also apply

5  pressures on the supplementals.  And in this instance, we

6  know that our client, and we have discovered several other

7  consumers' supplementals were subject to a consumer report

8  in which GC Services purchased through Micro Bilt and

9  Experian a product that Experian has already testified in

10  this case is a consumer report.  Inquiries included in the

11  consumer's file, employment information, lots of other

12  information.  That's a legal argument for a later point, I

13  expect.

14         But to simplify it, as I said I would do, the

15  single real issue that remains in dispute between the

16  parties, in fact, the same exact issue in the LUCAS case

17  cited in our materials in which Mr. Schultz and GC

18  Services had a similar position and multiple sanctions

19  orders in another class case, is establishing the class

20  membership, the numerosity element.  We believe we have

21  everything else.  But the numerosity element, we are right

22  now still at circumstantial evidence.  And so we have gone

23  about various ways to try to obtain that information.

24         The first item addressed in the third

25  stipulation is the easiest and simplest of those.  It is

1    an interrogatory in which we ask for the identity of these

2    individuals, to tell us who they are.  There is a

3    protective order in place.  We are pleased for whatever

4    restrictions the defendant would want to have imposed on

5    that information and its use.  But we have asked for it.

6          Earlier in this Cappetta case, Your Honor, Judge

7    Lauck issued a ruling that detailed at length something

8    Your Honor has long ago known, certainly Judge Dohnal

9    recently ruled as well in another case in this fashion,

10   that in order to show a burden as an objection to an

11   interrogatory, you have to show a burden.  In this

12   instance, there is no declaration.  There is not even an

13   explanation or hypothesis about why it would be difficult.

14         Nevertheless, we are plaintiffs; we have to

15   prove a case.  We hired an expert that our firm has

16   advanced considerable money to, close to $15,000 in travel

17   and in expert witness fees, who specializes in their

18   computer program.  After considerable wrestling back and

19   forth, and attempted mediation of this issue by Judge

20   Dohnal, our expert was permitted a limited access to the

21   use of their facility, has been there, has come back, and

22   would testify that it is a simple procedure for the

23   defendant to identify the putative class members.

24         We also, independent of that, Judge, have asked

25   for a list of supplemental cardholders.  And we have

1     arranged, if the supplemental cardholders are provided,

2     another mechanism by which the plaintiffs can absorb the

3     burden to identify which of those supplementals were

4     subject to the consumer report pool.  Mr. Clark, who is a

5     fantastic attorney in my opinion, it is on the record, I

6     don't want to compliment my opponent too much, but

7     Mr. Clark, who represents Experian for Jones Day, the

8     primary point person for them in this region, accepted a

9     subpoena to Experian for a list of individuals on whom

10    this product, this consumer report, was provided to GC

11    Services.  That's broad.  Mr. Clark and myself have

12    negotiated to narrow that so that Experian, once it

13    receives the list of supplementals that we have to get

14    from the defendant, Experian will then match that with its

15    own account records and identify which of those

16    individuals the defendant pulled a report on.

17            We also have done the same thing with Micro

18    Bilt.  Micro Bilt, Your Honor, is the reseller.  It is the

19    middleman through which the defendant has purchased these

20    Experian reports.  It licenses, GC Services, licenses each

21    terminal that can access a Micro Bilt product.  And Micro

22    Bilt has reached that similar agreement.  That is, when we

23    provide it the list of supplementals, Micro Bilt has

24    agreed and as a narrowing of its subpoena to match its

25    account records to identify which of those supplemental

1    lists were subject to a consumer report.  That's a

2    long-winded way of saying the simple issue, Judge, and

3    Your Honor, all discovery disputes are over, frankly, or

4    resolved but for the outstanding sanctions issues which

5    Judge Lauck had essentially taken in abeyance, are over if

6    the defendant is ordered to produce a list of the

7    supplemental cardholders, the individuals that did not

8    have any obligation to American Express.  We would then be

9    able to match that with Experian's records or with Micro

10   Bilt's records.  That's the simplest issue with respect to

11   discovery.

12           I'm happy -- happy isn't an accurate word, but I

13   am certainly willing at Your Honor's request to detail any

14   and all other components to this.  But I really don't want

15   to take more of Your Honor's time than I have to.

16           THE COURT:  Thank you very much.

17           MR. SKILLING:  Good morning, Your Honor.  Jim

18   Skilling on behalf of the defendant.  Judge, the discovery

19   dispute does go back quite a ways.  The interrogatories

20   and requests for productions were served after there was

21   much discovery that went on in the case, which included

22   the hearings before Judge Lauck and eventually referral to

23   Judge Dohnal.  The defendant, GC Services, does collect on

24   behalf of American Express approximately 7,000 to 10,000

25   accounts per month.  Your Honor, its database is called a

1   Star System that runs a pick software system which is

2   approximately 25 years old.  It does not work like modern

3   technology such as Microsoft or a Word document.  So there

4   has been a lot of discussion about how to get the data

5   from the system.

6          The plaintiffs have chosen never to serve a

7   30(b)(6) deposition notice on the defendants for these

8   technological issues.  They did take an individual

9   deposition of Ms. Leanna Walberg, who is the head of the

10  information technology department, and learned about the

11  system.  Subsequent to that, they did hire Mr. Bacall, and

12  Your Honor, the defendant was under the understanding that

13  this was the protocol that we were going to basically

14  engage in in order to determine if it was possible to mine

15  the data from GC Services's database.  And Your Honor,

16  this is between 250,000 and 500,000 accounts, probably 20

17  to 25 million, actually, pages of data.  Because each

18  account has between 10 and 20 pages of account notes and

19  other information on each debtor.

20         What GC Services cannot do is just push a button

21  to pull out the accounts that have supplemental debtors on

22  the accounts.  And the core issue is whether or not, our

23  understanding was, under Judge Dohnal's order, when he

24  ordered the site inspection, which Your Honor, I did

25  detail in our response to the motion for extension,

1    defendant's compliance with that March 11th order, the

2    site inspection did occur.  Mr. Bacall was given the data.

3    And we have heard no other response until today that some

4    program could be written to mine that particular data.

5            So GC Services's position is it has hundreds of

6    thousands of accounts of data from American Express.  The

7    core issue is culling out the supplemental accounts, and

8    also, with regard to the class definition, which Your

9    Honor, our understanding was we were responding to

10   discovery concerning the viability of a class, not

11   engaging in class discovery, that is, being required to

12   provide, you know, vast amounts of data for the plaintiffs

13   to go through.  We offered to give them a sampling of 100

14   or a thousand accounts for them to review to determine if

15   they could write a program in order to cull out the

16   supplemental accounts on which, Your Honor, there is a

17   second and third step, on which GC Services issued this

18   Micro Bilt request for the address update.

19           So the defendant's position is, while looking

20   into the issue of viability, that each account would have

21   to be an individual inquiry would have to be made to go

22   into each account in order to determine three things.

23   One, whether it was an Optima account; two, whether there

24   is a supplemental cardholder; three, whether a Micro Bilt

25   or Experian report was pulled on that.  And four, whether

1    or not that supplemental cardholder used or was obligated

2    on the account.  Because if the supplemental cardholder is

3    obligated on the account, they are not a class member if

4    this class were ever to go forward because GC Services

5    would have had a permissible purpose to contact the

6    supplemental cardholder.

7           And Your Honor, one other nuance is, it is not

8    illegal or improper for GC Services to contact a

9    supplemental cardholder.  Under the Cardholder Agreement,

10   it says that American Express can contact the supplemental

11   cardholder about the account, which is what occurred here.

12          Finally, Your Honor, we have produced thousands

13   of pages of documents.  And of course there's other

14   motions pending about the hard drive, but the final point

15   is, Your Honor, we've gotten to the point where we thought

16   we were doing a protocol through Judge Dohnal.  We

17   complied with that.  They then served discovery and said,

18   "Well, you have to push a button or answer this

19   interrogatory that identifies these particular

20   individuals," which we have already established that we

21   can't push a button and just present that to the plaintiff

22   or the Court.  And therefore, we were trying to determine

23   a protocol, how that data could be mined, and/or if the

24   plaintiff wanted to take further depositions regarding the

25   IT issues in the case, which to date they have not done.

1          So Your Honor, we are willing and able to

2    provide a sampling of the data to be presented to the

3    plaintiffs.  We will certainly respond, Your Honor, to any

4    protocol that Mr. Bacall puts together to review that to

5    determine whether that protocol or that, you know, program

6    could be run on the Star System.

7          Judge, the request for production says, "Please

8    give us those 500,000 accounts in Word format" so that

9    they can then search the word "supplemental" or "Micro

10   Bilt" or "Experian."  And it has been established through

11   testimony that basically, you can do it on one account.

12   You can convert the notes that are in this Star System

13   into a Word format.  But it is very burdensome if not

14   impossible to produce all of that data into a Word format

15   that would be searchable, Your Honor.

16         And again, Your Honor, the issue with Micro Bilt

17   and the issue with Experian is, I'm not sure, Your Honor,

18   and depositions have not been conducted of Micro Bilt,

19   whether they can produce that information in a searchable

20   format.  What I do know is that Micro Bilt cannot identify

21   who we collected against that had a supplemental account.

22   That can only be done on an individual basis by actually

23   looking at the particular account that GC Services has

24   been collecting upon.

25         So Your Honor, we have taken a protocol

1    approach.  We have offered a sampling.  They have had

2    their expert, have access to our database, our

3    architecture, the computer architecture.  I talked to

4    Leanna Walberg.  She was with Mr. Bacall.  I talked to her

5    yesterday and I said, "Was there anything the plaintiff's

6    expert needed or required further for their analysis of

7    our computer systems or our architecture or how this

8    system works?"  And she informed me that she had not

9    received any further call from Mr. Bacall or that he had

10   not required any further information.

11          So Your Honor, the defendant's position is that

12   it has complied with, certainly with Judge Dohnal's order

13   and the prior orders of the Court regarding this issue.

14   And certainly, Your Honor, we think that the class

15   discovery is premature because the amendment, of course,

16   has just been filed.  But we did engage in the issue of

17   viability, and this is the status of where we are in this

18   discovery.

19          And Your Honor, we certainly, there has, you

20   know, been sort of an undercurrent that the defendants

21   just obstructed discovery completely, Your Honor.  And I

22   just hope the record will reflect certainly, Your Honor,

23   that we have taken all means to comply with Judge Lauck's

24   orders and Judge Dohnal's order in providing any access

25   the plaintiff requires to our technology to determine this

1   issue.

2         Judge, they said they didn't trust us to run a

3   sample.  They said, "We don't want your sample.  We don't

4   trust that you will give us the correct data.  We want our

5   own expert to review your system."  And that's what Judge

6   Dohnal ordered, and that's what we did.  And now they are

7   here saying, "You have to answer these interrogatories"

8   when we have already established we cannot push a button

9   and give them that list.  And it was our understanding

10  that that is why Judge Dohnal issued his order and we

11  undertook all of those efforts.  So that, Your Honor, on

12  that particular issue, is our position at this time.

13         THE COURT:  All right.  Thank you.  I'll let you

14  respond.

15         MR. BENNETT:  Yes, Your Honor.  Judge, just an

16  overview.  Judge Dohnal's order:  We had a settlement

17  conference.  Judge Dohnal tried to resolve this issue.

18  And we both worked through Judge Dohnal and agreed to the

19  site inspection protocol, and then even couldn't get our

20  expert there for a while through that, but the last line

21  of the order, if the Court reads it, Judge Dohnal kicks

22  everything back, just says, "I'm only resolving this site

23  inspection issue.  All the other discovery issues are

24  Judge Lauck's."

25         You have two orders, a memorandum opinion

1    already from Judge Lauck, that give you what I think to be

2    an objective flavor of the previous history of the case.

3    Anyone, any plaintiff that appears before Your Honor, no

4    matter how clean my hands are, could have done better.

5    But you don't see that in the memorandum opinions in this

6    case, and I think correctly so.

7          The sample that has been offered to date was

8    100.  I think you even see it, to the extent the Court

9    regrettably had to wade through the stipulations, but you

10   see there was an offer.  If a sample, and we have always

11   said this, if for example there were a 10,000 person

12   account sample, and the sample was programmed by the

13   third-party expert witness as opposed to their folks, then

14   we could agree.

15         But I would ask the Court the simplest way to

16   rule is consistent with what Judge Lauck did, a Magistrate

17   Judge, of course, but what she did earlier in the case on

18   the 24th of December, in which claims of burdensomeness

19   were rejected by the Court because there was no evidence

20   offered of what that burden was to any extent or degree.

21   In fact, the only evidence you have about burden is a

22   declaration that our expert provided attached to the

23   stipulation in which that expert says, under oath, and

24   this is an individual we did not know before the case,

25   just a computer guy, that it would not be difficult, it

1   would not be a burden.

2          In this instance, Judge, we have done all we can

3   to remain consistent with our obligations as Eastern

4   District of Virginia attorneys, and certainly Mr. Skilling

5   has litigated honorably in the case, but this particular

6   defendant and its lead counsel had the exact same set of

7   arguments that caused exactly the same burden on the

8   Indiana Court in the LUCAS case, ultimately with GC

9   Services still refusing to provide the numerosity evidence

10  and the class list.  And the Court, and I don't know how

11  viable this is, I haven't researched it, actually granting

12  default on the elements of Rule 23.  An issue I don't

13  think the Court could do because you need to protect due

14  process of other individuals.  But Judge, I don't want to

15  work the case to death.  We would like to get it

16  completed.

17          THE COURT:  All right.  Well, let me explain to

18  you what I am going to do.  I will draft an order

19  resolving this, and I will be as clear as I can possibly

20  be.  Because, you know, the next step is sanctions.  And I

21  want everybody to understand what I'm saying and what the

22  obligations of the parties are after this order that I

23  will issue.  I'm sorry that things have gotten to this

24  point.  This is pretty much the judicial equivalent of

25  having too many cooks in the kitchen.  I guarantee you, if

1     I had had this case from the beginning we would be way

2     beyond this crap.  This case has been around way too long,

3     and we are going to work it and get it done.  And as I

4     say, clarity is, I think, what we need here, and that's

5     what I am going to provide in resolving these discovery

6     issues.

7              We were scheduled to pre-try this case today to

8     try to get at some reasonable and rational date for the

9     completion of this matter.  And I do want to put down a

10    date.  I want to get the train on the track toward a

11    destination so that we can at least be working in that

12    direction full bore.  This is May.  And Mr. Bennett, I

13    think you mentioned where you thought you were.  You are

14    trying to get information on numerosity so that we can

15    have some resolution of this class request business; is

16    that correct?

17             MR. BENNETT:  Absolutely, Judge.

18             THE COURT:  And if the discovery issues will be

19    resolved swiftly, how long do you think it would take you

20    to get to where you can use the information so that it can

21    be available and ready for all of us so we can resolve

22    this issue?

23             MR. BENNETT:  Yes, Your Honor.  My estimation is

24    60 days.  The only caveat, and candidly, Judge, I believe

25    that our work is pretty much completed or the completion

1   of it is scheduled.  But I need to be able to continue to

2   coordinate with Experian and with Micro Bilt to match the

3   list to come up with that information.  Candidly, Your

4   Honor, Your Honor is familiar with the numerosity law in

5   our circuit.  We have offered a stipulation.  These

6   hundreds of thousands of accounts, we have said we will

7   stipulate it is 100.  Because at that point we can then

8   raise the issues for Your Honor.  If Your Honor finds for

9   various reasons that, for any reason, that it is not a

10  viable class action, then there is no need for anybody to

11  spend the money.

12       I would offer that again, the same stipulations

13  that were offered in the LUCAS case, if the defendant will

14  stipulate that the class is at least a hundred.  Failing

15  that, Your Honor, we need to match the list.  And my

16  expectation is it would take about 60 days from when the

17  defendant gets it to us for the third parties.  If Your

18  Honor built in two weeks of briefing for us, then we would

19  be fine.

20       THE COURT:  All right.  Mr. Skilling, do you

21  have any thoughts?

22       MR. SKILLING:  I have no objection to 60 days.

23       MR. BENNETT:  If the Court please, given my

24  lengthy experience, which is not at all in your position,

25  but if Your Honor sets a trial date, we all respect it as

1   a targeted trial date, but I would ask that the Court also

2   would consider building in an order of a status update

3   from the parties, that we could provide informally -- not

4   informally, but without taking the Court's hearing time,

5   we would collectively file a status update to Your Honor

6   maybe after 30 days from now so that Your Honor would have

7   some idea of where the train is.

8        THE COURT:  All right.

9        MR. SKILLING:  I just had one thing.  Our

10  opposition to the motion to amend is due, I believe,

11  Friday.  I didn't know how -- obviously, for the record,

12  it is an individual case.  And of course we have preserved

13  our objections regarding class discovery.  But how that

14  may or may not affect the scheduling in the matter if it

15  is filed and then ultimately a motion for cert is filed,

16  how that may affect the calendar.

17       THE COURT:  All right.  Your response is due on

18  Friday?  All right.  Let me suggest this:  Today is May

19  12th.  I'm going to make an effort to get this order out

20  to you all by Friday of this week.  And then what I would

21  like is a status report from you, Mr. Bennett, by close of

22  business on the 15th of June, how things are going.

23  That's about 30 days or so.  And then another report, July

24  17th.  That's about 60 days or so out.  At that point,

25  once I get the status report, I would issue an order

1   providing a briefing schedule on the class issue.  And I

2   would like to resolve that class issue before August 15th.

3   So we will give you ten days or whatever to brief this

4   issue, and then somewhere in early August or somewhere in

5   there, we will have, if necessary, a hearing on this

6   issue.  Because once you get that done, out of the way, if

7   it is in, that may impact what goes on down the road

8   obviously in terms of the trial date that I intend to set

9   now, or it will just be out of the way and we will have a

10  case and we will deal with it.

11          So now in terms of the trial date, I would

12  suggest putting it off a little bit here, but I think

13  that's necessary.  What about November 19th?  That's a

14  Thursday.

15          MR. BENNETT:  Point of personal privilege,

16  Judge.  I don't forget one date, my wife's birthday, that

17  begins 11/19.  If it could be a week earlier or a day

18  later or a week later, I would be appreciative.  If the

19  19th is the only date available, we will be just fine.

20          THE COURT:  We can probably work with you.  What

21  about November 17th?

22          MR. BENNETT:  Much better for the plaintiff,

23  Judge.

24          THE COURT:  Mr. Skilling, is that all right?

25          MR. SKILLING:  November 17th?

```
 1                    THE COURT:  November 17th.

 2                    MR. SKILLING:  That's fine, Your Honor.

 3                    THE COURT:  We will put it down for a 10 o'clock

 4      start.

 5                    MR. BENNETT:  And Judge, of course, the Court

 6      knows there is an additional built-in incentive besides

 7      your own docket management to have that trial expedited.

 8                    THE COURT:  All right.  And if this case is just

 9      the one case, how long do you think it would take to try

10      that?

11                    MR. BENNETT:  One day.

12                    MR. SKILLING:  One day.

13                    THE COURT:  All right.  I think that's all that

14      we can accomplish today.  But as I said, the one thing I

15      want you to all understand:  My colleagues look through

16      our cases and see a case of this vintage on my docket, and

17      the question is, "What the hell is wrong with Spencer?"

18      And believe me, this case is going to disappear from my

19      life as quickly as I can make it disappear.  So just be

20      ready to work.  All right, thank you all very much.  I

21      appreciate it.

22                    MR. SKILLING:  One clarification, Judge.  Would

23      there be any opportunity for comment on the status report

24      by the defendant?

25                    THE COURT:  Sure.  I'll get the status -- you
```

1   serve your status report on them and then you all can have

2   a few days to respond to it.

3            MR. SKILLING:  Yes, Your Honor.  Then the

4   briefing schedule on the class issue, I'm sort of unclear.

5   Would that be on the numerosity or on the amendment or it

6   would be a class certification standard?

7            THE COURT:  No, this would be on the full class

8   certification.  But as I understand it, numerosity is the

9   big issue.  I'm sure there might be others, but we

10  would --

11           MR. SCHULTZ:  Actually, numerosity is one

12  component but there's going to be a lot of issues and we

13  have talked about those in our briefs and Mr. Skilling hit

14  on them as well.  Our biggest issue is not just are there

15  people who are subs on an AMEX account in which GC through

16  Micro Bilt accessed a report, whether or not it is a

17  consumer issue.  That's another issue, whether we even

18  have a consumer report here.  But regardless of that, the

19  bigger thing, I think, is there is going to be a lot of

20  individual inquiries which we are talking about, these are

21  supps, if these supps used the card they are obligated on

22  it so even if it is a consumer report, they therefore had

23  a permissible purpose to pull it.  So that's a significant

24  issue.

25           THE COURT:  I understand.  But what I am hearing

1    from you is, the question is whether or not a particular

2    person who had, was a supplemental was a supplemental who

3    had an obligation or a supplemental who did not have an

4    obligation.

5            MR. SCHULTZ:  That is the issue.  How are you

6    going to figure that out?  Primaries often say, "My spouse

7    used the card."  Therefore they are obligated as well, the

8    supps, under the law.  That's why Judge Lauck entered the

9    order saying let's look into viability.  It wasn't just an

10   issue of numerosity.  It was viability on those types of

11   issues and that's why we proposed a sample to demonstrate

12   there's going to be lots of these types of issues in

13   connection with the class.

14           MR. BENNETT:  We disagree, Judge.  In fact, the

15   issue is that the discovery that we have sought on the

16   question of numerosity is this issue.  We know that, we

17   don't know of any supplementals on whom GC Services

18   accessed one of these reports in which it had any

19   information in its files whatsoever that that supplemental

20   was obligated, and certainly GC Services has already

21   testified it would not have pulled any of these reports

22   for the purpose of enforcing an obligation.  But these are

23   legal issues that I'm sure the defendant, as in any class

24   case, will come up with as many arguments as they can.

25           THE COURT:  The point is, whatever your

1    arguments are going to be, whatever they are, they are

2    going to be made within that briefing period.

3            MR. SCHULTZ:  Some of these are going to be

4    addressed in our response to the motion for leave to file

5    an amended complaint that raises the class claim for the

6    first time.  That's going to be in our response that will

7    be filed this week.

8            THE COURT:  I'll take a look at it.

9            MR. SKILLING:  Judge, just generally, I assume

10   that discovery is extended for 60 days, the implication of

11   the Court's ruling?

12           THE COURT:  That's right.

13           MR. SKILLING:  I guess for these issues and for

14   these purposes.

15           THE COURT:  For these issues and the purposes

16   that were discussed today.  Thank you.

17           (Proceedings adjourned at 11:30 a.m.)

18                  CERTIFICATE OF REPORTER

19       I, Jeffrey B. Kull, Official Reporter, certify that

20   the foregoing is a correct transcript from the record of

21   proceedings in the above-entitled matter.

22

23

24   _____/s/_____

25   Jeffrey B. Kull,
     Official Federal Reporter

_____/s/_____

Date