IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| PAMELA G. CAPPETTA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action |
| | ) | No. 3:08cv288 |
| GC SERVICES, LP | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## SECOND AMENDED COMPLAINT

COMES NOW the Plaintiff, PAMELA G. CAPPETTA, (hereafter, "the Plaintiff") by

counsel, and as for her Second Amended Complaint against the Defendant, she alleges as

follows:

1.      This is a class action for statutory and punitive damages, costs, and attorney's fees

brought pursuant to the Fair Credit Reporting Act ("FCRA"). Individual claims are brought

pursuant to the Texas Debt Collection Act ("TDCA"), the Fair Debt Collection Practices Act,

("FDCPA"), and the Credit Repair Organizations Act ("CROA").

## JURISDICTION

2.      The jurisdiction of this Court is conferred by 15 U.S.C. § 1692, 15 U.S.C. § 1681,

15 U.S.C § 1679, and 15 U.S.C. § 1367. Venue is proper in this District and Division, as the

Defendant's violations of the law occurred in this jurisdiction, and the Defendant's registered

office and registered agent is located in Glen Allen, Virginia.

## PARTIES

3.      The Plaintiff is a natural person and resides in the Commonwealth of Virginia.

Plaintiff is a "consumer" as defined by the FDCPA, TDCA, FCRA, and CROA.

4.      Upon information and belief, GC SERVICES LIMITED PARTNERSHIP ("GC Services") is a partnership with its primary headquarters in Texas and which does business in the Commonwealth of Virginia through its registered offices in Glen Allen, Virginia.  It is a "debt collector" as defined and governed by the Fair Debt Collection Practices Act and the Texas Debt Collection Act.  It is a "credit repair organization" and a "person" as defined and governed by the Credit Repair Organizations Act.  It is a "user" of credit reports as defined by the Fair Credit Reporting Act.

## FACTS

5.      In or about May of 2007, the Defendant began the collection of a debt owed to American Express by Plaintiff's estranged husband, Robert Cappetta, (hereafter, "the account") and was unsuccessful in its efforts to persuade Robert Cappetta to pay the account.

6.      The Defendant acted as a debt collector in all of its contacts with the Plaintiff.

7.      Shortly after the account was assigned to the Defendant from American Express, the Defendant accessed at least one "skip trace" consumer report regarding the Plaintiff – specifically, the full version of an Experian Address Update report.  The Defendant also purchased the "Direct Check" and "Demographics" add-ons to this product from Experian.  A full description of this report and the data fields contained therein is attached as "Exhibit 1" to this Complaint.

8.      When the Defendant ordered the "full" version of this product from Experian through Microbilt, it was aware that the Fair Credit Reporting Act required the Defendant to have a permissible purpose for accessing the report, and that Experian required the same.

9.      The Defendant certified to Experian via a blanket certification that its permissible

2

purpose for obtaining the report was to be used:

    (a)    in connection with a "credit transaction" involving the consumer on whom the information was to be furnished; <u>and</u>

    (b)    in conjunction with the collection of the consumer's account, in accordance with 15 U.S.C. § 1681b(a)(3)(A).

10.    At the time it obtained the Plaintiff's consumer report pursuant to this certification, the Defendant knew that it was not in possession of any application on the account and that Plaintiff was only listed, at most, as a supplemental cardholder on the account.

11.    The American Express account was not the Plaintiff's account.

12.    American Express does not issue joint accounts.

13.    In response to the electronic communication containing the false certification, Experian furnished to the Defendant a consumer report that regarded the Plaintiff on or about May 21, 2007.

14.    The Experian consumer report revealed Plaintiff's private financial information to the Defendant, a complete stranger to the Plaintiff.

15.    Upon information and belief, the Defendant also accessed additional consumer reports from other sources regarding the Plaintiff, including, but not limited to MicroBilt (the "Credit Commander" report which included the Experian Full Address Update Report).

16.    The Defendant determined from these consumer reports that Plaintiff had an excellent credit rating and also obtained her personal identifiers, addresses, telephone numbers, and information about her creditors and employer.

17.    On that same day, May 21, 2007, one of the Defendant's representatives called the Plaintiff's place of employment and demanded that Plaintiff pay $10,444.59 on the Robert

Cappetta account.

18.     Plaintiff was never an obligor on the Robert Cappetta account.

19.     Plaintiff never applied for the Robert Cappetta account.

20.     Plaintiff never held or used a plastic charge card related to the Robert Cappetta account.

21.     American Express never represented to the Defendant that Plaintiff was obligated on the Robert Cappetta account.

22.     American Express never provided Plaintiff's social security number to the Defendant regarding the Robert Cappetta account.

23.     Plaintiff's ex-husband, Robert Cappetta, had opened the American Express account using a post office box that Plaintiff had no knowledge of and that her husband had previously told her that he had closed.

24.     When the Defendant's employee spoke with the Plaintiff, the collector began reciting to the Plaintiff numerous items of personal and private information which regarded the Plaintiff including but not limited to Plaintiff's social security number, home address, previous addresses, the identity of her employer, her employer's phone number, and her date of birth.

25.     Plaintiff was alarmed at the amount of information that the Defendant had obtained regarding her and asked the Defendant where it had obtained the information.

26.     The Defendant's employee told the Plaintiff that GC Services was in possession of a copy of the written application for the account, that the Plaintiff's personal information was contained therein, as well as Plaintiff's signature, and that she could prove to the Plaintiff that the Plaintiff had signed the application.

27.     The Defendant never possessed a copy of any application with regard to the

2

account at any time and was not in possession of the same when its employee spoke to the Plaintiff.

28.    Given that the account was opened in 1994, even American Express did not have a copy of the application during the time that the Defendant was collecting on the account, and it was unable to produce the same in this litigation to date.

29.    Upon information and belief, one or more of the items of information referenced in paragraph 24 was obtained by the Defendant from the Experian Address Update Report that it obtained regarding the Plaintiff.

30.    The Defendant's employee then began listing each of the charges on the account, which included, but was not limited to, thousands of dollars in motel charges presumably made by Robert Cappetta, and that Plaintiff had no knowledge of and had certainly not made.

31.    The Plaintiff informed the Defendant that she had no knowledge of any of these charges and had no knowledge that this credit account even existed prior to the Defendant's call to her.   Plaintiff had learned a few days earlier in conjunction with a mortgage application that American Express was reporting that she was an authorized user on an unknown account within her credit file, but at the time of the call, Plaintiff was not able to connect this "authorized user" reporting with the assertions made by the Defendant as to her status as an obligor.

32.    The Defendant told the Plaintiff that she was nonetheless legally responsible for paying for all of the charges, interest, and penalties on the account, including, but not limited to Plaintiff's husband's motel charges, and that the debt needed to be paid in full within seven (7) days in the amount of $10,444.59.

33.    The Defendant told the Plaintiff that if she did not comply within 7 days, it would be 'forced' to place a severely derogatory collection notation on her credit report.

34.     Plaintiff asked the Defendant to provide her with the documentation that it claimed to have in its possession regarding the account, including: the copy of the original application from 1994, a complete list of all charges made, and copies of the original account notes made by American Express.

35.     The Defendant promised that it would provide these to her.

36.     The Plaintiff said that she would like to review these documents and discuss them with her attorney prior to paying on the account.

37.     The Defendant then immediately began berating and ridiculing the Plaintiff for her cautious approach and told her that "your lawyer will tell you not to pay this account and your friends will tell you not to pay this account, but what they can't tell you is how horribly this is going to affect your credit rating in the future."

38.     The Defendant then offered advice to the Plaintiff regarding her credit report and credit score, including, but not limited to, the representation that the placement of the threatened collection notation on Plaintiff's credit report would "have the same effect on [her] credit score as if [she] had filed for bankruptcy," but that paying the amount demanded immediately would allow Plaintiff to retain her good credit standing.

39.     The Defendant again reiterated to the Plaintiff that she could only avoid having this derogatory notation placed on her credit report by paying the full amount of $10,444.59 that it demanded.

40.     The Defendant's employee then 'volunteered' to the Plaintiff that the collector herself had experienced a situation in which the collector's boyfriend had used her credit card without permission and the collector herself ultimately had to personally pay those charges, and that "sometimes you just need to handle it yourself if you want to move on in life."

4

41.    Upon information and belief, the Defendant's employee manufactured this story in its entirety.

42.    Defendant's representations regarding Plaintiff's status as an obligor were false.

43.    Defendant's representations regarding the effect of the threatened collection notation on Plaintiff's credit score were false.  In fact, Plaintiff has learned through discovery that American Express does not permit GC Services to report credit information at all regarding the accounts that GC Services is collecting for it.

44.    Defendant's sworn certifications to Experian regarding the Plaintiff were false, including, but not limited to, the certification that the Defendant's access of the Plaintiff's credit report was made in conjunction with a credit transaction involving the Plaintiff, that the Plaintiff had an existing credit relationship with the Defendant, that the account was Plaintiff's account, and that the Defendant had therefore had a permissible purpose for accessing her report.

45.    Experian would not have provided a full version of the Address Update Report to GC Services regarding the Plaintiff, but for the false representations described in paragraph 44.

46.    Defendant's representations to the Plaintiff regarding the 7-day timeframe within which the debt was 'required' to be paid were false.

47.    No such deadline existed.

48.    The 7-day timeframe asserted by the Defendant was not imposed by American Express, which had given the Defendant 90 days to collect on the account.

49.    The 7-day timeframe was intended by GC Services to create a false sense of urgency to extract money from the Plaintiff that she did not owe, in that it knew by virtue of its review of Plaintiff's consumer reports that she had an impeccable credit rating and would likely wish to protect it.

5

50.    However, Plaintiff was also extremely concerned that the closing date of the refinancing of her home was approaching very shortly, which was contingent on her excellent credit score, and, thus, based on the Defendant's misrepresentations to her, including, but not limited to: (1) its false assertion that Plaintiff was an obligor on the account; (2) that the amount demanded had to be paid within 7 days to avoid the Defendant's "obligation' to severely damage her credit report and credit score; (3) that such damage would have the same impact on her credit score as a bankruptcy notation; and (4) that the Defendant was in possession of a signed application which contained Plaintiff's social security number, date of birth, and other personal information which regarded her, Plaintiff succumbed to the Defendant's extortion efforts and paid $10,444.59 that day over the phone.

51.    Thus, Plaintiff relied on the Defendant's misrepresentations, specifically including those set forth in the preceding paragraph, to her detriment.

52.    When Plaintiff concluded the call with the Defendant, she collapsed emotionally in her office, while visibly shaking and crying uncontrollably.

53.    Plaintiff's officemate, an acupuncture therapist as well as a registered nurse, noted that Plaintiff's heartbeat was racing such that she became extremely concerned for Plaintiff's health.

54.    She then cancelled all of the Plaintiff's appointments for that morning as well as an appointment of her own and provided medical care to the Plaintiff in their office.

55.    Following this traumatic incident, and upon reflection, Plaintiff later realized after conversations with various people that she had no legal obligation to pay on the account, and that the Defendant had fraudulently extracted payment from her.

56.    Plaintiff then contacted the Defendant via telephone and asked that it provide her

6

with a copy of the 1994 credit application that it had supposedly confirmed that she had signed, as well as the account notes and the complete list of account charges that it had previously promised to provide to her.

57.    However, when Plaintiff communicated this request, the Defendant's employee immediately took a belligerent and aggressive tone and refused to let the Plaintiff speak to the female collector who had extracted payment from her.

58.    The Defendant's employee brusquely told the Plaintiff that her file was closed, and that GC Services would not provide anything to the Plaintiff other than a letter confirming her payment.

59.    This employee further told the Plaintiff that GC Services had no legal obligation to provide her with anything and that Plaintiff was legally required to ask American Express for a copy of the application herself.

60.    The Defendant then volunteered that Plaintiff would be wasting her time by doing so, and that its experience with American Express was that American Express would only send her a copy of the application "in response to a subpoena."

61.    Plaintiff nonetheless contacted American Express directly.

62.    When Plaintiff called American Express, she provided her name, address, and social security number, but American Express's employees and agents refused to discuss the account with her, because she was not listed on the account.

63.    Plaintiff spoke to approximately 7 to 10 different people at American Express, and after much time and an exhaustive effort on the phone, she finally reached an individual in the office of the Executive Vice-President in charge of consumer relations.

64.    Initially, even this individual refused to discuss the account with the Plaintiff, but

7

as Plaintiff became emotionally upset and informed this individual of the complete history of

what had transpired with GC Services, this individual finally relented.

65.     Plaintiff was informed by American Express that she was not listed as an obligor

on the account, and that it did not have her social security number or any other information

regarding her associated with the account, other than a notation that her name, and her name

alone, was noted as an "authorized user" on the account.

66.     American Express confirmed that it had never instructed GC Services that

Plaintiff was responsible for the account and had never provided GC Services with Plaintiff's

social security number.

67.     On or about August 8, 2007, Plaintiff wrote to GC Services and demanded a

refund of the monies paid, because it was not her account.

68.     GC Services thereafter and to this day has refused to return Plaintiff's money to

her.

## FIRST CLAIM FOR RELIEF
## FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681b(f)
## ("the FCRA Class Claim")

69.     Plaintiff realleges and reincorporates paragraphs 1 through 68 above as if fully set

out herein.

70.     The Defendant willfully and intentionally violated the Fair Credit Reporting Act,

15 U.S.C. § 1681b(f) by using or obtaining one or more consumer reports that regarded Plaintiff

and the putative class members without a permissible purpose.

71.     The Defendant willfully and intentionally violated the Fair Credit Reporting Act,

15 U.S.C. §1681b(f) by failing to certify its permissible purpose for accessing the consumer

8

reports which regarded Plaintiff and the putative class members prior to its access of their reports.

72.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this claim for herself and on behalf of a class ("the FCRA class") of similarly situated individuals initially defined as follows:

a)      All natural persons with addresses within the United States who were listed only as non-obligor "supplemental cardholders" on any account assigned by American Express to the Defendant for collection; and

b)      regarding whom the Defendant obtained a consumer report from Experian directly, or through a third-party, within the two-year period preceding the filing date of the Complaint.

Excluded from the class definition are any employees, officers, directors of GC Services, and any legal representatives, heirs, successors, and assignees of GC Services, and any judge assigned to hear this action.

73.     **Numerosity, Fed. R. Civ. P 23(a)(1)**  Upon information and belief, the Plaintiff alleges that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by GC Services, and the class members may be notified of the pendency of this action by published and/or mailed notice.

74.     The exact number of class members is known only by GC Services, which has refused to provide discovery in this regard to date.  However, Plaintiff is in possession of Experian's invoices to GC Services for the defined time period.  These invoices list the names of the individuals for whom the Full Address Update Report was sold.  Thus, upon the Defendant's compliance with discovery and its provision of the names of the supplemental cardholders listed

9

on the American Express accounts assigned to it for collection, the two lists can be matched and the members of the class will be readily identifiable.

75.     For example, the Plaintiff is aware that the Defendant obtained roughly 2,000 Address Update reports from Experian in May of 2007 alone.  The Fourth Circuit has held that putative classes consisting of as few as 18 members will satisfy the numerosity requirement in some cases, and generally, 40 members will nearly always satisfy the numerosity requirement. Thus, if even 2% of these consumer reports regarded American Express authorized users, the numerosity requirement would be satisfied in this month alone and certainly would be satisfied within the two-year class definition period.

76.     The Defendant's records produced in discovery reveal that it receives, on average, approximately 7,000 accounts per month for collection from American Express.

77.     The Defendant's testimony in this case is that between 50-75% of these accounts have a "supplemental cardholder" listed on the account.

78.     Therefore, for the 36-month period beginning May 9, 2006 and running through the present, it appears that approximately 250,000 accounts have been assigned to the Defendant for collection from American Express.  Thus, by the Defendant's testimony, it would appear that 125,000 to 190,000 of these accounts have supplemental cardholders listed.

79.     During the same period, and based on a conservative monthly average of 1,500 Address Update reports per month as reflected in the Experian invoices, GC Services obtained at least 54,000 Address Update Reports.

80.     Therefore, the Court may draw a reasonable inference that at least 40, and certainly 14, of the 125,000 supplemental cardholders were the subject of the 54,000 Address Update reports obtained by GC Services between May 9, 2006 and the present.

10

81.    **Predominance of Common Questions of Law and Fact**, Fed. R. Civ. P.

**23(a)(2)**  Common questions of law and fact exist as to all members of the putative class.  These

questions predominate over the questions affecting only individual members.

82.    **Typicality.  Fed. R. Civ. P. 23(a)(3)**  Plaintiff's claims are typical of the claims

of each putative class member.  Plaintiff is entitled to relief under the same causes of action as

the other members of the putative class.

83.    **Adequacy of Representation.  Fed. R. Civ. P. 23(a)(4)**  Plaintiff is an adequate

representative of the putative class, because her interests coincide with, and are not antagonistic

to, the interests of the members of the putative class she seeks to represent; she has retained

counsel competent and experienced in such litigation; and she has and intends to continue to

prosecute this action vigorously.  The interests of members of the putative class will be fairly and

adequately protected by Plaintiff and her counsel.

84.    **Superiority  Fed. R. Civ. P. 23(b)(3)**  Questions of law and fact common to the

putative class members predominate over questions affecting only individual members, and a class

action is superior to other available methods for fair and efficient adjudication of the controversy.

The damages suffered by each member are such that individual prosecution would prove burdensome

and expensive given the complex and extensive litigation necessitated by GC Services' conduct.

Even if the members of the class themselves could individually afford such litigation, it would be an

unnecessary burden on the Courts.  Furthermore, individualized litigation presents a potential for

inconsistent or contradictory judgments and increases the delay and expense to all parties and to the

court system presented by the complex legal and factual issues raised by GC Services' conduct.  By

contrast, the class action device will result in substantial benefits to the litigants and the Court by

allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

85.   **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2)**  Class

certification is appropriate, because GC Services has acted on grounds generally applicable to the

class, making appropriate equitable injunctive relief with respect to Plaintiff and the putative class

members.

86.   Based on the Defendant's lack of a permissible purpose for accessing the consumer

reports of the class members <u>and</u> its failure to certify a valid permissible purpose to the credit

reporting agency before obtaining their consumer reports – separate and discrete requirements of the

statute -- the Defendant is liable to the Plaintiff and each of the putative class members for statutory

damages of $1,000.00 per violation of the FCRA, as well as punitive damages in an amount to be

decided by the jury, and attorney's fees and costs pursuant to 15 U.S.C. § 1681n and 1681o.

87.   The Plaintiff, on behalf of her fellow class members, is further entitled to declaratory

and injunctive relief pursuant to Rule 23(b)(2) requiring GC Services' future compliance with these

requirements of the FCRA in the future.

**SECOND CLAIM FOR RELIEF**
**TEXAS DEBT COLLECTION ACT**
**TEXAS FINANCE CODE § 392.100, et seq.**

88.   Plaintiff realleges and reincorporates paragraphs 1-87 above as if fully set out herein.

89.   The Defendant violated the Texas Finance Code, § 392.100, et seq, by its actions

which include, but are not limited to:

a.   using criminal means to cause harm to a person or property of a person, including its successful extortion of money from the Plaintiff by using false pretenses thus committing numerous criminal offenses, including the crime of felony wire fraud pursuant to 18 U.S.C. §1343;

b.   using language intended to abuse unreasonably the hearer;

c.   placing telephone calls without disclosing the name of the individual making the call and with the intent to annoy, harass, or threaten a person at the called number;

d.   using a name other than the true business or professional name or the true personal or legal name of the debt collector while engaged in debt collection;

12

> and
>
> e.     using other false representations and deceptive means to collect a debt or obtain information about a consumer.

90.     As a result of the actions taken by the Defendant, which include but are not limited to its threats made against Plaintiff Cappetta personally and her credit rating, its attempts to collect money which was not properly due and owing, its false representations, verbal abuse, extortion of the Plaintiff, and other violations set forth herein, Plaintiff has experienced severe emotional distress evidenced by one or more of the following: anger, sleeplessness, crying, anxiety, fear, and humiliation. Plaintiff Cappetta has also experienced a loss of concentration and the ability to perform her job properly, as well as other economic and non-economic damages.

91.     The Defendant's conduct, actions, and inaction were committed knowingly and intentionally, rendering it liable for treble damages in an amount to be determined by the Court pursuant to the remedies subsection of the Texas Business and Commerce Code § 17.50(b)(1).  In the alternative, they were committed negligently, entitling Plaintiff to an award of actual damages pursuant to Texas Business and Commerce Code § 17.50(h).  Plaintiff is also entitled to an award of attorneys' fees and costs in accordance with the statute.

### THIRD CLAIM FOR RELIEF
### FAIR DEBT COLLECTION PRACTICES ACT
### § 15 U.S.C. 1692, et seq.

92.     The Plaintiff realleges and incorporates paragraphs 1 through 91 above as if fully set forth herein.

93.     Defendant violated the Fair Debt Collection Practices Act in multiple ways, including by example only and without limitation: by failing to provide Plaintiff with the initial notice required by § 1692(g) advising Plaintiff of her right to validation of the debt in a timely manner; by misrepresenting that the Plaintiff was an obligor on the account; and by misrepresenting that

13

American Express had communicated the Plaintiff's social security number to the Defendant and that she was an obligor; and by misrepresenting that it was in possession of the account application.

94.     As a result of the Defendant's violations of the FDCPA, the Defendant is liable to the Plaintiff for actual and statutory damages, attorney's fees and costs pursuant to 15 U.S.C. § 1692k.

95.     As a result of the Defendant's violation of the FDCPA, the Plaintiff suffered actual damages for emotional and mental anguish, fear, frustration, and anxiety in her attempts to recover the funds that were extorted from her, as well as the loss of use of her funds. Such damages are recoverable pursuant to 15 U.S.C. § 1692k.

## FOURTH CLAIM FOR RELIEF
## CREDIT REPAIR ORGANIZATIONS ACT
## 15 U.S.C. § 1679, et seq.

96.     The Plaintiff reiterates and incorporate the allegations contained in paragraphs 1-95 above as if fully set out herein.

97.     The above-alleged false statements, actions, and omissions of the Defendant, including, but not limited to, its advice to Plaintiff regarding her credit score, as well as its false statements made to the Plaintiff and to Experian, a national credit reporting agency, violated the CROA, 15 U.S.C. § 1679, et seq.

98.     The Defendant is liable to the Plaintiff for all actual damages sustained by the Plaintiff; for punitive damages for such amount as the Court may allow; and for costs and for attorneys' fees, pursuant to 15 U.S.C. § 1679g(a).

99.     The Plaintiff is additionally entitled by statute to declaratory and injunctive relief requiring the Defendant's future compliance with the CROA.

WHEREFORE, Your Plaintiff and her class members demand judgment to recover statutory damages, actual damages, treble actual damages, punitive damages, and attorney's fees and costs

14

from the Defendant in an amount to be determined by the Court.   The Plaintiff also moves this Court

for declaratory and injunctive relief, including, but not limited to, an Order forbidding the Defendant

from obtaining consumer reports which regard consumers who are listed as supplemental cardholders

on the American Express accounts that it collects.

**TRIAL BY JURY IS DEMANDED**.

Respectfully submitted,
**PAMELA G. CAPPETTA**,

_____/s/_____
Matthew J. Erausquin, VSB#65434
Counsel for the Plaintiff
CONSUMER LITIGATION ASSOCIATES, P.C.
3615-H Chain Bridge Road
Fairfax, VA  22030
Tel:    703-273-7770
Fax:    888-892-3512
matt@clalegal.com

15