IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| PAMELA G. CAPPETTA )<br><br>Plaintiff, )<br><br>v. )<br><br>GC SERVICES, LP )<br><br>Defendant. ) | Civil Action No. 3:08cv288 |

**DEFENDANT'S REPLY MEMORANDUM
IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS**

Defendant, GC Services, LP ("GC Services") respectfully submits this reply memorandum in support of its motion for judgment on the pleadings.

**INTRODUCTION**

Plaintiff's opposition to the pending motion for judgment on the pleadings is long on rhetoric but short on substance. For a series of straightforward reasons, Plaintiff is simply wrong about the legal standards governing her claims, and fails to offer any proper basis why this action should be permitted to proceed. While Plaintiff is wrong about the law for reasons discussed in detail below, she also misrepresents the procedural posture of the case in ways that require immediate correction. Plaintiff claims that the Court previously considered and rejected the same arguments presented in GC Services' motion. Not so. The motion to dismiss filed at the outset of this action was addressed to a complaint that did not even include claims under the Fair Credit Reporting Act, 15 USC § 1681 et seq. (2008) ("FCRA"), the Credit Repair Organizations Act 15 U.S.C. § 1679, et. seq.,(2008) ("CROA"), or the Texas Debt Collection Act, Tex. Fin. Code § 392.001 ("TDCA"); none of the arguments raised here was considered in that prior

1

proceeding.  And Docket Entry 33, which Plaintiff contends represents a rejection of the arguments raised here, is nothing more than a magistrate judge's ruling allowing Plaintiff to file an amended complaint notwithstanding GC Services' claims of untimeliness and discovery improprieties.  Plaintiff's representation about the context in which the present motion arises is, in short, flatly wrong, and she should not be rewarded for her misleading characterization.

On the merits, each of Plaintiff's claims fail as a matter of law.  *First*, her opposition brief does nothing to resuscitate her FCRA claim.  Plaintiff begins by arguing that statutory amendments enacted in 1996 somehow preclude GC Services from having any "permissible purpose" to access her consumer report, but that is not the case.  The viability of GC Services' permissible purpose is the same under both the pre- and post-1996 versions of the statute, since, taking Plaintiff's allegations as true, she neither "initiated" nor was "involved" in making charges to the American Express credit card account that was the subject of GC Services' collection efforts.  But in the Fourth Circuit and elsewhere, the legal standard for assessing permissible purpose is not what the consumer actually did, but whether there was a reasonable basis on the part of GC Services for believing that a permissible purpose existed at the time to request the consumer report.  Under established case law, the specific allegations about the named Plaintiff's specific circumstances – including that she was an authorized user of an American Express card, that the account was delinquent, and that American Express reported the account to credit bureaus in her name – satisfy this standard.  Plaintiff's FCRA claim therefore, must be dismissed.  (See Section I *infra*.)

*Second*, Plaintiff's remaining claims are barred by the voluntary payment doctrine. Plaintiff's argument that the FDCPA and CROA somehow preempt the voluntary payment doctrine are based exclusively on two out-of-circuit district court decisions that are inconsistent

with other decisional law, and in any case her argument for conflict preemption fails under the Supreme Court's recent decision in *Wyeth v. Levine*. And her attacks on the elements of the voluntary payment doctrine are inadequate as a matter of law; she cannot establish that she paid the disputed debt under duress since GC Services allegedly said nothing more to her than that nonpayment would negatively affect her credit record, and she cannot establish that she lacked information about the circumstances since she told a GC Services representative she did not owe the debt in her very first conversation. (*See* Section II *infra*.)

**Third**, Plaintiff's arguments about the TDCA verge on the absurd. In attempting to defend application of a Texas statute to a Virginia claimant suing in Virginia, Plaintiff cites a variety of cases from jurisdictions that apply a government interest analysis to choice-of-law questions – ignoring the fact that Virginia follows the rule *lex loci delicti*. There is no question but that Texas law cannot be applied to the debt-collection claims of a Virginia resident who received debt-collection phone calls in Virginia. The Fourth Circuit itself has expressly so held. Plaintiff's Texas claim thus must be dismissed. (*See* Section III *infra*.)

**Finally**, Plaintiff abandons the CROA claim alleged in her complaint, and seeks instead to pursue a new theory that, even if GC Services is not a "credit repair organization," it is a "person" covered by the statute and thus can be sued under a different statutory provision. That argument has been rejected by every court to have considered it, so far as our research has revealed. (*See* Section IV *infra*.)

## ARGUMENT

I. **PLAINTIFF'S ALLEGATIONS ESTABLISH THAT GC SERVICES HAD A PERMISSIBLE PURPOSE TO OBTAIN A CONSUMER REPORT UNDER BOTH 15 U.S.C. § 1681b(a)(3)(F)(i) AND 15 U.S.C. § 1681b(a)(3)(A).**

### A. THE COMPLAINT ESTABLISHES ALL THE ELEMENTS OF A "LEGITIMATE BUSINESS NEED" FOR PURPOSES OF SECTION 1681b(a)(3)(F)(i).

Plaintiff erroneously suggests that GC Services lacked a permissible purpose under 15 U.S.C. § 1681b(a)(3)(F)(i) based on three fundamental misreadings of the statute. *First*, Plaintiff argues that the 1996 amendments to the statute, which changed the phrase "transaction involving the consumer" to "transaction that is initiated by the consumer," compels a finding that GC Services lacked a permissible purpose in pulling Plaintiff's alleged consumer report. (See Pl. Mem. at 4-6.) To the contrary, the "slight variation in language between the current and pre-1996 version," *Sather v. Weintraut*, 2003 U.S. Dist. LEXIS 12435, at *10 n.5 (D. Minn. 2003), has no bearing on GC Services' argument. Assuming the truth of Plaintiff's allegations for purposes of this Rule 12 motion only, she neither "initiated" nor was "involved" in the procurement of the relevant American Express card or the specific charges she now disputes. Thus, the amended statutory language is immaterial to the outcome here.

*Second*, Plaintiff's analysis is wrong, because she incorrectly narrows her analysis to the charges made on her account as the only relevant "business transaction." While Plaintiff focuses on the specific charges to the account, federal courts have taken a broader approach and have made it clear that the "business transaction" at issue here includes not just the underlying charges, but the American Express account itself, for which she was an authorized user. *See Trikas v. Universal Card Services Corp.*, 351 F. Supp. 2d 37, 42 (E.D.N.Y. 2005) (bank has "business relationship" with its cardholders). Plaintiff has not alleged that GC Services knew

4

when it requested her consumer report that her husband had never told her that he requested a card be issued on the account in her name, that she did not consent to the request for a supplemental card, or that she had never made any charges with the card. Under *Trikas*, Plaintiff has failed to allege that GC Services did not have reason to believe that she had initiated a business transaction with American Express.

**Third**, Plaintiff argues that GC Services cannot avail itself of Section 1681b(a)(3)(F)(i) because she allegedly did not initiate the underlying transactions. But the FCRA does not require that the relevant consumer initiate the transaction at issue; it requires only that the user's **purpose** be to use the consumer report in connection with a transaction that is initiated by the consumer. Plaintiff's proposed interpretation ignores the broad statutory "purpose" language in favor of an unduly myopic interpretation that is at odds with the judicial consensus that, "[i]n determining whether a consumer report was obtained for a permissible purpose § 1681b(a)(3)(F) should be broadly construed." *Minter v. AAA Cook County Consolidation, Inc.*, 2004 U.S. Dist. LEXIS 13629, at *13 (N.D. Ill. July 19, 2004) (quoting *Ippolito v. WNS*, 864 F.2d 440, 451 n. 11 (7th Cir. 1988)).

The most basic definition of the statutory term "purpose" encompasses a person's future "intention." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1993) at 949. The forward-looking nature of the permissible purpose inquiry is underscored by the statutory text focusing on how the user "intends to use" the consumer report. 15 U.S.C. § 1681b(a)(3)(A)-(E).[1] Established case law thus makes clear that the inquiry is not whether the user's intent turns out to be well founded after the fact, but whether the user had a basis for its intended use *ex ante*.

---

[1] While Section 1681b(a)(3)(F) does not itself use the phrase "intends to use," its use of the phrase "**otherwise** has a legitimate business need" makes clear that that phrase is intended to be incorporated in Section 1681b(a)(3)(F).

Perhaps the best example of this proposition is *Korotki v. Attorney Servs. Corp.*, 931 F. Supp. 1269, 1272 (D. Md. 1996), a district court decision later affirmed by the Fourth Circuit. As here, *Korotki* involved allegations that the Plaintiff, whose consumer report was obtained by a purported creditor, did not actually owe the debt at issue. The district court held that the creditor had a permissible purpose notwithstanding any ex post challenge to the underlying debt because, "so long as a user has reason to believe that a permissible purpose exists, that user may obtain a consumer report." *Id.* at 1276. The Fourth Circuit affirmed, explaining that the permissible purpose provision of the FCRA "refer[s] to the needs and object[ives] of the individual to whom the report is furnished, not the needs of the person about whom the report is furnished." *Korotki v. Thomas, Ronald & Cooper, P.A.*, 1997 U.S. App. LEXIS 34157, at 6-7 (4th Cir. Dec. 5, 1997).

Under the *Korotki* analysis, the question for the Court thus is not whether Plaintiff actually initiated the issuance of the supplemental card in her name or was involved in making charges to the American Express account; for purposes of this motion only, the Court may assume the negative. The question is whether the facts alleged in the complaint provided GC Services a reasonable basis to believe such a transaction existed. The answer is plainly yes. The complaint alleges that an American Express account was opened; that Plaintiff's name was associated with the account as an authorized user who could have incurred charges on the account; and that the account was reported to the consumer reporting agencies in Plaintiff's name.[2] Those facts, affirmatively alleged by Plaintiff, suffice to establish a permissible purpose. The outcome does not change merely because Plaintiff also alleges facts that, if true, would give

---

[2]     Plaintiff's suggestion that GC Services "could not have known that before it obtained the report" and thus cannot rely on this fact is misplaced. The fact that a consumer report contains information appearing to confirm the basis on which the report was requested is generally regarded by courts as relevant to the permissible purpose inquiry. *See, e.g., Breese v. TRIADvantage Credit Servs.*, 393 F. Supp. 2d 819, 822 (D. Minn. 2005) ("this is not a case

Case 3:08-cv-00288-JRS   Document 170   Filed 07/24/09   Page 7 of 22

her a good defense to a collection claim.

Decisions of other courts reinforce this conclusion.  As summarized by the district court in *Korotki*:

> One question which arises is the standard that a court should use to determine whether a user has shown that he or she has a permissible purpose under § 1681b.  That provision requires that the consumer reporting agency have "reason to believe" that the information it provides to a user will be used for one of the enumerated permissible purposes. The case law suggests that the burden on users is similar.  For example, in *Zeller v. Samia*, 758 F. Supp. 775, 781-82 (D. Mass. 1991), defendant had previously alleged that plaintiff owed him a debt and had obtained plaintiff's consumer report in connection with collection of that debt. ***The court concluded that that purpose in obtaining a consumer report was permissible, even though defendant merely had reason to believe plaintiff owed him a debt, and did not have conclusive proof of that fact***. Likewise, in *Cambridge Title Co. v. Transamerica Title Insurance Co.*, 817 F. Supp. 1263, 1278 (D. Md. 1992), *aff'd*, 989 F.2d 491 (4th Cir. 1993), defendant, who was plaintiff's principal, believed that $ 1.3 million had been misappropriated and obtained plaintiff's consumer report to determine whether plaintiff had misappropriated that money. Judge Harvey concluded that such purpose was permissible even though defendant apparently did not know, but only believed, that it could have been true that the money was missing. ***Thus, so long a user has reason to believe that a permissible purpose exists, that user may obtain a consumer report without violating the FCRA.***

931 F. Supp. at 1276.[3]

### B.     GC SERVICES HAD A PERMISSIBLE PURPOSE UNDER 15 U.S.C. § 1681B(A)(3)(A).

The same *ex ante* standard applicable to the permissible purpose inquiry under Section

---

where White merely suspected Pederson of wrongdoing; rather, his credit report revealed derogatory marks related to Pederson's activities.").

[3]     Plaintiff's suggestion that Section 1681b(a)(3)(F) "is not a supplement" to the other categories of permissible purposes (Pl. Mem. at 6 n.6), and instead is somehow limited to categories expressly stated elsewhere, is inconsistent with the better-reasoned authorities. *See, e.g., Wallace v. Finkel*, 2006 U.S. Dist. LEXIS 42271, at *11 (M.D. Ala. June 22, 2006) ("Construing the 'business need' provision to include only those circumstances specifically enumerated elsewhere in § 1681b(a) would render the 'business need' provision superfluous.").

7

1681b(a)(3)(F) applies to GC Services' separate permissible purpose defense under Section

1681b(a)(3)(A).  That provision permits access to a consumer report where the user "intends to

use the information in connection with a credit transaction involving the consumer on whom the

information is to be furnished and involving the extension of credit to, or review or collection of

an account of, the consumer."  As with the other permissible purpose provision, this provision

requires the Court to analyze whether GC Services had a reasonable basis to believe there was "a

credit transaction involving" Ms. Cappetta and that it intended to use the information it obtained

to collect "an account of" Ms. Cappetta.  The same factual allegations recited above establish

that such a reasonable basis existed.  So far as GC Services was aware, an American Express

account existed with respect to which Ms. Cappetta was an authorized user, and the delinquent

debt amount was reported to consumer reporting agencies in her name.

As with cases interpreting Section 1681b(a)(3)(F), case law interpreting Section

1681b(a)(3)(A) make clear that a user's permissible purpose is not defeated merely because the

user was in error with respect to the status of the underlying debt.  *See, e.g., Korotki*, 1997 U.S.

App. LEXIS 34157 at (interpreting both permissible purpose provisions); *Trikas*, 351 F. Supp.

2d at 42-44 (bank's permissible purpose under Section 1681b(a)(3)(A) not defeated by

customer's showing that he had previously closed his account); *Kennedy v. Victoria's Secret

Stores, Inc.,* 2004 WL 2186613, at *3 (E.D. La. Sept. 29, 2004) (retailer's permissible purpose

not defeated by customer's showing that credit card account was fraudulently opened by store

employee).[4]

Plaintiff's invocation of *Stergiopoulos v. First Midwest Bancorp, Inc.*, 427 F.3d 1043

---

[4]     Plaintiff's primary authority – *Pintos v. Pacific Creditors Assoc.* 561 F.3d 1106, 1110
(9th Cir. 2009) – is not to the contrary.  *Pintos* involved a consumer who did not owe a debt, and
a user that had not basis for thinking she did.  Here, by contrast, Plaintiff alleges she did not owe

(7th Cir. 2005) (*see* Pl. Mem. at 10 n.9) is both puzzling and unavailing. *Stergiopoulos* rejected

a permissible-purpose challenge similar to that mounted by Plaintiff here, affirming summary

judgment in favor of the user. The central teaching of *Stergiopoulos* is that "[a] third party

cannot troll for [consumer] reports, nor can it request a report on a whim." *Id.* at 1047. Instead,

there must be a "direct link" between the consumer and the purpose for which the consumer

report is requested. *Id.* That undeniably exists here: Plaintiff herself alleges that there was a

delinquent account opened in her name and reported to consumer reporting agencies in her name.

She does not (and cannot) allege that GC Services obtained her consumer report "on a whim";

the facts she herself alleges establish that, *ex ante*, there was a reasonable basis for GC Services

to believe there was a direct connection between her and the purpose for which her consumer

report was sought. Under *Stergiopoulos*, that is sufficient to warrant judgment for GC Services.

II.    **PLAINTIFF CANNOT OVERCOME THE VOLUNTARY PAYMENT BAR TO
       CLAIMS II THROUGH IV.**

      A.    **THE VOLUNTARY PAYMENT DOCTRINE IS NOT PREEMPTED BY THE
              FDCPA AND CROA AND CAN COEXIST ALONGSIDE THE FEDERAL
              STATUTES.**

Plaintiff correctly cites the preemption provisions of the FDCPA and CROA but draws

incorrect conclusions regarding their meanings.[5] The FDCPA preemption provision states:

---

the debt, but affirmatively alleges facts establishing the existence of an account in her name with
reported delinquency in her name.

[5]    Even if federal preemption were to dispose of GC Services' voluntary payment defense
to the FDCPA and CROA (which it does not), it can obviously have no application to plaintiff's
TDCA claims. Her assertion that "[t]he dispositive point then is that Texas does not apply
common law waiver and estoppel defenses such as the voluntary payment doctrine to the type of
statutory claim that plaintiff has raised" (Pl. Mem. at 13 n.11) and her citation to *Kennemore v.
Bennett*, 755 S.W.2d 89, 90-91 (Tex. 1988) are puzzling to say the least. As Plaintiff appears to
acknowledge, Virginia choice of law rules control the disposition of her Texas claim, (Pl. Mem.
at 13 n.11), and therefore the choice of law analysis in Section III *infra* will subsume any claim
or defense arising under Texas law. Even standing on its own, *Kennemore* is completely
inapposite and should be of cold comfort to Plaintiff. It does not do as much as to mention the
voluntary payment doctrine; to the extent Plaintiff is of the opinion that *Kennemore*'s rejection of
waiver and estoppel defenses in the specific contractual dispute at issue in the case reflects

> [The FDCPA] does not annul, alter, or affect, or exempt any
> person subject to [it] from complying with the laws of any State
> with respect to debt collection practices, except to the extent that
> those laws are inconsistent with any provision of [the FDCPA],
> and then only to the extent of the inconsistency. For purposes of
> this section, a State law is not inconsistent with [the FDCPA] if the
> protection such law affords any consumer is greater than the
> protection provided by [the FDCPA].

15 U.S.C. § 1692n. CROA contains almost identical language. *See* 15 U.S.C. § 1679j.[6] By its

express terms, far from preempting the voluntary payment doctrine and other debt collection

state laws, the statute makes clear that such laws will continue "[un]alter[ed]" and

"[un]affect[ed]" by the FDCPA unless they are inconsistent with it and only to the extent of such

inconsistency.

### 1)    *The Voluntary Payment Doctrine Is Not Inconsistent With the FDCPA.*

The federal statute does not define what may constitute such an "inconsistency" except

for providing that a state law affording consumers greater protection than the FDCPA is not

inconsistent with it. This hardly means that any state law that defines, bears on, or informs debt

collectors' rights and obligations is inconsistent with the federal statute if the litigation outcome

supplied by the state law does not favor the consumer. The voluntary payment doctrine is a

principle of law that is an integral part of the states' traditional debt-collection regulatory toolkit

and it informs the circumstances under which debts are collected and settled. Contrary to

Plaintiff's assertions that Congress "acted to federalize the field of abusive debt collection

practices," (*see* Pl. Mem. at 12-13), the voluntary payment doctrine, like other state debt

---

negatively on the voluntary payment doctrine, her belief is misguided since the court explicitly
allowed for "an express settlement or other express waiver" to bar plaintiffs' claim. *Kennemore*,
755 S.W.2d at 91.

[6]    Because the preemption language in the FDCPA and the CROA is almost identical and
because most of the preemption discussion in plaintiff's opposition brief centered on the

collection laws, is plainly preserved in parallel with federal statutes and contains nothing "that permits the [FDCPA-]prohibited practice[s]" as Plaintiff would like to make it appear. (*Id*. at 13.) *Agostino v. Quest Diagnostics Inc.*, 2009 U.S. Dist. LEXIS 10451 (D.N.J. Feb. 11, 2009) is a case in point. There, the court denied certification for the plaintiff Refund Interest Subclass because individualized defenses like the voluntary payment doctrine destroyed the typicality of the Subclass FDCPA claims. *See id*. at *53, 97-105. Had the FDCPA trumped the voluntary payment defense, there would have been no need to deny the subclass certification because the FDCPA would have applied commonly (and preemptively) to all subclass members. This conclusion is consistent with established law holding that various state statutes and common-law doctrines relating to debt collection are not preempted by the FDCPA. *See also Dean v. Compass Receivabls Mgmt. Corp.*, 148 F. Supp. 2d 116, 119 (D. Mass. 2001) (holding that the Massachusetts unfair and deceptive practices statute and the regulations issued by the Massachusetts Attorney general defining unfair or deceptive acts or practices with respect to the collection of debts are not preempted by the FDCPA); *In re Scrimpsher*, 17 B.R. 999, 1012 (Bankr. N.D.N.Y. 1982) (finding that a state criminal law affirmative defense affects the meaning and enforcement of the FDCPA).

Plaintiff cites only two out-of-circuit cases for her proposition that the FDCPA preempts the voluntary payment doctrine. (Pl. Mem. at 11-12.) Tellingly, Plaintiff does not cite even one CROA case supporting her preemption thesis. (*See id*.) Plaintiff's assertion that "federal courts have without fail" reached preemption holdings thus is an exaggeration, to put it mildly. The two cases Plaintiff cites appear to be outliers that have not been followed or ever cited with approval in the more than five years since they were decided. They are contradicted by cases

---

FDCPA, this Reply will focus on the FDCPA with an understanding that the arguments made herein dispose of plaintiff's CROA claims as well.

like *Agostino* and fundamentally misconstrue the interests in repose and settlement finality that the voluntary payment doctrine promotes. *See, e.g., Lamont v. Seabury*, 64 Va. Cir. 243, 250 (Va. Cir. Ct. 2004) (explaining that, in the absence of the voluntary payment doctrine, "[a]ny payment made might later be a predicate for a lawsuit upon the reasoning that the payment was not owed."). More importantly, as explained below, they misperceive the fundamentals of federal preemption law.

>    2)    **The Application of Federal Preemption Principles Demonstrates That The Voluntary Payment Doctrine Is Not Preempted By The FDCPA.**

In a recent preemption decision, the Supreme Court reiterated the principle that "in all preemption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was clear and manifest purpose of Congress." *Wyeth v. Levine*, 129 S. Ct. 1187, 1194-95 (2009) (internal alterations and citations omitted). On its face, the FDCPA does not provide a "clear and manifest" definition of when state law is inconsistent and, thus, preempted. Therefore, this is not a case of express preemption. *Cf. Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008) ("[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'") (citation omitted).

The other two possible types of preemption are (1) field preemption, where state law attempts to regulate conduct in a field that Congress intended the federal law exclusively to occupy; and (2) conflict preemption, where state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress or where it is impossible to comply with both state and federal requirements. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 78-80 (1990). That this case does not involve field preemption is evident from the face of the FDCPA,

12

which preserves the power of the states to regulate debt collection practices. *See* 15 U.S.C. §

1692n; *see also Murphy v. Repossession Specialists, Inc.*, 2008 U.S. Dist. LEXIS 50681, at *9

(S.D. Cal. June 24, 2008) (noting "clear congressional intent to allow the states to regulate debt

collection practices").

     The Supreme Court's recent decision in *Wyeth* also makes clear that conflict preemption

is no longer a viable theory in cases where the only conflict is a supposed obstacle to the

objectives of Congress. "If Congress thought state-law suits posed an obstacle to its objectives,

it surely would have enacted an express preemption provision. . . . The case for federal

preemption is particularly weak where Congress has indicated its awareness of the operation of

state law in a field of federal interest, and has nonetheless decided to stand by both concepts and

to tolerate whatever tension there is between them." *Altria Group, Inc.*, 129 S. Ct. at 1200

(citations omitted). Precisely so here: In the FDCPA and CROA preemption provisions,

Congress has indicated its awareness of the operation of state law in the field of debt collection

and has left its operation undisturbed unless the state law is inconsistent with the federal statutes.

     Even if the conflict preemption theory were still viable after *Wyeth*, the voluntary

payment doctrine's requirement of the "absence of fraud or improper conduct on the part of the

payee," *Newton v. Newton*, 118 S.E.2d 656, 659 (Va. 1961), ensures that it is not contrary to the

congressional objective of protecting consumers against abusive debt collection practices. The

fact that the doctrine may bar recovery under the FDCPA in some circumstances does not mean

that it is inconsistent with its goals and objectives. The FDCPA itself contains a bona fide error

defense to actions for violations of the statute. *See* 15 U.S.C. 1692k(c). Were *all* defenses to

FDCPA claims deemed incongruous with the consumer-protection goals of the statute, the bona

fide error defense would have no place in the FDCPA at all. This is underscored by rulings that

state laws are not necessarily inconsistent with the FDCPA merely because they do not afford greater protections to consumers. *See, e.g., Williams v. Northcut & Edwards, P.C.*, No. C-3-96-103, 1999 LEXIS U.S. Dist. LEXIS 12980, at *9-10 (S.D. Ohio July 7, 1999) ("Accepting [the] premise that a claim of invasion of privacy does not afford greater protection than a claim under the federal statute, the Court cannot agree that such a failure renders the state common law claim inconsistent with the FDCPA.").

Finally, there is no basis for the preemption of the voluntary payment doctrine on the grounds of impossibility of compliance with federal law. Being an affirmative defense, the doctrine certainly does not make compliance with any FDCPA provision "a physical impossibility." *Wyeth*, 129 S. Ct. at 1209 (citation omitted); *see also Sanchez v. Client Servs.*, 520 F. Supp. 2d 1149, 1164 (N.D. Cal. 2007) (explaining that the FDCPA preempts "only state laws which make it impossible to comply with both state and federal law, such as where state law requires conduct prohibited by federal law").

B.   **PLAINTIFF'S COMPLAINT REVEALS ON ITS FACE THAT THE VOLUNTARY PAYMENT DOCTRINE IS A VALID DEFENSE AGAINST PLAINTIFF'S CLAIMS II THROUGH IV.**

Plaintiff's argument on the merits of the voluntary payment doctrine is no more persuasive than her preemption argument. Her allegations show that she was fully aware of all relevant facts and that she was not acting under duress as a matter of law.

It is uncontested that Plaintiff believed and represented to GC Services that she had not applied for, used, or even known about the American Express account at issue. (*See* SAC ¶¶ 19-20, 30-31.) Plaintiff also affirmatively alleges that, after a single conversation with a GC Services representative, she paid the disputed debt. (*See* SAC ¶ 50.) In support of her "duress" theory, Plaintiff offers nothing more than GC Services' alleged statement that nonpayment would negatively affect her credit record. (*See* Pl. Mem. at 14.) Given these allegations, the

14

voluntary payment doctrine bars Plaintiff's claims as a matter of law.  Plaintiff was in possession

of all relevant facts, *see Amica Mut. Ins. Co. v. Liberty Mut. Fire Ins. Co.*, 72 Va. Cir. 154, 158-

60 (Va. Cir. Ct. 2006); there was no threat that Plaintiff's "property or person [would] be taken"

or that any other "immediate or urgent necessity" precluded her from "resorting to legal

methods" to contest the debt (*see* Def. Br. at 6, 8-11 and cases cited therein); and Plaintiff thus

did not overcome the presumption that her payment was voluntary.  *See City of Va. Beach v.

Octo, Inc.*, 30 Va. Cir. 507, 509 (Va. Cir. Ct. 1981).

 In response to a host of cases that unequivocally establish its voluntary payment defense,

(*see* Def. Br. at 5-11), Plaintiff cites *Williams v. Consolvo*, 379 S.E.2d 333 (Va. 1989) for "one

key element of the Virginia voluntary payment doctrine" that supposedly "bars summary

dismissal": unjust enrichment.  (*See* Pl. Mem. at 15-16).  Yet *Williams* offers no support to

Plaintiff.  To the contrary, under circumstances where a Plaintiff paid a noteholder money owed

by someone else, the Virginia Supreme Court held that unjust enrichment was not an issue

because "[m]oney was actually owed to the noteholder; the question was who was legally

required to make those payments." *See* 379 S.E.2d at 337; *see also Qualichem, Inc. v. Xelera,

Inc.*, 62 Va. Cir. 179, 183 (Va. Cir. Ct. 2003).  So too here: Plaintiff does not dispute that

someone owes American Express $10,000; she merely disputes that it is ***she*** who owes the

money.  Under *Williams*, her unjust enrichment argument fails.

 Plaintiff's duress theory fares no better.  In addition to the specific duress authorities

cited in GC Services' opening brief, general principles of duress in the debt collection context

make clear that mere attempts to collect a debt, even if coupled with statements about the legal

consequences of nonpayment, do not constitute duress.  *See Goode v. Burke Town Plaza*, 246 Va.

407, 411 (Va. 1993) ("Because the application of economic pressure by threatening to enforce a

legal right is not a wrongful act, it cannot constitute duress"); *Dorsey v. Morgan*, 760 F. Supp. 509, 515-16 (D. Md. 1991) ("[T]hreats to take legal action do not constitute conduct designed to harass, oppress or abuse within the meaning of FDCPA § 1692d."); *Wright v. The Credit Bureau of Georgia, Inc.*, 555 F. Supp. 1005, 1006 (N.D. Ga. 1983) (finding no violation of the FDCPA in light of "the well-known fact, recognized by all consumers, regardless of the degree of their sophistication, that a failure to pay one's bills will affect his ability to obtain credit in the future").

For these reasons, the voluntary payment doctrine requires that Counts II through IV must be dismissed.[7]

## III.     THE TEXAS DEBT COLLECTION ACT DOES NOT APPLY.

Rather than address cases from the Fourth Circuit and this Court cited by GC Services, (*see* Def. Br. at 11-13), Plaintiff dedicates several pages of her Opposition to an argument that GC Services is headquartered in Texas and is therefore subject to the TDCA. (*See* Pl. Mem.at 20-21.)  Nobody disputes the point that in a case brought in a proper forum and in accordance with the forum's procedural and choice-of-law rules, the TDCA may be invoked against GC Services.  Nor is the question about whether the TDCA applies to out-of-state consumers. (*See id.*)  The question raised here is whether the choice of law provisions of the forum allow for the application of a law – local or out-of-state – to the dispute at issue.  *See Terry v. June*, 420 F. Supp. 2d 493, 500 (W.D. Va. 2006) ("[O]nce the court has determined which choice of law rules apply, it must apply these rules to the facts of the case to determine the appropriate substantive laws.").  Fourth Circuit authority, uncontested by Plaintiff, dictates that where, as here, a Plaintiff

---

[7]     Plaintiff's argument that a ruling in GC Services' favor on the basis of the voluntary payment doctrine would not preclude plaintiff's recovery of damages provided for by the FDCPA, CROA and TDCA is without support. *See, e.g., Williams*, 379 S.E.2d at337-338 (voluntary payments cannot be relied on by Plaintiff to prove damages against defendants); *Cooperative Refinery Ass'n v. Consumers Pub. Power Dist.*, 190 F.2d 852, 855-56 (8th Cir.1951) (affirming denial of damages for voluntary payments made).

sues in Virginia for violations allegedly committed in Virginia, the TDCA does not apply.[8]

Plaintiff appears to argue that there is no need for a choice-of-law determination in this case because rather than asserting a common law tort, she has raised "a discrete and unique" "statutory tort." (*See* Pl. Mem. at 17, 19.) Plaintiff fails to explain what makes a statutory tort so unique and different from a common law tort so as to warrant eschewing determination of the place of the wrong. If nothing else, cases cited by GC Services and ignored by Plaintiff, all involving statutory claims, debunk this misplaced belief. *See Withers v. Riggs Nat'l Bank*, 829 F.2d 37 (4th Cir. 1987) (holding that a Maryland debt collection statute does not apply to a wrong committed in the District of Columbia); *Corinthian Mortg. Corp. v. Choicepoint Precision Marketing, LLC,* 543 F. Supp. 2d 497, 503 (E.D. Va. 2008) (Massachusetts unfair trade practices statute does not apply to a claim for injuries suffered in Virginia); *United Dominion Indus., Inc. v. Overhead Door Corp.*, 762 F. Supp. 126, 131 (W.D.N.C. 1991) (dismissing North Carolina statutory claim for unfair and deceptive acts when Texas was the place of the wrong).

It appears that Plaintiff's opposition stems from a misunderstanding of the nature and function of choice of law rules. The Second Restatement of Conflict of Laws has this to say about that subject:

> Each state has rules to determine which law (its own local law or the local law of another state) shall be applied by it to determine the rights and liabilities of the parties resulting from an occurrence involving foreign elements. These rules are commonly referred to as choice-of-law rules, because they do not themselves determine the rights and liabilities of the parties, but rather guide decision as to which local law rule will be applied to determine these rights and duties. Each state has its own methods and rules for

---

[8]     It is worth noting that even the Texas Supreme Court rejects the proposition that the law of the defendant's headquarters jurisdiction can be applied to the claims of out-of-state residents. *See Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 698-99 (Tex. 2002).

> determining whether particular issues in a suit involving foreign
> elements should be determined by its own local law rules or by
> those of another state.

Restatement (Second) Conflict of Laws, § 2, Comment (a)(3) (1986).

This analysis also reveals that Plaintiff's concern that the application of choice of law principles would "eviscerate" the "simultaneous prosecution of both state and federal" debt collection statutes is either misplaced or a red herring as choice-of-law of determinations are made on a daily basis without jeopardizing the vitality of any statutory scheme.

Finally, Plaintiff's reliance on *Perry v. Household Retail Services, Inc.*, 953 F. Supp. 1370 (M.D. Ala. 1996), *Cirone-Shadow v. Union Nissan of Waukegan*, 1995 WL 238680 (N.D. Ill. 1995) and *Brown v. Market Dev., Inc.*, 322 N.E.2d 367 (Ohio C.P. 1974) to counter GC Services' *lex loci delicti* argument are unavailing. (*See* Pl. Mem. at 18-19) *Cirone-Shadow* and *Perry* are inapposite because Illinois follows the significant relationship test for choice of law rules rather than the *lex loci delicti* test applicable in Virginia. *Ingersoll v. Klein*, 262 N.E.2d 593, 597 (Ill. 1970). *Cirone-Shadow* was also undercut by *Avery v. State Farm Mut. Auto Ins. Co.*, 835 N.E.2d 801, 854 (Ill. 2005), which held that the Illinois Consumer Fraud Act applies to out-of-state consumers and conduct only if the disputed transaction "occur[s] primarily and substantially in Illinois."

*Brown* similarly offers an inapt analogy because the case involved a consent order entered into by defendants, and the dispute centered on the meaning of the term "consumers" used in the Order. *See* 322 N.E.2d at 369. Furthermore, the Ohio court did not employ the *lex loci delicti* rule but essentially performed a grouping-of-interest analysis where defendants had alleged that the statute at issue violated the Dormant Commerce Clause of the United States Constitution. That is obviously not the posture here.

Because the instant suit is brought in Virginia for an injury allegedly suffered in Virginia,

18

under the *lex loci delicti* rules of Virginia choice of law principles, the TDCA does not apply, and Plaintiff's claim under it must be dismissed.

IV.     **PLAINTIFF'S CROA CLAIM MUST BE DISMISSED BECAUSE THE ALLEGED CONDUCT DID NOT OCCUR IN CONNECTION WITH CREDIT REPAIR SERVICES.**

Plaintiff concedes she has no basis for alleging that GC Services is a "credit repair organization", and thus withdraws her claim under the provisions of CROA relating specifically to credit repair organizations. She now asks that she be permitted to proceed under a different statutory provision referring only to "persons." (Pl. Mem. at 22.) Plaintiff cites no law supporting this eleventh-hour theory, presumably because it has been consistently rejected by the federal courts. Established case law holds that, to state a claim under 15 U.S.C. § 1679b(a)(1) (the provision Plaintiff now invokes), the "person" alleged to have violated the statute must be associated with a credit repair organization.

In *Henry v. Westchester Foreign Autos, Inc.*, for instance, the plaintiff purchased a vehicle from the defendant automobile dealership and then later refinanced her automobile loan with the same dealership. 522 F. Supp. 2d 610, 611 (S.D.N.Y. 2007). The plaintiff contended that the automobile dealership submitted false information to a consumer reporting agency in connection with the refinancing organization and, therefore, violated 15 U.S.C. § 1679b. *Id.* The district court disagreed, holding instead that the defendant dealership was not a credit repair organization and that the plaintiff had failed to allege facts sufficient to establish that the dealership was associated with a credit repair organization as required by Section 1967b. *Id.* at 613-614. In so holding, the Southern District of New York rejected the plaintiff's contention that any "person" can be held liable under CROA, explaining that "[s]tatutory language is analyzed by looking at the 'specific context in which the language is used, and the broader context of the statute as a whole.'" *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341

(1997)). Because "Congress' focus in enacting the CROA was on the credit repair industry, and specifically for regulation of credit repair organizations," it was clear that "*it was not Congress's intent to have to [sic] CROA apply to all persons, whether they are associated with credit repair or not.*" *Id.* (emphasis added). Accordingly, "only a credit repair organization or a 'person' associated with a credit repair organization can violate the CROA." *Id.*; *see also Stith v. Thorne*, 2006 WL 5444366, at *10 (E.D. Va. Oct. 30, 2006) ("the plain language of the statute dictates that the CROA applies to . . . actions *taken in connection with the offer of credit repair services*.") (emphasis added); *Nixon v. Alan Vester Auto Group, Inc.*, 2008 U.S. Dist LEXIS 79294, at *23-24 (M.D.N.C. Oct. 8, 2008); *Wojcik v. Courtesy Auto Sales, Inc*, 2002 WL 31663298, at *8 (D. Neb. Nov. 25, 2002).

Plaintiff herself has withdrawn her argument that GC Services performed credit repair services on her behalf and does not – and cannot – allege that GC Services was in any way associated with a credit repair organization. Accordingly, Plaintiff's CROA claim must be dismissed in its entirety.

## CONCLUSION

For the foregoing reasons, GC Services respectfully requests that the complaint be dismissed in its entirety.

Dated: July 24, 2009

Respectfully submitted,

GC SERVICES, LP

By:_____ /s/_____

John "Jack" M. Robb, III, Esq. (VSB No. 73365)
Charles M. Sims, Esq. (VSB No. 35845)
LeClairRyan, A Professional Corporation
Riverfront Plaza, East Tower
951 East Byrd Street, 8th Floor
Post Office Box 2499
Richmond, Virginia 23219

(804) 915-4138 Telephone
(804) 916-7238 Facsimile
jack.robb@leclairryan.com
Charles.Sims@leclairryan.com

David M. Schultz, Esq.
Todd Stelter, Esq.
Hinshaw & Culbertson, LLP
222 N. LaSalle Street, Suite 300
Chicago, IL 60601
Telephone: (312) 704-3527
Facsimile: (312) 704-3001
dschultz@hinshawlaw.com
tstelter@hinshawlaw.com

**Counsel for Defendant GC Services
Limited Partnership**

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of July, 2009, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Leonard A. Bennett, Esq.
Matthew J. Erausquin, Esq.
Consumer Litigation Associates, P.C.
3615-H Chain Bridge Road
Fairfax, Virginia 22030
Telephone: (703) 273-7770
Facsimile: (888) 892-3512
lenbennett@cox.net
matt@clalegal.com

Jason M. Krumbein, Esq.
Krumbein Consumer Legal Services, Inc.
1650 Willow Lawn Drive, Suite 300
Richmond, Virginia 23230
Telephone: (804) 673-4358
Facsimile: (804) 673-4350
KrumbeinLaw@gmail.com

21

Richard J. Rubin, Esq.
1300 Canyon Road
Santa Fe, New Mexico 87501
Telephone: (505) 983-4418
Facsimile: (505) 983-2050
dickrubin@cs.com
**Counsel for Plaintiff Pamela G. Cappetta**

_____/s/_____

John "Jack" M. Robb, III, Esq. (VSB No. 73365)
LECLAIRRYAN, A PROFESSIONAL CORPORATION
951 East Byrd Street, 8th Floor
Post Office Box 2499
Richmond, Virginia 23219
(804) 915-4138 Telephone
(804) 916-7238 Facsimile
jack.robb@leclairryan.com
**Counsel for Defendant GC Services Limited
Partnership**