IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| PAMELA G. CAPPETTA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action |
| | ) | No. 3:08cv288 |
| GC SERVICES, LP | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
HER MOTION FOR SANCTIONS**

COMES NOW the Plaintiff, by counsel, and for her Memorandum in Support of her Motion for Sanctions, she states as follows:

While the Plaintiff recognizes that this Defendant and its national counsel admitted *pro hac vice* do not often litigate in the Eastern District of Virginia, the Defendant's repeated obstruction of the discovery process and violations of the Federal Rules would be sanctionable in any District in this country.[1]  The Defendant has issued baseless objections to discovery, redacted documents, pulled deposition witnesses out of the room after damaging testimony was given, fabricated privilege objections where no valid privilege and/or attorney-client relationship existed, made inaccurate statements to the Court, withheld evidence, and in the process of doing so, violated each of the three discovery orders issued by this Court.

The Defendant's conduct and scorched-earth approach to its discovery obligations have severely delayed the trial of this matter, consumed hours of court time on the record in numerous

---

[1] For example, four separate sanctions were levied against the Defendant in the Lucas matter in the Northern District of Indiana for similar conduct.  The same national counsel defended GCS in that matter. Lucas v. GC Services LP., 226 F.R.D. 328, 330 (N.D.Ill.2004) (finding that the Defendant exhibited "blatant and willful bad faith", and found its discovery responses to be "egregiously evasive and incomplete").

discovery hearings, necessitated multiple discovery orders and two memorandum opinions, and required Plaintiff to incur countless hours of attorney, paralegal, and administrative staff time, including out of pocket costs in excess of $40,000 in attempting to obtain the Defendant's compliance with discovery.  In many instances, the Plaintiff did not ultimately obtain discovery of relevant and discoverable facts to which she was entitled, and Plaintiff is now forced to rely on the self-executing provisions of Rule 37 which bar the use of such information or evidence.

## BACKGROUND

The present motion is filed to address three issues.  First, the Defendant has not complied with the May 15, 2009 Order of this Court.  Second, with discovery closed, the Plaintiff is seeking to bar GC Services from creating or belatedly offering any new evidence or arguments on class certification or as to liability that were not previously disclosed.  Finally, the earlier rulings of Magistrate Judge Lack had deferred the decision as to what particular sanctions were appropriate after resolving previous discovery motions.  Plaintiff is now asking the Court to dispose of these questions.

In order to provide the complete context to these issues, the Court should first understand the significant history of discovery abuse accomplished in this case by the Defendant.  This request for sanctions is filed only after multiple court orders, countless meet and confer attempts, offers to resolve the present motion off the docket[2], and even two status reports since May 15th that attempted to fully convey Plaintiff's continued and remaining willingness to compromise and to solicit Defendant's compliance.  It is regrettable that this motion has become necessary.  After nearly a year of discovery alone, the full discovery background in the case is exhausting.

On August 26, 2008, Plaintiff issued her first set of Interrogatories, Requests for Admissions, and Requests for Production to the Defendant.  Exhibit 1.  On September 11, 2008, the Defendant

---

2 Plaintiff's last offer included remedial stipulations, a payment of a small percentage of the fees incurred, and a charitable donation.  This was rejected by the Defendant.

objected to each and every discovery request.  <u>Exhibit 2</u>.  These objections were not stated with specificity and further complained that various words and phrases used in the discovery requests were vague, such as "information provider", "collection aliases", "each contact with any person made in connection with the collection of the account", and remarkably, the words "codes", "investigation", and "promised".  <u>Id.</u>

The objections also refused production of information on the grounds that the requests called for what the Defendant alleged was "proprietary information" regarding what it contended without support were its "trade secrets".  It additionally objected to other requests and contended that the requests "impermissibly [sought] private and/or personal information protected by [sic] disclosure pursuant to Local Rule 7(C)(e)" --- a rule which governs filings and is completely inapplicable to a party's duty to respond to discovery <u>Id. at 14-16, 18-19.</u>  The Defendant did not provide a privilege log with its objections.

On October 3rd and 31st, 2008, the Defendant issued its responses to discovery.  <u>Exhibits 3 and 4</u>.  In almost every instance, the Defendant either refused to answer, or it purported to answer "subject to its objections".  The Defendant provided no substantive answers at all to Interrogatories Nos. 4 and 21 and Requests for Production Nos. 14, 16, 21, 24, and 25.  The Defendant responded to the vast majority of the remaining discovery requests subject to its non-specific objections, which left Plaintiff to guess at the scope of what was actually being answered.  The Defendant only answered seven of Plaintiff's twenty-three Interrogatories without objection, and ultimately, did not furnish a single un-objected response to any Request for Production.

Defendant finally provided a privilege log along with its responses, but it listed only seven narrow and specific documents.  <u>Exhibit 3</u>.  Although Defendant did not assert attorney-client privilege as to any document in its privilege log, many of Defendant's responses were predicated upon

hypothetical attorney-client and work-product objections which did not correspond to its untimely privilege log.

Substantively, the answers that were given were sparse at best.  For example, in its October 3rd response to Interrogatory No. 2 which simply called for the disclosure of the amount of money that the Defendant paid in two discrete calendar years to any credit reporting agency or skip tracing provider from which it requested information regarding the Plaintiff, the Defendant's response was simply that it was in the process of obtaining the information.  This Interrogatory was not supplemented in any fashion until January 12, 2009, three months later, and then only after the Court intervened.  In response to other requests, even those that were answered and not objected to, the Defendant did not give a substantive answer.  For example, in Interrogatory No. 12, Plaintiff asked the Defendant to describe each reason that it believed that she was personally obligated on the account.  The GCS response was that Plaintiff was listed as a supplemental cardholder pursuant to the cardholder agreement with American Express [3].  Exhibit 3, pg. 7.   The Defendant concluded its response with a grossly improper use of Rule 33(d), referring the Plaintiff generally to the collection log *and every other document it produced in discovery* as further support for its position that Plaintiff was an obligor on the account.  Once again, Plaintiff was left to speculate as to the nature of the Defendant's true litigation position.

Plaintiff began her efforts to meet and confer with the Defendant almost immediately upon receipt of its objections.  Several teleconferences ensued, at least two of which lasted multiple hours, and many emails were exchanged.  The Defendant's global position was that it was proper to answer "subject to its objections", despite that it had not stated its objections with any specificity.  Plaintiff's position was, for example, that if the Defendant was objecting on the basis that the time period in the

---

[3] This response, if given alone, should have properly postured the FDCPA claim for summary judgment.  Further, the "voluntary payment" theory that the Defendant crafted recently and relies heavily on in its most recent Rule 12(c) motion was conspicuously absent as well.

discovery request was too broad, the Defendant must tell the Plaintiff what it believes the un-objectionable portion of the request to be when answering, such that Plaintiff would know what was being answered, and what is not.

As to other requests that were the subject of prior discovery motions in this court before Judge Payne in which the very same objections were already overruled, Mr. Skilling's position was that he was not involved in those cases, and Judge Payne's prior determination as to the discoverability of those requests was not relevant for purposes of this case, as far as he was concerned.  (INT 4 and RFP 21).  Thus, on November 5th, 2008, as directed by chambers, Plaintiff filed her portion of the First Joint Stipulation (which the Defendant explicitly refused to join in creating) and her Motion to Overrule Objections and to Compel Discovery Responses.  Exhibit 5.

Plaintiff served her second Requests for Production on December 9th, 2008.  On December 22nd, Plaintiff received Defendant's second supplemental responses to her first Requests for Production and its objections to her second Requests.  Exhibits 6, 7, and 8.  While Defendant either stood on its objections or provided responses subject to its objections in its October 3rd responses to Plaintiff's First Requests for Production, Defendant only supplemented its responses to a mere four Requests on December 22nd.  At this juncture, Defendant still had not provided substantive responses to Requests for Production Nos. 14, 16, 21, 24, and 25, and the documents that it did produce were not organized or bates stamped in any particular fashion.[4]  Thus, the Defendant resorted to referring the Plaintiff to the entirety of the documents that it produced as responsive to specific Interrogatories or Requests for Production, in that it could not identify pages more specifically – a problem of its own creation.

---

[4] While the Rules do not specifically require bates-stamping, they do require that the documents be "labeled" to correspond to the Requests.

As of the December 11th, 2008 hearing, the majority of the discovery disputes remained outstanding, despite the hearing nine days earlier in which the Court provided extensive guidance regarding what it expected from the meet and confer process and the specific types of requests that were not objectionable.  For example, in that hearing, the Court explicitly instructed the Defendant that information regarding the its net worth was discoverable, but as of December 11th, the Defendant still refused to answer.  As of that hearing, more than ninety days after discovery had been issued, Defendant had practically provided no answers to discovery, and those that were provided were couched in some objection.

The December 11th hearing occupied 2.75 hours of this Court's time as Judge Lauck took the time to go point by point through the narrowed subset of un-answered discovery requests.  During this hearing, the Defendant made multiple misstatements to the Court in order to defend its positions.  For example, GCS initially asserted to Judge Lauck through counsel that it had provided Plaintiff with all of the codes contained in its collection log, but it quickly became clear that Defendant's position was completely untrue.  The Court adjourned the hearing for thirty minutes to allow the Defendant to provide the code definitions that it claimed it had produced; when the hearing reconvened, it was forced to admit that its representations to the Court regarding the status of these codes, were objectively untrue.[5]

With regard to many of the discovery requests, the Defendant finally conceded that it had not even consulted the documents in the possession of the handful of witnesses whom it identified as having knowledge in order to ascertain whether responsive information and/or documents existed. This list of potential sources of information included the American Express relationship manager, Terri

---

[5] Plaintiff's counsel has gone to great effort to ensure that this motion does not impugn the professionalism or integrity of the Butler, Williams and Skilling firm, as it has become evident over the past year that their client and national counsel has directed the litigation in almost all regards.  To the extent that Plaintiff's counsel's frustration with the Defendant's conduct bleeds through into this memorandum, it is not directed at her fellow members of this Court.

Paurich, and her laptop – the sole repository for all GCS-AMEX documents in this company.  This

failure occurred despite Defendant's claims to the Court and the Plaintiff that an "exhaustive effort"

had been made to locate responsive information.

The Defendant also abused the meet and confer process to gain tactical advantage for itself.  It

accepted Plaintiff's concessions and continuous narrowing of discovery requests, yet made almost no

concessions of its own.  After accepting Plaintiff's narrowing of the scope of many of the requests, Mr.

Skilling stated repeatedly that he needed to check with his client as to whether it would make the

concession Plaintiff sought.  From the silence that ensued thereafter, his client made no similar

concession.  When GCS did finally answer, it provided either evasive or objective false answers.  For

example, in response to Plaintiff's Request for Production No. 3, Defendant employed boilerplate

objections and stated pursuant to Rule 26(g), again "subject to its objections", that there were no

responsive documents related to the contractual agreements or relationships with the entity(ies) that

sold or assigned Plaintiff's account.  Plaintiff only learned *through American Express's counsel* that

there were at least two versions of the contract, and further, that numerous categories of additional

documents referenced in this contract also existed.  Again here, the Defendant had not even checked

with the GCS-American Express relationship manager to determine whether the documents existed.  It

was not until Plaintiff served a subpoena on American Express that she received a copy of the

American Express-GCS contract for collection services and other associated documents referenced

therein for the first time from third-party American Express, as well as a knowledgeable Rule 30(b)(6)

witness on short notice, and without the need for a single discovery motion.

Plaintiff's Request for Production No. 5 called for documents that describe the organizational

structure of GCS.  Just as in <u>Lucas</u>, Defendant again objected to this uncontroversial request, this time

on the grounds of work-product and attorney-client privilege.  Despite the Court's guidance at the

December 2nd hearing that its privilege log was produced in an untimely fashion as to this and other

Requests, Defendant stood on its boilerplate objections, asserted privilege as to hypothetical

documents that might be created in the future during the course of litigation, and continued to withhold

the documents referenced in the privilege log.

### <u>JUDGE LAUCK CONCLUDED THAT SANCTIONS WERE APPROPRIATE</u>

On December 24, Judge Lauck ruled on the first Motion to Compel in a comprehensive

memorandum opinion, overruled the Defendant's boilerplate objections, and ordered Defendant to

respond to specific discovery requests no later than January 12, 2009.  <u>Exhibits 9, 10 and 11</u>.  Judge

Lauck described Defendant's answers as "beyond largely inadequate".  The Court also stated that:

"Given that the Court has granted Plaintiff's Motion to Compel to such a large degree, the
parties will be given an opportunity to be heard as to whether sanctions should issue pursuant to Fed.
R. Civ. P. 37, and if so, to what extent."  <u>12/24/08 Mem. Op.</u> at 13.

In "Exhibit A" to the memorandum opinion, the Court also noted numerous failures to respond

as likely violative of Rule 37(a)(4) as incomplete answers, or failures to admit or deny as per Rule

36(a)(6), and stated that the Court would consider the present motion for sanctions after the parties had

the opportunity to be fully heard on the issue  -- as to Interrogatories:

"This Court considers Defendant's unverified letter as to just one entity, Experian, to be an
incomplete answer and a likely failure to answer under Rule 37(a)(4).  *See Averbach v. Rival Mfg. Co.*,
879 F.2d 1196, 1201 (3d Cir. 1989)("It is well-recognized that complete and accurate responses to
discovery are imperative to the functioning of the modern trial process.")(*citing Rozier v. Ford Motor
Co.*, 573 F.2d 1332, 1345 (5th Cir. 1977)).  The parties may have an opportunity to be heard on whether
sanctions should issue, and if so, to what extent.  <u>12/24/08 Mem. Op.</u>, "Exhibit A", at 3.

--as to Requests for Production:

"Defendant has not identified any documents that are specifically responsive to this Request for
Production of Documents.  This violates Fed. R. Civ. P. 34(b)(E).  The Defendant must respond
pursuant to Fed. R. Civ. P. 26(g) and 34(b)(E).  GC Services must ensure that it has exhausted all
resources for responsive information".  <u>Id.</u> at 62.

--as to Requests for Admission:

"The Court finds that some answers likely are insufficient under Fed. R. Civ. P. 36(a)(6).  The parties are directed to address the Court as to whether sanctions are appropriate, and if so, to what degree".  Id. at 65.

## THE DEFENDANT'S CONDUCT REMAINED UNCHANGED

On January 12th, 2009, Defendant provided Plaintiff with supplemental Interrogatory answers pursuant to Judge Lauck's December 24th Order.  Exhibit 12.  On January 14th, the Fairfax office of Consumer Litigation Associates, P.C. received five banker's boxes of documents via courier from the Defendant containing "Supplemental Responses to Plaintiff's Interrogatories, Requests for Production, and Requests for Admissions pursuant to the Court's Order dated December 24th, 2008".  These boxes contained unmarked documents that had not been bate-stamped, and Defendant purported to designate documents as responsive by inserting blue sheets of paper throughout the production.  Defendant's documents were not indexed, bate-stamped, or produced in any otherwise meaningful or logical order.  It was impossible to even determine the sequence of the boxes, given that these were also not labeled sufficiently.  Defendant's elected method of document production was woefully insufficient to adequately inform the Plaintiff which documents were responsive to which Interrogatory, Request for Production, or Request for Admission.

As a result of Defendant's conduct, Plaintiff's counsel was forced to shoulder a massive administrative effort to collate, scan, bate-stamp, index, and attempt to segregate Defendant's documents.  A paralegal and administrative support specialist, who jointly expended about 100 hours, completed this project over the course of a month and required significant attorney assistance throughout.  At the conclusion of the project, Plaintiff provided the Defendant with electronic, bate-stamped copies *of its own documents*, as well as the document index that the Defendant should have created on its own.

The Defendant's supplemental Interrogatory answers provided for the first time on January 12th pursuant to Judge Lauck's order were deficient as well.  For example, in further response to Interrogatory No. 2 regarding payments to entities that supplied consumer reports regarding the Plaintiff and individuals with knowledge of these figures, the Defendant continued in its failure to respond and evasively stated, "various individuals in the GCS Accounting Department may also have access to and/or knowledge of some or all of these figures".  <u>Exhibit 12, pg. 3</u>.

The Court also ordered a response to Interrogatory No. 4 regarding prior lawsuits that alleged the same violations of the FCRA and the FDCPA.  The Defendant responded by informing the Plaintiff that it did not "maintain" this information and invited the Plaintiff to travel to its warehouse in Houston, Texas to dig through its archived litigation files in an effort to find the requested information.  It is unclear how the Defendant expected that the warehouse expedition invitation extended to the Plaintiff would have resulted in the creation of its own sworn Interrogatory answer.  Nonetheless, the Defendant wholly disregarded the Court's order as to Interrogatory No. 4.

The Court ordered a response to Interrogatory No. 8 which called for a list of GCS employees and managers from January 1, 2007 to the present.  During the hearing, and again in its memorandum opinion, the Court made reference to Ms. Paurich's testimony that she maintained "collection rosters" that were emailed to American Express on a monthly basis and which contained this information.  However, in its response, the Defendant did not identify any employees other than the collectors employed in the physical building in St. Louis from which it collected on Plaintiff's account.  It also refused to produce Ms. Paurich's collection rosters, because they happened to contain the names of employees who worked in other locations.  As a result of this disobedience of the Court's order and unjustified withholding of the Paurich emails and collection rosters, Plaintiff was only given access to

the list of debt collectors who worked in the same physical building at the time her former husband's account was collected on.

Defendant supplemented its responses to Plaintiff's first Requests for Production on January 30th and again on February 10th.  Exhibits 15 and 16.  In these instances, Defendant's production of documents were similarly disorganized and separated nondescriptly with blue sheets of paper. Plaintiff's counsel was again forced to spend significant time segregating, scanning, and indexing Defendant's documents.  The document responses and supplements provided on January 14th, January 30th, and February 10th were also substantively deficient.  For example, at no time did the Defendant ever comply with the Court's ruling as to RFP No. 18 and RFP No. 28, which required the Defendant to produce its un-redacted telephone records *for May 2007 only, and for the St. Louis facility only* (the result of additional scope narrowing by the Plaintiff).  In response to this concession by the Plaintiff and order of the Court, the Defendant's discovery response merely informed the Plaintiff as to the identity of its long-distance providers and directed the Plaintiff to subpoena the information from the long distance providers at her own expense.

After Plaintiff issued subpoenas to third-parties Experian and Microbilt to obtain a subset of the information still withheld by the Defendant, the Defendant filed a motion to quash on February 4, 2009, falsely claiming (1) that it had provided all of the documents which would have been responsive to the Experian subpoena and (2) that "No Experian product was used with regard to the Plaintiff." Def. Mem. Supp. Mot to Quash, at 4-5.  (Docket No. 84.)  It further made the unsupported attack that Plaintiff's counsel was abusing the discovery process, specifically that "Plaintiff is using her case against GC Services as a back door to obtain information about MicroBilt and its business."  Id. at 9.

After third-parties Experian and Microbilt withheld production while awaiting the Court's ruling, and after Plaintiff briefed a full opposition to the motion at additional expense, the Defendant withdrew

its motion 45 days later as to both Experian and Microbilt.  (Docket No. 108).

As a result of Defendant's continued non-compliance with discovery, and after a new round of efforts to meet and confer, a Second Joint Stipulation was presented to the Court on February 23rd and oral arguments heard.  Exhibit 20.  Notably – as of the date of this hearing on February 23rd, *the Defendant had not even completed reviewing the contents of the Paurich laptop,* despite that the Court had previously ordered the Defendant to supplement a multitude of its discovery answers with *all* of the electronic documents found on Ms. Paurich's laptop no later than January 12th, 2009.   On the day after this hearing, Judge Lauck issued a second Memorandum Opinion regarding the ongoing discovery disputes and Defendant's continued non-compliance with her prior order.  Exhibit 21. Defendant was again ordered to produce a complete inventory of the hard drive of Ms. Paurich, this time no later than February 27th, and responsive documents, including all emails, by March 6th.

Plaintiff had previously served her second Interrogatories and Requests for Admissions and third Requests for Production and Notice of Site Inspection on February 12, 2009.  Exhibit 18.  Just days after the second hearing before this Court, Defendant objected to Plaintiff's Notice of Site Inspection on the grounds that it was an "improper abuse of Rule 34," and that the "scope of the Notice is overly broad and not tailored at all".  Exhibit 24.  Ultimately, Judge Dohnal's assistance was required and an order was entered permitting the inspection.  With regard to Plaintiff's Interrogatories, Requests for Production, and Requests for Admissions, Defendant continued in its practice of employing boilerplate objections such as " "overbroad," and "unduly burdensome."  Outrageously, despite the considerable admonitions given by this Court in the December hearing and in its memorandum opinion, the Defendant also objected to the phrases "associated with," "made mistakes" and "consider" as vague.  Exhibit 23.

The Defendant provided an inventory list of the Paurich laptop that it contended was a complete list, but it withheld many of the documents contained on it.  Despite the Court's direct guidance that the Defendant was to inventory and list each of Ms. Paurich's emails on the laptop, no inventory of these emails was *ever* provided, and no privilege log was given to justify the Defendant's decision to withhold these.  If Ms. Paurich ever had any email communications with American Express regarding this litigation or the access of consumer reports and collection of debts regarding supplemental cardholders, Plaintiff will never know.

Defendant served its answers and responses to Plaintiff's second Interrogatories and Requests for Admissions and third Requests for Production on March 16th.  Defendant failed to respond substantively to a single request propounded to it.  It opined in response to Plaintiff's request for the STAR collection records in Microsoft Word format that this task was "unduly burdensome" and "perhaps impossible".  The timestamps found on the subset of electronic records (collection logs) that it would later produce in response to this Court's May 15th order would reveal that the Defendant was ultimately able to generate the STAR "debtor detail logs" for a given year *in less than one day*.

As a result of Defendant's continued pattern of obstruction, Plaintiff's counsel submitted a Third Joint Stipulation, which this Court addressed in its May 15th Order.  <u>Exhibits 28 and 31</u>.

<u>**THE MAY 15, 2009 ORDER**</u>

On May 15th, 2009, the Defendant was ordered to produce the names and addresses of all the basic and supplemental cardholders on all American Express accounts assigned to Defendant for collection from April 1, 2006 through the present.  The Defendant was also ordered to produce a copy of the STAR collection records in Microsoft Word format for every account assigned to it by American Express for collection since April 1, 2006.

The Plaintiff will not restate the contents of the two status reports submitted, but as of the date of this motion for sanctions, it is without dispute that the Defendant is in material violation of this order as well.  Over the course of the past two months, Defendant has continued in its abuse of the meet and confer process.  Despite the order's language that the Defendant should comply "forthwith", it asked for Plaintiff's agreement that it could produce the account list and STAR collection records on a rolling basis.  Plaintiff agreed, but conditioned this agreement on the Defendant's reciprocal agreement that it would be fully compliant with this Court's order by June 15th.  Then, armed with this concession, Defendant thereafter redacted data in the records produced, provided data for some time periods and not others, and sent Plaintiff a DVD containing literally hundreds of thousands of strings of unintelligible data representing, without support or objective verifiability, that these strings of data comprised the entirety of the data found in the 12-21 screen.  Defendant would later claim that most of these deficiencies were accidental and were un-noticed until Plaintiff brought the issues to its attention.

As of this motion, Defendant has still not produced a clean list of the supplemental cardholders and their addresses.  GCS has allowed its collectors to overwrite these fields with free-text as this litigation has progressed and remarkably *used its own spoliation as a basis for the present non-production*, apparently concluding that it would require too much effort to retrieve this information from its archived nightly backup tapes.

The Defendant has also failed to produce the entirety of the STAR collection records in Word format.  Indeed, while Defendant argues vigorously that this case should not proceed as a class action because *some* supplemental cardholders *might* have made charges, it has never produced a single *"12-21 screen"* in this case, even for the account at issue with respect to the Plaintiff.  The 12-21 screen is the screen in the STAR system for where the "supplemental spend" field from American Express would occasionally be found, if American Express happened to provide it to the Defendant.  Ms.

Paurich testified on July 25th, 2009 that this information is supplied "randomly" by American Express and could not testify as to how often it is provided.

This issue has apparently become Defendant's only defense to certification. Defendant argues that it might have had a FCRA permissible purpose to obtain and use a supplemental cardholder's consumer report if that person had his or her own indebtedness to American Express under some type of equitable or quasi-contract theory. But, GC Services would have only known of the existence of this theoretical indebtedness through its review of the 12-21 screens, and then only if the Defendant also knew that the supplemental had not made payments that would have exceeded the amount of the charges. However, the Defendant's testimony is that American Express has never provided it with the supplemental's payment information, and it would only learn of payments made by the supplemental if the supplemental were to inform it of the same after being called, which would only occur after the supplemental's Experian report was obtained. Indeed, even when American Express provides this information, it is only provided for the prior 6 months and lists the general percentage of charges made by the basic vs. the supplemental.

After eleven months of discovery, three orders from this Court on motions to compel, two memorandum opinions, 14 depositions (almost all of which were directed at the Defendant's non-compliance with discovery), an on-site inspection of the Defendant's database by an highly skilled and proportionally priced consultant, and more than $40,000 in out of pocket expense incurred by Plaintiff along the way, the Defendant remains in non-compliance with its obligations under the Federal Rules and this Court's multiple orders to this day.

Its national counsel admitted *pro hac vice*, Todd Stelter, has interfered with Plaintiff's right to obtain untainted evidence from the Defendant's lead compliance trainer, Kim Parsons, abruptly pulling her out of the room in the middle of a deposition as she was giving damaging testimony, and thereafter

asserting attorney-client privilege with regard to the conversation that ensued in the hallway, despite the clear lack of such a relationship between Mr. Stelter and this non-control group employee.  Exhibit 32 (compact disk containing a 12 min video deposition clip).

The Defendant has made numerous misrepresentations to the Court and placed discovery obstacles in Plaintiff's path at each point along the way.  Each time the Plaintiff has succeeded in obtaining evidence, the Defendant has changed its litigation strategy.  For the first time on Friday, July 25th, Defendant informed the Plaintiff in its general counsel's deposition that GCS has finally retreated to the untenable litigation position, restated at least 10 times in the deposition, that GCS was not aware that the Microbilt report included data from Experian.  The Defendant made this representation despite that GCS's invoices from Experian reflected these Address Update pulls, despite that its collection logs reflect that the collectors understood that these were Experian reports, and despite that GCS paid Experian $828,746.14 in the year 2007 alone to satisfy these invoices.   It didn't take long for this manufactured story to crumble further.  On July 31st, 2009, Plaintiff obtained a declaration for the first time from Microbilt establishing that the testimony given by the Defendant's general counsel was false on its face.  GCS entered into an agreement with Microbilt and Experian by which Microbilt would serve as the conduit for Experian to provide Full Address Update reports to Microbilt, and in which GCS also certified to Microbilt that it was not a skip-tracing company.  The actual report provided by Microbilt to the Defendant states in large bold letters on its face that it is an "Experian Address Update Report".  This declaration and related business records have been filed with Plaintiff's Motion for Class Certification and are incorporated herein.

The Defendant sits in this posture of non-compliance while it continues to assert defenses that Plaintiff and the other supplemental cardholders may have theoretically made charges on the account which might have justified its access of their consumer reports, had its employees theoretically noted

the existence of these charges prior to obtaining their reports, if the employees theoretically believed

that the supplemental's charges exceeded his payments, and if these employees had theoretically been

confused into believing that the supplemental cardholder was responsible for payment of some amount.

It makes this argument while denying Plaintiff access to the very STAR collection 12-21 screen prints

that regard the account they collected from her..  Indeed, as of this motion, the Defendant continues to

even deny Plaintiff's request that it admit the very basic issue at the core of the case—that Plaintiff was

not obligated to pay for her unfaithful ex-husband's motel charges incurred on his American Express

account.

## ARGUMENT

Sanctions are available against a party under various provisions of the Federal Rules, including

the following provisions applicable here:

1.  <u>Rule 26(g)</u> (signing discovery objections or responses intended to unnecessarily delay
    or needlessly increase the cost of litigation);

2.  <u>Rule 37(a)</u> (failure to respond to an Interrogatory or Request for Production of
    Document, including evasive answers);

3.  <u>Rule 37(b)</u> (failure to comply with court order to provide or permit discovery); and

4.  <u>Rule 37(c)(1)</u> (failure to supplement a discovery answers as required by FRCP 26(e) in
    a timely manner or as ordered by the court).

Each of these sanctions has a corresponding remedy.  Some of these remedies are mandatory,

for example, an award of fees and costs incurred as a result of the sanctionable conduct.  Other

remedies are discretionary and are to be tailored to cure the prejudice to the non-offending party to

serve as a deterrent to other litigants and to preserve the dignity of the Court.  The Court may order the

matters at issue [or other designated facts] "established" for purposes of this action. *Insurance Corp. of*

*Ireland, Ltd. v. Compagnie des Bauxites de Guinea*, 456 U.S. 694, 695, 102 S.Ct. 2099, 2100; Fed.R.

Civ. P. 37(b)(2)(A).  The court may also order that defendant is precluded from supporting or opposing

designated claims or defenses or from introducing designated matters into evidence. *Brimmer v. Whirlpool Corp.*, 536 F.2d 838 (9th Cir. 1976); Fed.R. Civ. P. 37(b)(2)(B); *Committee Notes on the Amendments to the Federal Rules of Civil Procedure*, 146 F.R.D. 401, 692 (1993).  The court may strike defendant's pleadings, may enter a default, and/or take other dispositive action. Fed.R.Civ.P. 37(b)(2)(C); *Navarro v. Cohan*, 856 F.2d 141 (11th Cir. 1988); *Committee Notes on the Amendments to the Federal Rules of Civil Procedure*, 146 F.R.D. 401, 692 (1993).

The standard of "willfulness" or "bad faith" is met by showing "disobedient conduct which is *not outside the control of the litigant.*" Id.  Sanctions are proper to meet the public interest in expeditious resolution of litigation, the court's need to manage its docket, the need to enforce the disclosure and discovery plan, the prejudice to the plaintiffs and other defendants caused by the recalcitrant party, the public policy favoring reduction in discovery-related expenses, the reduced need for court intervention, and the preservation of judicial resources. Id.

The full range of sanctions, under Fed.R.Civ.P. 37, is proper and should be awarded absent a pre-existing order to compel where a party either fails to appear for a deposition [or causes the failure of the integrity of the deposition, as in this case] and/or where a party makes no response to written discovery or answers discovery in such a fashion as to constitute bad faith. *Factory Air Conditioning Corp. v. Westside*, 579 F.2d 334 (5th Cir. 1978) (Discovery sanctions for failure to answer written discovery may include default judgment, striking of pleadings, informing the jury, monetary sanctions, issue preclusion or any other sanctions allowed under Rule 37).  Underlining the seriousness of a willful failure to participate in discovery, the drafters of the Rules have required that courts "shall" award "reasonable expenses, including attorney's fees" against the recalcitrant party. Fed.R.Civ.P. 37(d).

Under Rule 37, if a responding party does not cooperate, the requesting party may move for an

order to compel and/or other discovery sanctions, Fed.R.Civ.P. 37.  Sanctions available under Rule

37(b) go beyond the imposition of expenses and may include the entry of a default judgment, an order

striking claims or defenses, and other substantive relief.  *Regional Refuse Sys., Inc. v. Inland*

*Reclamation Co.*, 842 F.2d 150, 154 (6th Cir. 1988) at 153; *Intercept Sec. Corp. v. Code-Alarm, Inc.*,

169 F.R.D. 318 (E.D. MI. 1996) at 321.  Even in the absence of a discovery order, this Court may

impose sanctions on a party for misconduct in discovery under its inherent power to manage its own

affairs.  *DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 135-36 (2d Cir. 1998);

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-107.  See generally *Chambers v.*

*NASCO, Inc.*, 501 U.S. 32, 43, 115 L. Ed. 2d 27, 111 S. Ct. 2123 (1991) ("It has long been understood

that 'certain implied powers must necessarily result to our Courts of justice from the nature of their

institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the

exercise of all others.' " (quoting *United States v. Hudson*, 11 U.S. 32, 7 Cranch 32, 34, 3 L. Ed. 259

(1812)).

Rule 37 also permits the court the broad discretion to enter a default.  While this represents the

most draconian of remedies, it is appropriate where there is a complete failure to cooperate with

discovery.  Where there is a willful refusal to cooperate with discovery, in disregard for the court's

order, a default is appropriate, *see Bass v. Jostens*, Inc., 71 F.3d 237, 241 (6th Cir. 1995).  Such "a

willful violation occurs when there is conscious and intentional failure to comply with the court order."

*Bass*, *id* at 241.  This sanction is certainly available where a Defendant has failed to comply with 3

separate orders of this Court.

GCS's conduct stands in patent disregard of the court rules.  There is simply no rational

explanation for the refusal to produce documents which are admittedly relevant and which have been

ordered by the Court.  Each of these factors, even standing alone, supports strong sanctions.  Plaintiff

has offered every opportunity for GCS to provide documents and answers to discovery.  Throughout this period, Plaintiff has consistently and continuously offered to narrow the scope of the discovery issues so as to avoid the need to bring issues before the Court. *At the same time, the discovery that the Defendant demanded of the Plaintiff has been provided expeditiously and in good faith.*  For example, when the Defendant asked Plaintiff to turn over her medical records for the past ten years without limitation, she did so for the prior two years (providing very specific objections as the Rules require, as to the objectionable time period) and thereafter provided her complete medication history going back beyond even the ten-year period that the Defendant sought.  The Defendant then responded by issuing third party subpoenas to no fewer than five of Plaintiff's doctors and medical providers, forcing Plaintiff to (successfully) move to quash the scope of these subpoenas.  Ultimately, the Court determined that the documents the Plaintiff had previously produced of her own volition met the full scope of relevant and discoverable information.

When the two positions are contrasted, this case represents the worst form of discovery gamesmanship, whereby the Plaintiff has complied with the Rules and litigated fairly, while each piece of evidence that could conceivably have hurt the Defendant's litigation position had to be forcibly wrenched from it at the expense of this Court's limited judicial resources and its docket.  This case is still pending 14 months after it was filed, and it will not be tried until 18 months have passed.  Under these circumstances, the purposeful withholding of evidence justifies the conclusion that certain facts be deemed as admitted for purposes of this litigation.  At this late stage in discovery, the conclusion that can be drawn from GCS's behavior is that the still un-produced documents, including the 12-21 screens, would be adverse to it, and a presumption should be granted in Plaintiff's favor regarding their substance.  Alternately, the Court should just strike the Defendant's argument that its collectors would

have interpreted these screens to form a belief that supplemental cardholders were obligors on these

accounts.

## THE DEFENDANT'S ARGUMENTS ON CERTIFICATION SHOULD BE LIMITED BY RULE 37(C)(1)

Aside from the various sanctions remedies provided by Rules 26, 37(a), and 37(b), the

Defendant is also subject to Rule 37(c)(1).  Defendant cannot be permitted to use documents and

evidence that it has refused to disclose and provide pursuant to Rule 26(a)(1) and Rule 26(e).  Unlike

conventional discovery, a party's disclosure obligations are "self-executing."  If a party does not

properly and timely comply with Rule 26(e), it may not use the evidence it failed to disclose or

supplement in a timely fashion. Fed. R. Civ. P. 37(c).  Rule 37(c) states

> **Rule 37. Failure to Make Disclosure or Cooperate in Discovery; Sanctions**
> **(c) Failure to Disclose; False or Misleading Disclosure; Refusal to Admit.**
> (1) A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under Rule 37(b)(2)(A), (B), and (C) and may include informing the jury of the failure to make the disclosure. (Emphasis added).

Exclusion of the new evidence is the only appropriate remedy for a party's failure to

disclose it.  The Advisory Committee notes to the 1993 Amendment of Fed. R. Civ. P. 37(c)

explain:

> Subdivision (c). The revision provides a self-executing sanction for failure to make a disclosure required by Rule 26(a), without need for a motion under subdivision (a)(2)(A).Paragraph (1) prevents a party from using as evidence any witnesses or information that, without substantial justification, has not been disclosed as required by Rules 26(a) and 26(e)(1). This automatic sanction provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence, whether at a trial, at a hearing, or on a motion, such as one under Rule 56.

The only exceptions in Rule 37(c) are for circumstances in which the failure to disclose was with "substantial justification" or in which the failure to disclose was "harmless."  Neither of these limited exceptions applies in this case.  The Committee notes offer examples under which these conditions might apply.  They include instances in which the omission was limited, for a witness otherwise known to both parties, or when the negligent party was a *pro se* litigant.  None of these apply in the present case. The Notes go on to explain that:

> Limiting the automatic sanction to violations "without substantial justification," coupled with the exception for violations that are "harmless," is needed to avoid unduly harsh penalties in a variety of situations: e.g., the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties; the failure to list as a trial witness a person so listed by another party; or the lack of knowledge of a pro se litigant of the requirement to make disclosures. In the latter situation, however, exclusion would be proper if the requirement for disclosure had been called to the litigant's attention by either the court or another party.

One of the cases which is most frequently cited on this issue, even outside this District and Circuit, is *Rambus, Inc. v. Infineon Technologies AG,* 145 F. Supp.2d 721 (E.D. Va. 2001) (J.Payne).  In the Court's detailed analysis of the appropriate standard and remedy under Rule 37(c), Judge Payne considered the severity of the exclusion remedy and determined the standard by which the remedy should be enforced.  The Court applied the *Burlington Insurance* test to consider the following five factors: (1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure the surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to name the witness before trial; and (5) the importance of the testimony.  145 F. Supp.2d at 726, 727-734. Importantly, there is no "bad faith" element, and even an innocent omission cannot constitute "substantial justification".  *Southern States Rack and Fixture v. Sherwin-Williams Co.*, 318 F.3d at 596.  As Judge Payne explained,

[T]he plain language of the rule contains no requirement for bad faith or callous disregard of the discovery rules.  In fact, the rule is rather harsh in that it automatically imposes the preclusion sanction unless the non-complying party can show that there is substantial justification for the failure to make the disclosure, and that the failure was harmless.  145 F. Supp.2d at 727.

There can be no doubt that the Defendant's failure to comply with its discovery obligations and the orders of this Court has prejudiced the Plaintiff.  The Defendant has not provided the list of supplemental cardholders and their addresses as the Court ordered for each account.  The Court should therefore not allow the Defendant to argue that the class of supplemental cardholders is not numerous.

The Defendant has not provided a single 12-21 screen or any other response to discovery which would prove that there was a single instance in which (1) a collector looked at a 12-21 screen before pulling an Address Update report on a supplemental cardholder; (2) that the 12-21 screen then revealed charges made by the supplemental cardholder which exceeded the payments made by the supplemental cardholder; and (3) that the collector thus misinterpreted the charges appearing on the 12-21 screen and believed that the supplemental cardholder was the primary obligor on the account.  The Court should preclude any evidence or argument by the defense that it might have had a theoretical permissible purpose to obtain consumer reports regarding supplemental cardholders.[6]

---

[6] Again, the statute requires that the account must be "the account…of the consumer" that is the subject of the consumer report.  The American Express agreement clearly states, "Supplemental Cardholders do not have accounts with us".  Plaintiff maintains her legal argument that charges made by authorized users do not transform the account or the terms of the cardholder agreement, such as to provide the Defendant with a permissible purpose where none previously existed.  This is particularly true when the Defendant has never considered any record of **payments** made by supplemental cardholders, to determine whether these payments might exceed their alleged use of the card.

## <u>CONCLUSION AND REQUESTED REMEDIES</u>

Accordingly, the Plaintiff asks for the following relief:

1.      That GC Services be precluded from arguing for the duration of the case any position that depends upon proof that supplemental cardholders may have made charges, or are or were ever indebted to it or American Express;

2.      That GC services be barred from disclosing any additional documents or witness testimony not provided pursuant to Fed. R. Civ. P. 26(e) prior to the close of its discovery period;

3.      That Plaintiff be permitted to continue discovery of still outstanding information from third party Experian through September 1, 2009;

4.      That Plaintiff be awarded as a sanction her reasonable attorneys' fees and costs incurred in obtaining the Defendant's compliance with discovery, in an amount to be determined after disposition of this case before the District Court; and

5.      That the Court take all remaining potential relief under advisement until it has ruled on Plaintiff's Motion for Class Certification, with additional briefing ordered for the same, if necessary, after the Rule 23 determination has been made.

Respectfully submitted,
**PAMELA G. CAPPETTA**,

_____/s/_____
Matthew J. Erausquin, VSB#65434
Leonard A. Bennett, VSB#37523
Counsel for the Plaintiff
CONSUMER LITIGATION ASSOCIATES, P.C.
3615-H Chain Bridge Road
Fairfax, VA  22030
Tel:    703-273-7770
Fax:    888-892-3512
matt@clalegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 31ST day of July, 2009 I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification to the following:

John MacDonald Robb, III
LeClair Ryan P.C.
951 E Byrd St.
Richmond, VA 23218-2499
jack.robb@leclairryan.com

David Matthew Schultz
Hinshaw & Culbertson LLP
222 N LaSalle St., Suite 300
Chicago, IL 60601
dschultz@hinshawlaw.com

Charles Michael Sims
LeClair Ryan P.C.
P.O. Box 2499
Richmond, VA 23218-2499
charles.sims@leclairryan.com

Todd Stelter
Hinshaw & Culbertson LLP
222 N LaSalle St., Suite 300
Chicago, IL 60601
tstelter@hinshawlaw.com

          /s/

Matthew J. Erausquin, VSB#65434
Leonard A. Bennett, VSB#37523
Counsel for the Plaintiff
CONSUMER LITIGATION ASSOCIATES, P.C.
3615-H Chain Bridge Road
Fairfax, VA  22030
Tel:    703-273-7770
Fax:    888-892-3512
matt@clalegal.com
