IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

PAMELA G. CAPPETTA                                         )
                                                   )
             Plaintiff,                              )
                                                 )
             v.                                    )      Civil Action
                                               )      No. 3:08cv288
GC SERVICES, LP                                     )
                                             )
             Defendant.                           )
_____    )

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF HER MOTION FOR SANCTIONS

COMES NOW the Plaintiff, by counsel, and as for her reply brief in support of her motion for entry of sanctions against Defendant GC Services, she states as follows:

### ARGUMENT

The Defendant is unrepentant.   Most of Cappetta's discovery was served in 2008. Nearly every issue (if not all of them) addressed in the present Motion was also addressed in one or more previous discovery motions.  There is not an issue addressed herein that has not been the subject of repeated meet and confer attempts by the Plaintiff.   Still, in the face of harsh criticism from Magistrate Judge Lauck in the 3 hour hearing conducted in December of 2008, the loss of multiple discovery motions and the sanctions warning from this Court on May 13th, 2009, GC Services remains unapologetic and in fact attempts to cast blame on the Magistrate Judge and the Plaintiff rather than correct or respond substantively to Cappetta's allegations.   The simple fact is this – now on its fourth team of defense attorneys, the Defendant has not complied with either the Federal Rules or any of this Court's orders in their entirety.

The Court could choose from a broad range of sanctions in this case.   At least two major issues that were the subject of significant discovery disputes – even through July 2009 – are now

central to GCS' opposition to Cappetta's Motion for Class Certification.   First, GCS bases its predominance challenges to class certification on the assertion that it would have accessed the consumer reports of putative class members for the intended purpose of collecting money from such persons that they might have owed, in the case of authorized users.  (Def. Mem. Opposing Cert., p.16-23).  Second, to support its claim that it would suffer annihilating damages if held accountable for all class member violations, it now produces an Affidavit from its accounting employee, Michael Jones, asserting a revised net worth of less than $50 million.  (*Id*. at p.8).  The evidence to support the first position still has never been produced.  GCS' assertion of possible indebtedness by some supplementals remains just that – theoretical.   The "12-21" screens that purportedly would contain such information have never been produced.  In fact, the "sample" screens GCS provided in its sanctions opposition establish a lack of indebtedness by the respective authorized users, as they show only the charges (or in most cases, the lack of charges) in the prior 6 months by those authorized users, but with no record of *payments* made by those individuals such that their true indebtedness might be established, even on an equitable *quantum meruit* theory.[1]

Additionally, not only has the discovery sought been both relevant and reasonably calculated to lead to the discovery of admissible evidence, it turned out to be critical to Plaintiff's prosecution of this matter as Defendant's litigation position has morphed substantially throughout this case.  First, GC Services claimed that when it "performed" an Address Update on

---

[1] Admittedly, Plaintiff's primary legal position makes this evidence irrelevant.  Evidence of use by an authorized user is not relevant to the question of whether it was permissible for GCS to access and use a class–member's consumer report for the purpose of collecting from the authorized user.  For reasons fully stated in both Cappetta's Opposition to the Rule 12(c) Motion and her Reply Memorandum supporting her Motion for Class Certification, this was neither the collection of "an account of the consumer" nor the actual reason GCS obtained the reports (the location of the account obligor).  Nevertheless, while GCS' argument remains "alive", whether or not GCS has disclosed and produced the evidence it would need to prove its position, it remains relevant to the present motion.

the Plaintiff through Microbilt, it did not *obtain* an Address Update Report, but rather merely *updated* Plaintiff's address. After compelled discovery, Plaintiff learned that such position was false – as suspected, an actual report was used. Then, the Defendant claimed that it never used an Experian report and even went so far as to expressly represent this to Magistrate Judge Lauck in a written motion to quash in an effort to block discovery from Experian. This is notable, given that Experian is a third party that has not stated an un-willingness to comply with Cappetta's subpoena, despite its status as a third-party entitled to all of the protections afforded by Rule 45. Finally, in July 2009, after Plaintiff obtained additional discovery, including the entirety of the Experian invoices from 2006 through 2009, its general counsel concocted the position that GC Services was merely not aware that it was obtaining Experian reports and that it had made a mistake jointly caused by third parties Microbilt and Experian -- effectively conceding a negligent violation of the law, in an apparent effort to avoid a willfulness finding.

If this Court had not ordered the Defendant to produce the STAR collection logs in Word format, this final stab at a defense to willfulness might have gone unchallenged. Instead, Plaintiff was ultimately able to efficiently search and locate instances in which the Defendant's electronic collection logs revealed that its employees understood that these reports were Experian reports. She was then able to impeach the Defendant's highest ranking legal officer with these statements. The collection logs also demonstrated the Defendant's pattern and practice of using other tools (third-party products Accurint and Insight) to determine the identities of the parents, siblings, children and neighbors of the basic cardmembers, and then armed with this information, using the Experian consumer reports to obtain their full contact information, social security numbers, employment information, and the identities of their creditors.[2]

_____

[2] GCS complains that Cappetta has contacted some putative class members after receiving their account records upon the Court's May 15th Order. Such objections of course contradict GCS'

### A.    THE DEFENDANT CONTINUES TO MAKE INACCURATE REPRESENTATIONS TO THIS COURT.

Plaintiff recognizes that this case has consumed a significant amount of this Court's resources and time, and many of the Defendant's attempted defenses to sanctions are addressed *infra* and very briefly.  However, the Defendant's opposition brief contains numerous inaccuracies that need to be addressed for the record.

First, the Defendant states that it has provided "all information" that it has in its system regarding the cardholders.  This is simply not true.  There are numerous collection screens that the Defendant has not produced at all, even for Ms. Cappetta.  Further, nearly every screen that it has produced for Ms. Cappetta has been redacted in some fashion.  Indeed, the list of un-produced screens even included the "12-21" screens for Ms. Cappetta until just last week when the Defendant filed its motion for reconsideration.  During the 3-hour hearing with Judge Lauck, the Defendant consistently represented to Judge Lauck that it was physically unable to produce the 12-21 (and other) screens without enormous effort and catastrophic impact on its daily

---

assertion in opposition to certification that representation in individual actions is currently available and preferable as an alternative to class litigation.  Regardless, Plaintiff's counsel in a putative class action may properly contact putative class members for a variety of reasons, most notably to develop evidence and additional representatives for the putative class litigation.  *Gulf Oil Co. v. Bernard*,  452 U.S. 89, 101 S. Ct. 2193, 68 L. Ed. 2d 693, 31 Fed. R. Serv. 2d 509 (1981).  In fact, GCS itself argued as to Rule 23 typicality (and did so falsely) that Cappetta's claims could not be typical of the putative class as she could not "identify a single other person" who faced similar facts as did Cappetta. (Def. Mem. Opposing Cert., p.16).  Had Cappetta been unable to contact putative class members, she would be unable, as GCS asserted, to identify additional class members.  Now, after the communications with these witnesses, Plaintiff's counsel has identified hundreds of such persons in Virginia alone and currently represents numerous similarly situated consumers, most of which are un-related family members, friends and neighbors of the AMEX obligor.  She has also identified literally scores of people who have expressed their willingness to appear at trial and testify regarding the threats made by the Defendant in violation of the FDCPA, including threatened imprisonment for "fraud" based on non-payment of the account, the loss of their homes, the removal of their children from their home, and the threat of relentless calls to their places of employment and exacerbated family members. To the extent applicable, each is also committed to representation for their FCRA claims through a certified class.  In short, the response and recurrent themes of abuse reported by these unrelated individuals even as to the FDCPA claims has been nothing short of shocking.

business operations, claiming that the STAR software would not permit access to these screens once the account was coded as closed, and that even attempting to do so would require a massive software overhaul.  The Court advised the Defendant both at the hearing and in the February 24 memorandum opinion which followed that if it continued to claim that producing the withheld screens would be unduly burdensome, it should file a motion for a protective order together with evidence establishing the alleged burden.  Tellingly – it never did so.

However, on August 12, 2009, this Court ordered the Defendant to produce the 12-21 screens for all American Express accounts.  This order immediately and drastically changed the Defendant's outlook on the feasibility of retrieving these screens.

By August 14, 2009, the Defendant had managed to print not only the 12-21 screens for the Plaintiff herself (which should have been produced *months* earlier), but also for 12 other accounts which, in most cases, involved Experian pulls regarding entirely innocent family members who were neither basic cardmembers, nor authorized users.  In fact, the Defendant's Assistant Vice-President, Liana Waldberg, testified via affidavit that it took her the entirety of *twenty minutes* to retrieve the 12-21 screens for Pamela Cappetta.  (Docket #183, Attachment 1, Affidavit of Liana Waldberg).  To this day, and despite never filing the motion for a protective order as the Court directed, the Defendant has still not produced the following screens noted with a "slash" from its STAR system, even for Pamela Cappetta, including the obviously relevant "Work Skip" screen:

```
MENU  1 UPDATE DB-HO    8 WORK SKIP      17 STATUS-NOTES
      2 UPDATE DB-POE  10 UPDATE BANK    18 TALK-OFF #1
      3 UPDATE NAME 2  11 UPDATE MEDICAL 19 UPDATE LEGAL
      4 UPDATE NOTES   12 DISPLAY        20 UPDATE TRACE NOTES
      5 UPDATE STATUS  13 HOLDOVER       21 UPDATE ASSETS
      6 PROMISE        14 COMMAND        22 DISPLAY DUE DILIGENCE
      7 RECORD NB/MUL  15 LETTER         23 MEDICAL BILLING DISPLAY
      8 RECORD VAR-SKP 16 TO MGR         24 WORK CREDIT REPORT
```

This menu is found on the Defendant's top-level STAR screen.  The slash marks were found on the Defendant's documents when it produced them to the Plaintiff -- thus it clearly understood that it was withholding these screens.  As a reference for the Court -- if the user were to push function key 12 (DISPLAY), a new menu would appear from which the user could select 21 (CONTACTS), thus the "12-21" notation.  Most of these screens have submenus with additional information, a substantial part of which was never produced.  Further - nearly every screen that was produced was redacted in some fashion, upon untimely claims of  "privilege".

To be clear – Plaintiff is not asking the Defendant to produce these screens now.  This case needs to be brought to a close.  But the Defendant cannot maintain arguments based on what might theoretically be found in these screens.

As to the representations made in the Defendant's opposition brief, our District cannot and should not tolerate the Defendant's representation that:

> "[it] has provided Plaintiff with *all the information* it has on the account holders for over 566,000 American Express accounts assigned to it for collection, as well as the information on any other cardholder associated with all of these accounts" [3],

or that

> "…sanctions are not appropriate, because Plaintiff has *all of the data* that GCS has for each of the roughly 566,000 accounts that GCS produced.  *There is no missing data*, and there is no prejudice to Plaintiff".[4]

It cannot make either of these statements truthfully even as to the named Plaintiff, and certainly cannot do so as to each of the accounts.   While the Defendant makes these representations in a final effort to avoid the entry of sanctions against it, the irony is that these inaccuracies are themselves are *prima facie* evidence as to why sanctions – severe sanctions – are appropriate.

---

[3]  Def's Opp. to Pl's. Mot. for Sanctions at 3.
[4]  Id. at 9.

Next, the Defendant claims in a footnote that it provided the information that it alleges comprises the entirety of the 12-21 screens "at the request of Plaintiff and her computer expert". Def's Opp. to Pl's. Mot. Sanctions at 4, fn. 1.  This statement is objectively untrue.  Plaintiff's expert was retained for the sole purpose of retrieving the names of the basic and supplemental cardholders from the Defendant's computer system when it refused to produce this information. There has simply never been any discussion of the 12-21 screens being provided in "txt" format to him.  Plaintiff's expert specializes in the "PICK" software language that the Defendant's collection system was written in – nothing more.  Again, the Defendant had claimed until very recently that this information could not be retrieved without recoding the accounts via a massive software overhaul, representing the same to Mag. J. Lauck at oral argument, and there was no discussion of the 12-21 screens prior to this with regard to any format allegedly required by Plaintiff's expert.

**B.    THE DEFENDANT HAS NOT COMPLIED WITH THIS COURT'S ORDER OF MAY 15, 2009**

The Defendant takes an illogical position with regard to the Court's order that it provide the full names and addresses of the basic cardholder and the authorized user for each account. On one hand, it claims that it complied with this order because it provided the "Name1" and "Name2" fields in providing the name of the obligor and the authorized user, respectively. However, on the other hand, it claims that "the Name2 field may contain the name of a person, but this is not necessarily always true".  Def's. Opp. at 6.  GCS goes on to hypothesize that the value(s) in the Name2 field may have been placed there, in some instances, by an account representative who cut and pasted it there from some other unknown field in the system.   Id. While GCS may benefit by creating uncertainty as to the identity of the authorized users,

presumably to place more roadblocks in front of a decision on certification of the "supplemental only" sub-class, it cannot have it both ways.

Either GCS complied with this Court's order and provided the names of the basic cardmembers, the authorized users, and their respective addresses, or it did not. This request was an Interrogatory directed to the Defendant. As evidenced by its position in its opposition, it has not answered this Interrogatory as to the authorized users on these accounts, even to this day. The names of the authorized users were provided by American Express and loaded into a field somewhere in the Defendant's collection system. If the "Name2" field does not always contain these names, the Defendant did not comply with the Court's order by providing the contents of that field.

## C.     THE DEFENDANT'S EVENTUAL AND PARTIAL COMPLIANCE WITH DISCOVERY DOES NOT EXCUSE ITS DISCOVERY CONDUCT.

The theme found through the Defendant's opposition brief is that because it finally produced a subset of the information sought in discovery after 3 orders of this court and multiple hearings, this Court should not sanction it for its discovery conduct. However, Rule 37 does not contemplate this approach. In fact, Rules 37 and 26(g) create a tiered sanctions process by which the available sanction grows more severe as time passes and the disobedience continues. For example, the availability of sanctions remedies found within Rule 37(a) upon a party's simple non-compliance with discovery (essentially, fees incurred), are far less caustic than those available pursuant to Rule 37(b) when a party disobeys a court order. The purpose of sanctions is to "deter parties from engaging in [prohibited conduct], place the risk of an erroneous judgment on the party who wrongfully created the risk, and restore the prejudiced party to the position it would have been in had the misconduct not occurred." *Consolidated Aluminum Corp. v. Alcoa, Inc.*, 2006 WL 2583308 (M.D.La. July 19, 2006). A court has "broad discretion to fashion

appropriate sanctions on a case by case basis." *Phoenix Four, Inc.*, 2006 WL 1409413 at 3.

Federal courts also possess an inherent authority to impose sanctions for the conduct of litigants

in counsel regardless of whether the behavior at issue would be covered specifically under a rule

or statute. *O'Brien v. Ed Donnelly Ents., Inc.*, 2006 WL 2583327, at 2 (S.D. Ohio Sept. 5, 2006).

The court is given a great deal of latitude in deciding what, if any, sanction should be imposed

for misconduct. *Id.*  By the very terms of Rule 37(b), when a discovery order is violated, the

Court can take any action it deems appropriate to remedy the disobedience and deter future

misconduct, ranging from an award of fees incurred all the way through striking a party's answer

and entering default against it.  If it can take these actions upon the disobedience of a single

discovery order, it certainly do so when 3 discovery orders are violated.

     While the Defendant insists that this Court should disregard its discovery conduct in

other cases, including the 4 sanctions entered against it in the *Lucas* matter, this position

disregards the deterrent purpose of sanctions.  The Defendant conflates the concept of a Court

sanctioning a Defendant *because* of past conduct in other cases, with the concept of a Court's

determination of the *proper sanction* based on the Defendant's conduct.  Clearly the sanction

imposed by the Court in *Lucas* was not sufficient to deter this Defendant from engaging in the

same discovery conduct.  Indeed – as Judge Lauck noted – the Defendant actually issued the

same objections and withheld the same discovery as to its net worth as it did in *Lucas*:

> During the December 11, 2008 hearing, however, the majority of the disputes remained
> outstanding.  For instance, Defendant rested on its objection against supplying its net worth,
> despite this Court's December 2 admonition that such information was discoverable.  Defendants
> readily could find case law to that effect.  *See, e.g.*, *Lucas v. GC Services, L.P.*, 226 F.R.D. 328,
> 334 (N.D. Ill 2004) (issuing sanctions against GC Services L.P. for, among other things, failing
> to respond properly to discovery about the company's net worth).

<u>12/24/08 Mem. Op. at 11.</u>

9

Thus, when determining the appropriate sanction, it is proper for this Court to consider the Defendant's prior history of discovery misconduct in this context, particularly as to the identical discovery requests that it was already sanctioned for not providing.

**D.     THE DEFENDANT'S STATEMENTS TO THE COURT REGARDING EXPERIAN WERE FALSE AND IT CONTINUES IN THESE EFFORTS TO OBSTRUCT DISCOVERY REGARDING EXPERIAN.**

When Plaintiff served a subpoena on third-party Experian for invoices and various other documents regarding the Defendant's access of her consumer report, the Defendant delivered only the Experian invoices covering the period of January 2006 through August 2007 to the Plaintiff and then moved to quash the subpoena, stating to the Court that Plaintiff had already received the document she had subpoenaed from Experian from the Defendant.  Def's Mtn. to Quash, Docket #84 at 5.  This statement was false on its face.  The Defendant now attempts to justify this statement in its opposition by claiming that "To the extent that any invoices were relevant, Plaintiff already had received documents for the time period *that could be considered relevant – 2006 and 2007*."  However, this "relevance" qualification is not the same as the statement that it made to the Court when it told the Court that *all of the documents subpoenaed from Experian had been voluntarily produced by the Defendant*.  Further, the Defendant's opposition does not address the second misstatement raised in Plaintiff's motion – the Defendant's blatant claim that it had never used an Experian report regarding the Plaintiff.  *Id.* at 4.  This has now been conclusively proven untrue.

The Defendant has gone to every possible means to keep discoverable information in Experian's possession from the Plaintiff.  In fact, just as recently as this past month, Plaintiff's counsel became aware that the Defendant's national counsel from the Hinshaw firm contacted

Experian's counsel, Joseph Clark, to inform him that the Defendant might still raise an objection to Experian's impending production of the class list.  It was not until Plaintiff's counsel learned of this and strongly cautioned the Defendant against further interference in a series of emails that the Defendant's counsel finally confirmed that it would not object to Experian's production of the class list.

In short - this is not the way that the discovery process is intended to function, certainly not in this District.  In this case, each of the third parties involved (American Express, Experian and Microbilt) cooperated fully and communicated with the Plaintiff at all steps along the way to coordinate discovery.  When American Express objected to the scope of Plaintiff's subpoenas, a compromise was quickly reached, literally in several days and in 2 phone calls.  Witnesses were produced cooperatively by these third-parties and without the need for any involvement by this Court.  Yet, despite the cooperation of these third-parties, GC Services repeatedly injected itself into the process, raising motions to quash, in one case ultimately withdrawing its motion after a significant period of time had passed, during which the third-parties withheld production while waiting for the Defendant to prosecute its ultimately un-prosecuted motion.

Plaintiff was forced to learn of and to obtain the AMEX-GCS contract for services from American Express, to obtain the Experian-GCS contract from Experian, and the Microbilt-GCS contract from Microbilt, along with the Plaintiff's actual Experian consumer report that it transmitted to the Defendant.  If Plaintiff had not diligently sought this information from third parties, it would not be in her possession today, and the Defendant would still be withholding each of these documents, subject to some vague boilerplate objection.  For example, as previously noted, despite that the Court explicitly ordered the Defendant to index and produce the emails on Ms. Paurich's laptop, the Defendant disobeyed that order without explanation and

continues to withhold them to this day.  Had Plaintiff received these emails, she was prepared to have a second expert import the Microsoft Outlook files into a clean email repository and search them for various phrases, specifically "Experian" and "Microbilt" to determine the Defendant's corporate knowledge and internal discussion of these skip-trace products.  As a result, Plaintiff will have to make her case for willfulness via other evidence.

In short, and to avoid belaboring these points further – the Court must decisively deal with this Defendant's discovery violation and its disobedience of the 3 discovery orders of this Court.  Our District functions efficiently and effectively because parties understand what the Court expects from them.  When discovery disputes arise, as they often do, fair-minded counsel resolve these issues over the phone and with a handshake, often without the need to involve the Court at all.  In many instances, this requires the disclosure of evidence that may hurt a party's case, and it sometimes requires parties to accept narrower discovery than that which they are entitled to -- but this is the nature of litigation.  Litigants in this Court do not misrepresent the facts, and certainly not to the Court in written pleadings.  They do not pull deposition witnesses out of the room or instruct witnesses not to answer merely because the testimony is not going the way that they would hope.  This conduct would not be condoned anywhere in the country, not in the Northern District of Illinois, and certainly not here.

For each of these reasons, the Court should sanction the Defendant and award such relief as the Court deems appropriate and necessary to remedy the misconduct and deter the Defendant from engaging in this type of behavior in the future.

Respectfully submitted,
**PAMELA G. CAPPETTA**,


_____/s/_____
Leonard A. Bennett, VSB#37523

Counsel for the Plaintiff
CONSUMER LITIGATION ASSOCIATES, P.C.
12515 Warwick Boulevard, Suite 100
Newport News, Virginia 23606
Tel:    757-930-3660
Fax:    757-930-3662
lenbennett@cox.net

**CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of August, 2009 I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification to the following:

John MacDonald Robb, III
LeClair Ryan P.C.
951 E Byrd St.
Richmond, VA 23218-2499
jack.robb@leclairryan.com

David Matthew Schultz
Hinshaw & Culbertson LLP
222 N LaSalle St., Suite 300
Chicago, IL 60601
dschultz@hinshawlaw.com

Charles Michael Sims
LeClair Ryan P.C.
P.O. Box 2499
Richmond, VA 23218-2499
charles.sims@leclairryan.com

Todd Stelter
Hinshaw & Culbertson LLP
222 N LaSalle St., Suite 300
Chicago, IL 60601
tstelter@hinshawlaw.com


_____/s/_____
Leonard A. Bennett, VSB#37523
Counsel for the Plaintiff
CONSUMER LITIGATION ASSOCIATES, P.C.
12515 Warwick Boulevard, Suite 100
Newport News, Virginia 23606
Tel:    757-930-3660
Fax:    757-930-3662
lenbennett@cox.net