IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

PAMELA G. CAPPETTA, Individually
and on behalf of all others similarly situated,

        Plaintiff,

v.                                     Civil Action No. 3:08cv288

GC SERVICES, LP,

        Defendant.

## PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF
## MOTION FOR CLASS CERTIFICATION

COMES NOW Pamela G. Cappetta, Plaintiff, individually and on behalf of all others

similarly situated, by counsel, and for her Reply Memorandum in Support of Plaintiff's Motion

for Class Certification, she states as follows:

### *OVERVIEW*

The putative class in this case contains tens of thousands of members – possibly

thousands in Virginia alone – comprised of family members, neighbors, and spouses of defaulted

American Express cardholders. None of these class members is closer to the account than as an

authorized user. Defendant GC Services (hereafter "GCS") opposes certification based either on

arguments already rejected by this Court, on a significant misunderstanding of the FCRA, or on a

refusal to address the merits of this case as actually framed by Plaintiff. These arguments do not

stand in the way of class certification.

Plaintiff is requesting that the class definition as she proposed in the instant Motion be

modified. She recommends that the class definition be changed to shorten its temporal scope so

that the two-year look-back period be calculated from the filing of the First Amended Complaint

rather the original Complaint; that is, the class membership should otherwise remain the same as

argued in the opening Memorandum except that it now apply to "all natural persons...regarding whom GC Services obtained an Experian Full Address Update consumer report within the two-year period preceding the filing date of the First Amended Complaint on September 19, 2009".

In addition to certifying a national class – either finally or provisionally – Plaintiff asks this Court to order GCS (and its carrier) to return with Plaintiff's counsel to mediation at the first date available to the Magistrate Judge.   At each stage of the litigation, GCS has ignored its late stage risks and proceeded stubbornly in its refusal to consider compromise.   Plaintiff is correct on certification and her Rule 23 motion should be properly granted.   Still, she recognizes the benefit to the putative class (and the judicial process) of a result obtained through the mediation process.

## ARGUMENT

### I. SUPERIORITY.

**The Defendant's view of the possibility of a financially "annihilating" verdict is an inadequate reason to ignore the established rules that now support class certification. GCS' argument has been rejected in this District in a decision that survived Rule 23(f) appeal. *Williams v. LexisNexis Risk Management Inc.*, 2007 WL 2439463 (E.D.Va. 2007). Even if an excessive verdict is obtained, the Court retains the option of remittitur to prevent a constitutionally excessive result here as in any other setting. *Murray v. GMAC Mortgage,* 434 F.3d 948 (7th Cir.2006).**

"[T]here is a strong presumption in favor of a finding of superiority" in a statutory damages FCRA case where, as here, "the alternative to a class action is likely to be no action at all for the majority of class members." *Cavin v. Home Loan Center, Inc.*, 236 F.R.D. 387, 396 (N.D. Ill. 2006)  This presumption is rooted in the policy that lies "at the very core of the class action mechanism"—namely, "overcom[ing] the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  Thus, as Judge Easterbrook noted in *Murray v. GMAC Mortdage*, "Rule 23(b)(3) was designed for situations such as [those involving FCRA

impermissible use claims], in which the potential recovery is too slight to support individual

suits, but injury is substantial in the aggregate." *Murray v. GMAC Mortgage,* 434 F.3d at 953.

Defendant challenges Plaintiff's complete satisfaction of the Rule 23(b)(3) superiority

element based on its speculation as to size of the potential statutory damages.   While its

argument heading complains of a disparity between actual damages and statutory damages, its

primary contention is the "annihilating damages" argument based on the fact that the FCRA

provides a statutory damages alternative between $100 and $1,000 for willful violations.   15

U.S.C. § 1681n; *see e.g. Beverly v. Wal-Mart Stores, Inc.,* 2008 WL 149032, *1, n 2 (E.D. Va.

2008) (A plaintiff who has proven a willful failure to comply with the FCRA may recover

statutory and punitive damages without proof of actual damages); *Yohay v. City of Alexandria*

*Employees Credit Union, Inc.,* 827 F.2d 967, 972 (4th Cir. 1987) ("Actual damages are not a

statutory prerequisite to an award of punitive damages under the Act.")

The Defendant's superiority challenge is simple – because it violated the FCRA privacy

rights of a large number of consumers, any litigation that provided adequate redress as

envisioned by Congress would significantly impact its finances.   Its argument is not based upon

any language in either the FCRA or Rule 23.   Rather, it is founded upon a 1972 Truth in

Lending Act (TILA) district court decision and a number of cases from the Central District of

California, each of which seeks to impose a legislative solution from the judicial bench.

Contrary to GSC's claim, this "method" is not countenanced in this District or Circuit.   *Williams*

*v. LexisNexis Risk Management Inc.,* 2007 WL 2439463 (E.D.Va. 2007).[1]   The 1972 decision in

*Ratner v. Chem. Bank N.Y. Trust Co.,* 54 F.R.D. 412, 416 (S.D.N.Y. 1972), gave rise to the

---

[1] GCS falsely asserts "the Fourth Circuit has endorsed *Ratner* as the prevailing view."   Neither
*Barber v. Kimbrells* nor Judge Merhige's decision in *Richmond v. Railey's Appliance Cr., Inc.*
states anything close to GCS' claim.   In addition, the Fourth Circuit's rejection of the Rule 23(f)
appeal from Judge Payne's decision in *Williams* cautions otherwise.

strange and counterintuitive argument that a case should not be certified as a class action if the number of persons injured by the defendant was so great that it may be severely impacted or financially threatened. *Ratner* was not a FCRA case. Its reasoning also had no basis in the actual statutory language or in Rule 23. Instead, the New York Court executed a controversial judicial philosophy that a policy "mistake" made by Congress was properly corrected by the Court rather than the legislature.[2]

Federal courts uniformly have resisted applying *Ratner* and have expressly limited its reach in any event to technical violations unlike the willful and intentional misconduct presented here. See e.g. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1271 (11th Cir. 2004). To date, no District in the nation has uniformly adopted the view GCS now suggests. Few Districts have ever ruled as GCS asks – finding the potential of annihilating damages a basis to reject the superiority of class certification in a FCRA case. The primary venue for this argument has been the Central District of California, evidenced by GCS's own homogeneous string cite. However, even that District is divided, with some of its judges ruling differently. *See e.g. Pirian v. In-N-Out Burgers*, 2007 WL 1040864 (C.D. Ca. 2007).

The decisions cited by GCS from the Central District of California arose under FCRA hyper-technical "truncation" provisions added by the FACTA amendments in 2006. FACTA imposed a requirement on merchants who accepted payment by credit or debit card to redact the card's expiration date and truncate most of the credit card number. A small number of attorneys[3] then engaged in a wave of FACTA class litigation against merchants – mainly restaurants and retail stores - who previously had no exposure to the FCRA as a compliance

---

[2] After *Ratner*, Congress actually amended the TILA [ 15 U.S.C § 1640(a)(1)(B)] to cap its class recoveries to the lesser of 1% of the Defendant's net worth or $500,000, a provision never extended legislatively to the decades-old FCRA.

[3] Plaintiff's counsel has not prosecuted any of these FACTA claims, and Mr. Bennett has in his profession opposed same.

4

concern. Courts struggled with what was an apparent injustice – perhaps even a legislative mistake – and in California, a number of the class cases were rejected as posing a risk of annihilating damages.

Beyond the Central District of California, one other forum has considered multiple cases presenting this type of superiority challenge, the Northern District of Illinois. *See In re Trans Union Corp. Privacy Litig.,* 211 F.R.D. 328 (N.D. Ill. 2002) (litigated by GCS' most recent *pro hac vice* counsel, Mr. Brooks). Despite this initial decision, the Seventh Circuit and cases from the same District subsequently rejected the FCRA annihilating damages argument. *Murray v. GMAC Mortgage,* 434 F.3d at 953-954. *See also Murray v. New Cingular Wireless Services, Inc.,* 232 F.R.D. 295 (N.D. Ill. 2005); *Harris v. Best Buy Co., Inc.,* 254 F.R.D. 82 (N.D. Ill. 2008). When a defendant made the same argument in a 2007 case, the district court issued a scathing Order rejecting it as "frivolous" and cautioning its proponent under Fed. R. Civ. P. 11. *Asbury v. People's Choice Home Loan, Inc.,* 2007 WL 809531 (N.D. Ill. March 12, 2007). The Seventh Circuit reasoning is simple – Congress makes the laws. Judge Easterbrook explained:

> The reason that damages can be substantial, however, does not lie in an "abuse" of Rule 23; it lies in the legislative decision to authorize awards as high as $1,000 per person, 15 U.S.C. § 1681n(a)(1)(A), combined with GMACM's decision to obtain the credit scores of more than a million persons.
>
> ****
>
> The district judge sought to curtail the aggregate damages for violations he deemed trivial. Yet it is not appropriate to use procedural devices to undermine laws of which a judge disapproves. *(citations omitted)* Maybe suits such as this will lead Congress to amend the Fair Credit Reporting Act; maybe not. While a statute remains on the books, however, it must be enforced rather than subverted. An award that would be unconstitutionally excessive may be reduced, *see State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), but constitutional limits are best applied after a class has been certified.

*Murray v. GMAC Mortgage,* 434 F.3d at 953-54 (emphasis added).

All of these issues have also been recently addressed by this Court in *Williams v. LexisNexis Risk Management Inc.,* 2007 WL 2439463 (E.D.Va. 2007)(Payne, J.). In *Williams,* a

decision that also survived a Rule 23(f) appeal to the Fourth Circuit, Judge Payne refused to extend *Ratner* to the FCRA and similarly rejected nearly every argument now suggested by GCS. In its opposition, GCS asserts that the decision in *Williams* was "not to the contrary" because it was solely based on the Court's conclusion that LexisNexis had failed to meet an evidentiary burden – it had failed to prove that it would be "annihilated" or put out of business if a class were certified. (Def. Mem. p.8, n.4). The best that can be said of this description is that it is false.

GCS must assume that this Court would not actually read Judge Payne's decision. In rejecting the *Ratner* argument, the Court stated, "That position is unpersuasive." *Williams*, 2007 WL 2439463, *9. The first basis for this rejection was, as GCS states (and as is also a defect in GCS's current argument, as addressed below), that the defendant failed to provide "evidence estimating what the proposed classes are likely to recover, and it has not provided evidence about how such a recovery would affect its financial position." *Id.* But the Court's primary conclusion was a much broader rejection of the GCS position. In adopting the Seventh Circuit's position from *Murray*, Judge Payne stated:

> Furthermore, the legal premise for LexisNexis' argument is without merit. As Judge Easterbrook of the United States Court of Appeals for the Seventh Circuit recently put it when addressing similar concerns, "it is not appropriate to use procedural devices to undermine laws of which a judge disapproves.... While the [FCRA] remains on the books, ... it must be enforced rather than subverted. An award that would be constitutionally excessive may be reduced, but constitutional limits are best applied after a class has been certified." *Murray v. GMAC Mortgage,* 434 F.3d 948, 953-54 (7th Cir.2006).

> Indeed, Congress created two separate sets of remedies to provide relief from CRAs' violations of the FCRA. If a CRA was found to have violated the statute negligently, a plaintiff could recover actual damages only. However, if a CRA was found to have violated a statute willfully, <u>Congress provided that a plaintiff could recover both statutory and punitive damages, regardless of any actual damages the plaintiff may have suffered.</u> Furthermore, <u>Congress could have, but did not, forbid class actions based on statutory and punitive damages alone. Provided that these remedies are constitutional, the Court must enforce them.</u> For these reasons, the Court finds LexisNexis' position unpersuasive. The damages

6

awarded against it in either class action, if any, may turn out to be excessive, but, as the *Murray* decision suggests, that is an issue with which the Court may not deal at this time.

2007 WL 2439463, *9 (emphasis added).

Remarkably, while forcefully advocating a 1972 New York case addressing an entirely different statute, GCS' only mention of this 2007 FCRA decision from the Eastern District of Virginia, Richmond Division, is a short and inaccurate footnote. *Williams* is directly on point. It is well reasoned and was sustained against interlocutory appeal. The Court should decline the Defendant's unprincipled invitation to ignore it.

As a result of recent Congressional action, the *Ratner* approach has even less impact now than it did two years ago when Judge Payne rejected it. In 2008, Congress responded to the controversy generated by the truncation litigation (and no doubt the invitation from Judge Easterbrook quoted above "to amend the Fair Credit Reporting Act") and overwhelmingly adopted the Credit and Debit Card Receipt Clarification Act of 2007, Pub. L. 110-241, 122 Stat. 1565 (June 3, 2008) ("Clarification Act"). Thus, as in the aftermath of *Ratner* when Congress amended TILA to respond and correct its earlier oversight, Congress also acted in response to the presumably unintended consequences created by FACTA. However, in contrast to its post-*Ratner* TILA action, Congress last year did not limit FCRA class litigation or make wholesale changes to the availability of class-based statutory damages, but to the contrary, corrected the one provision involving the truncation rule and otherwise re-affirmed the complete system in its entirety.

The Clarification Act eliminated any remedy under § 1681n, including statutory and punitive damages, as to "any person who printed an expiration date on any receipt provided to a consumer cardholder at a point of sale or transaction between December 4, 2004, and the date of the enactment of this subsection but otherwise complied with the requirements of section 605(g)

7

[§ 1681c(g)]." Clarification Act, § 3. Significantly, Congress did not eliminate even FACTA class actions for statutory damages, allowing them to continue for violations after the date of enactment. Congress naturally would also have considered whether to limit or bar class actions under the FCRA and also chose not to do so. As a result of its 2008 actions, Congress merely limited one set of violations (and even then only for a specific period of time) and otherwise reaffirmed the FCRA class action statutory damages scheme for all willful violations in all other circumstances, including of course, the instant matter. Even prospective truncation statutory damage class actions have now received an explicit Congressional approval notwithstanding the *Ratner* defense, an endorsement that applies *a fortiori* to this non-truncation case.

GCS' arguments in opposition to certification are also in diametrical internal conflict. On one hand it claims that it would be devastated by a certified class – exposing it to liability for millions of dollars. But in its same brief, GCS argues that individual litigation is just as effective as class relief with individual consumers likely to prosecute the tens of thousands of separate cases necessary to assure that every putative class member is represented and their claims redressed. The contradictory but necessary assumption of that argument—no matter how untrue—is that GCS's exposure would be at least as great against a series of individual claims. If Defendant's argument were correct, it would be in greater risk of annihilation if the case were not litigated as a class. One District Court rejected this argument for that reason alone:

> While these cases [Parker and Trans Union] are doubtlessly correct to note that a punitive and grossly excessive statutory damages award violates the Due Process Clause, it is far from clear why class actions should be singled out for heightened scrutiny under such a theory. Indeed, the sum of the actual damages suffered by a class of plaintiffs will be the same regardless of whether their claims are prosecuted as a single class action or as a myriad of individual suits. In the absence of any theory to explain why the amount of statutory damages awarded would expand faster than the size of the class, the assumption that class action treatment exacerbates concerns about excessive damages awards is either a product of mathematical error or based on the assumption that defendants who injure large number of individuals are less culpable than those who spread the effects of their unlawful conduct less widely. While the former could be chalked up to the mathematical illiteracy of the legal profession, the latter rationale is clearly incompatible with the

8

purpose of Rule 23, which is in part intended to serve as vehicle for redressing widely dispersed harm that might otherwise go uncompensated. *Id* at 39-40.

*In re Napster Copyright Litig.*, 2005 WL 1287611, *11 (N.D. Cal. June 1, 2005) (emphasis added); *see also Pirian v. In-N-Out Burgers*, 2007 WL 1040864 (C.D. Cal. 2007).

In fact, if GCS is correct that tens of thousands of individual cases will somehow be filed, it is certain that GCS' financial loss would be even greater than in this action. Its own attorney's fees and costs as well as payment of the fees of individual plaintiff's counsel would dwarf its class exposure. One of its two positions is *prima facie* incorrect – and certainly the chance that any more than a marginal number of individual consumers would litigate their $100 to $1,000 claim in federal court is the most likely candidate.

Despite GCS' feigned optimism in the viability of statutory damage cases in individual litigation, it is ridiculous to claim that any more than a marginal number of individual consumers would or could pursue a federal lawsuit to seek their $100 to $1,000 statutory recovery, particularly one in which they are ethically obligated to pay all costs and expenses. Even if a small fraction of the putative class made such an attempt, let's assume 10% of the 50,000-person class, there is not a sufficient number of consumer plaintiff's attorneys to handle even half of this 5,000 person group. Despite GCS' half-serious footnote referencing Plaintiff's counsel's 350 plus FCRA cases over ten years – the largest FCRA practice during that period - there are literally only a few dozen attorneys who have ever litigated a FCRA case. The only possible explanation for the *Ratner* or GCS assumption that individual litigation would be less financially burdensome on a defendant than a single class action is that few, if any, individual consumers would pursue such claims – the very reason that the Supreme Court stated in *Amchem* that the class action mechanism is so vital. 521 U.S. at 625   Judge Payne rejected this patently flawed superiority challenge for just that reason:

9

> The proposed classes involve at least hundreds, perhaps thousands, of proposed
> class members pursuing identical, fairly small claims for relief, who, if required to
> proceed individually, probably would not assert their claims. The class action
> device therefore appears to be a superior means of resolving their disputes. *See In
> re Kirchner Med. Corp. Sec. Litig.,* 139 F.R.D. 74, 80 (D.Md.1991) (finding class
> action superior when class consisted of numerous members with claims too small
> to warrant individual suits).

*Williams v. LexisNexis Risk Management Inc.,* 2007 WL 2439463 , *9.

GCS' alternative of individual litigation would also be disastrously burdensome for the

federal court system.  In Virginia alone, there are approximately 3,400 putative class members.

Plaintiff's counsel currently represents a number of such individuals – each presently hoping his

or her FCRA claim is disposed by class litigation.  If the case is not certified, these consumers –

likely eventually to number in the hundreds – would be forced to file individual actions.  Thus,

while this is only a small fraction of the class, that small fraction would still cause an

exponentially greater burden on the Court than the class alternative.

In addition to all of these reasons to reject GCS' *Ratner* argument, the Court should also

refuse to accept the GCS' lack of a useful and admissible factual record showing Defendant's

putative financial annihilation upon class certification.  By its own admission, this Defendant

realizes gross revenue between $300 million and $350 million per year, and a net revenue

averaging $23 million per year over the past 3 years.  Yet it now – belatedly - claims that its net

worth does not exceed $50 million dollars.  If true, this is certainly because it has elected to make

distributions to various entities and individuals, GCS is a Limited Partnership with substantial

General Partners, each liable for any verdict reached.  *Peters v. AT & T Corp.,* 43 F.Supp.2d 926,

930 (N.D.Ill. 1999) ("Under Delaware partnership law and the Uniform Limited Partnership Act

§ 403 (amended 1985), the General Partners are vicariously liable for the acts of GC Services.");

accord, *Randle v. GC Services, L.P.,* 25 F.Supp.2d 849, 851-52 (N.D.Ill. 1998).  Defendant also

ignores its disclosed insurance of $10 million, an amount that is greater than the settlement

10

demand made by Plaintiff in June 2009. In addition, to the extent that it is relevant, Plaintiff has

also asked this Court to exclude the Jones Declaration and related evidence pursuant to Rule

37(c)(1), as GCS has withheld same in discovery by objection and refusal to respond.

There is also no evidence in the record regarding Defendant's vulnerability to improper

settlement pressure. Nearly every party in every case faces some incentive to settle. GCS,

informed of the Plaintiffs' claims and arguments, faced settlement pressure before this Court

ruled in May to permit the filing of class allegations and even greater pressure thereafter. It

faced settlement pressure before the filing of the present motion. This case continues to baffle

Plaintiff's counsel. The docket in this District relies upon counsel on both sides to seek an

efficient and expeditious path to their clients' best interests. Fair compromise is nearly always a

better result than end game 'all-or-nothing' litigation. Plaintiff and her counsel understand this

well in this Court. However, to date, despite offers from Plaintiff, the most recent of which was

deliberately made in writing and below policy limits, GCS has yet to make any counter. Not one

dollar. This is in spite of considerable clarification of GCS' liability and class size exposure.

GCS cannot have any realistic illusions about the "strength" of its defenses, or lack thereof.

Pressure to settle is already present, and if the case is certified, it would remain properly so.

## II. ADEQUACY

**The FCRA class claim, while seeking redress for GCS' violation of an important statutory protection, does not offer either an inseparable claim or one that presents actual damages. GCS's argument that a plaintiff who seeks FCRA statutory damages is somehow inadequate to serve as a class representative is the same insubstantial argument rejected in _Williams v. LexisNexis Risk Management Inc._**

GCS argues that Plaintiff is an inadequate class representative because she is also

asserting her individual claims for GCS' separate misconduct and because she is not attempting

to prove that putative class members incurred actual damages greater than the $1,000 FCRA

statutory damages threshold.   15 U.S.C. §1681n.   GSC has not met its burden to show inadequacy,[4] and neither of its arguments has merit.

GCS' first adequacy challenge is upon Plaintiff's prosecution of her separate non-FCRA claims arising from GCS' debt collection practices.   Apparently, GSC is displeased that Plaintiff's counsel has not been retained to or agreed to represent all other putative class members on an individual basis for all possible claims.   This raises the same irony considered by the Seventh Circuit in *Eggleston v. Chicago Journeyman Plumbers Local Union No. 130*:

> [I]t is often the defendant, preferring not to be successfully sued by anyone, who supposedly undertakes to assist the court in determining whether a putative class should be certified. When it comes, for instance, to determining whether "the representative parties will fairly and adequately protect the interests of the class," or the plaintiffs' ability to finance the litigation, it is a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house.

657 F.2d 890, 895 (7th Cir. 1981).

Defendant of course is correct that Plaintiff benefits from her ability to recover actual damages that were caused by its non-FCRA violations.  But this fact does not create a conflict between the Plaintiff and putative class members – the key test for adequacy.  *Williams*, 2007 WL 2439463, *4-5.  GCS is apparently confused by the nature of the allegations and claims stated in the Second Amended Complaint.   The FCRA class claim is based on its unlawful access of class members' consumer reports.   The debt collection and related individual claims for which proof of actual damages above $1,000 is at least conceivable are based upon separate misconduct.  None of these claims is excluded, waived, or later precluded by a class member's recovery of his or her FCRA remedy. "The fact that the named Plaintiffs have claims in addition to those asserted on behalf of the class does not render representation inadequate." National

---

[4] "The burden is on the defendant[] to demonstrate that the representation will be inadequate." *Johns v. Rozet*, 141 F.R.D. 211, 217 (D.D.C. 1992); *see also Lewis v. Curtis*, 671 F.2d 779, 788 (3rd Cir. 1982); *Trautz v. Weisman*, 846 F. Supp. 1160, 1167 (S.D.N.Y. 1994).

Consumer Law Center, <u>Consumer Class Actions</u>, Fifth Ed., 2002, p.116.  "[T]he fact that individual plaintiffs may have interests which go beyond the interest of the class, but are at least co-extensive with the class interest, will not defeat the class."  *First Am. Corp. v. Foster,* 51 F.R.D. 248, 250 (N.D. Ga. 1970); accord, *Gunnells v. Healthplan Services, Inc.,* 348 F.3d 417, 430-31 (4th Cir. 2003).

In *Williams,* the FCRA defendant argued exactly as has GCS that the class representatives' collateral prosecution of their separate non-class claims created a potential conflict.  Judge Payne rejected the argument: "[P]laintiffs argue that the assertion of related individual claims does not make them unfit representatives because, while the adequacy prerequisite requires that the class representatives' claims be coextensive with the class members', it does not require that they be identical. Plaintiffs' argument is correct[.]"  2007 WL 2439463, *4-5.

In contrast to the holding in *Williams* and the facts in this case, GCS' authority is cited wholly out of context.  Each of the decisions cited by GCS to support its adequacy challenge considered circumstances in which the specific claim pursued as a class included or could have included additional relevant remedies that would be waived if not then pursued.  Further, the Fourth Circuit has rejected Defendant's contention that later pursuit of actual damages in separate claims would be improper "claim-splitting."  *Gunnells,* 348 F.3d at 430-32.

GCS's contention is that the named Plaintiff would somehow become disinterested in her recovery under the FCRA because she will also have recovered actual damages under the FDCPA or by other individual claims.  Essentially, GCS is claiming that the lessened marginal utility of an additional dollar to one class member would put that class member in conflict with a person who has recovered less money and who would have a greater marginal utility for the next dollar.  While perhaps the basis for an interesting Law and Economics debate, there is not a

single case that would so extend the "actual conflicts" bar of Rule 23(a)'s adequacy of representation requirement. The recovery of an additional $1,000 in statutory damages has $1,000 of value to Plaintiff just as it does to the putative class members who have not retained counsel for their individual claims (even if they have them). No apparent or even imagined antagonism exists between Plaintiff and members of the proposed class. And, at any rate, "any conflicts that may be presently discovered will likely pale in comparison to the issues unifying the class." *Wehner v. Syntex Corp.*, 117 F.R.D. 641, 645 (N.D. Cal. 1987).

GCS' second adequacy argument challenges Plaintiff's decision to seek certification solely upon a statutory and punitive damages claim. She does not allege that she or any other class member could prove actual damages (and causation thereof) greater than the $1,000 § 1681n statutory damage remedy. Defendant largely ignores the significant body of cases that support Plaintiff's decision, relying instead on cases in which the district court determined that the plaintiffs had cognizable actual damages—a distinction from the present case. *Gardner v. Equifax Info. Servs., LLC*, 2007 WL 2261688, at *5 (D. Minn. 2007) (distinguishing and citing *Murray*, "[T]his Court finds that in the instant case, it is not clear '[t]hat actual loss is small and hard to quantify.'"); *Clark v. Experian Info. Solutions, Inc.*, 2002 WL 2005709 (D.S.C. 2002) (finding from the evidence that the respective FCRA allegation—the erroneous reporting of a bankruptcy in the credit files of a "bankruptcy innocent" co-obligor—presented claims with provable actual damages.) In fact, both *Gardner* and *Clark* considered significant damages claims. For example, in *Gardner*, the district court considered the plaintiffs' testimony that they had suffered significant actual damages, but would "relinquish their respective claims for actual damages in favor of the class action, despite it being a potential disadvantage to themselves." *Gardner*, 2007 WL 2261688, at *5. Similarly, the *Clark* court considered a "classic" FCRA claim of inaccurate reporting. 15 U.S.C. § 1681e(b). The fact pattern in *Clark*, in which the

14

national credit reporting agencies reported a bankruptcy on the credit reports of consumers who had never filed bankruptcy, was remarkable and presented claims for significant economic and other actual damages.   Given the discretionary findings of significant and provable actual damages in these cases, it is not surprising that the respective district courts would not permit the subject plaintiffs to abandon class claims with merit.

In contrast, in nearly every case to consider a FCRA putative class claim in which actual damages were less substantial – cases that were not premised on an allegation of an inaccurate credit report – the court rejected the GCS argument and sustained or certified a statutory damages class.  *Murray*, 434 F.3d at 952-53 ("<u>Unless a district court finds that personal injuries are large in relation to statutory damages</u>, a representative plaintiff must be allowed to forego claims for compensatory damages in order to achieve class certification.") (emphasis added.) Nearly every court to consider this question has accepted a statutory damages FCRA class and ruled similarly.[5]

Plaintiff is prosecuting here an FCRA claim that, while important and meaningful, cannot be liquidated into actual damages.[6]  Some FCRA rights, including those specifically in this class claim, are not readily provable and cannot be reduced into a monetary measure of actual damage because the injury results from a violation of the class members' intangible, though important,

---

[5] *See, e.g., John M. Farrow v. Capital One Auto Fin., Inc., et al.*, Civil No. CCB-06-2324 (D. Md. May 18, 2007) (Exhibit "C"); *Asbury v. People's Choice Home Loan, Inc.*, 2007 WL 809531 (N.D. Ill. March 12, 2007); *Campos v. ChoicePoint, Inc.*, 237 F.R.D. 478 (N.D.Ga. 2006); *Wanek v. C.M.A. Mortgage Inc.*, No. 05cv4775, slip op. at 3 (N.D. Ill. April 17, 2006) (Exhibit "D"); *Murray v. Sunrise Chevrolet, Inc.*, No. 04 C 7668, 2006 WL 862886, at *3 (N.D. Ill. March 30, 2006); *Cavin v. Home Loan Center, Inc.*, 236 F.R.D. 387, 392 (N.D. Ill. 2006); *Murray v. New Cingular Wireless Servs., Inc.*, 232 F.R.D. 295, 302-03 (N.D. Ill. 2005); *Murray v. Cingular Wireless II, LLC*, 242 F.R.D. 415, 418 (N.D. Ill. 2005); *Murray v. Cingular Wireless II, LLC*, 242 F.R.D. 415, 420 (N.D. Ill. 2005).

[6] GCS asserts that Plaintiff has alleged actual damages for her FCRA claim.  (Def. Mem. p.10). This is untrue. GSC' citations to the Second Amended Complaint all relate to the non-FCRA, debt collection misconduct claims.

privacy rights. A statutory damages class is ideal in this type of FCRA case. 15 U.S.C. § 1681n.

The Seventh Circuit so held in a class case alleging an impermissible use violation, where the

injury cannot be reduced or proven to an economic value:

> The district court's second reason - that Murray should have sought compensatory damages for herself and all class members rather than relying on the statutory-damages remedy - would make consumer class actions impossible. *** Yet individual losses, if any, are likely to be small-a modest concern about privacy, a slight chance that information would leak out and lead to identity theft. That actual loss is small and hard to quantify is why statutes such as the Fair Credit Reporting Act provide for modest damages without proof of injury.
>
> Rule 23(b)(3) was designed for situations such as this, in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate. *See, e.g., Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344-45 (7th Cir.1997).
>
> ****
>
> Refusing to certify a class because the plaintiff decides not to make the sort of person-specific arguments that render class treatment infeasible would throw away the benefits of consolidated treatment. Unless a district court finds that personal injuries are large in relation to statutory damages, a representative plaintiff must be allowed to forego claims for compensatory damages in order to achieve class certification. When a few class members' injuries prove to be substantial, they may opt out and litigate independently. *See Jefferson v. Ingersoll International, Inc.*, 195 F.3d 894 (7th Cir.1999). Only when all or almost all of the claims are likely to be large enough to justify individual litigation is it wise to reject class treatment altogether.

*Murray*, 434 F.3d at 952-953. (emphasis added). (Judge Payne similarly ruled in *Williams*, 2007

WL 2439463, at *4-5.)

The Fourth Circuit has also considered GCS' theory and rejected it. In *Gunnells v.*

*Healthplan Services, Inc.*, addressing a comparable adequacy argument, the Court refused to

engage in the invited conjecture, explaining, "To defeat the adequacy requirement of Rule 23, a

conflict 'must be more than merely speculative or hypothetical.'" Gunnells, 348 F.3d at 430-31.

The mere assertion by a defendant that some additional remedy or damage measure is

"abandoned" is an inadequate substitute for proof that such unrecovered damages actually exist.

*Id.* In truth, there can be no conflict as the real decision is between pursuing class litigation for

statutory and punitive damages or instead not pursuing any claim at all. *See Gunnells*, 348 F.3d

16

at 426 ("First, it appears likely that in the absence of class certification, very few claims would

be brought against TPCM, making 'the adjudication of [the] matter through a class action . . .

superior to no adjudication of the matter at all.'") (emphasis added). There is likely no interest

by class members to litigate individually. The Court of Appeals stated:

> Thus, class certification will provide access to the courts for those with claims that
> would be uneconomical if brought in an individual action. As the Supreme Court put the
> matter, "[t]he policy at the very core of the class action mechanism is to overcome the
> problem that small recoveries do not provide the incentive for any individual to bring a
> solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 617, 117 S.Ct. 2231
> (citation omitted).

*Gunnells*, 348 F.3d at 426.

In the event that any class members hereafter allege their suffering of actual damages, the

solution is not to abandon the tens of thousands of consumers who could not or would not make

such a claim.  Instead, Rule 23 permits such persons to opt-out of the class and pursue their

individual claims for actual damages.  The Fourth Circuit has found the protection not just

relevant, but sufficient. *Gunnells*, 348 F.3d at 430-32 (noting that, with Rule 23(c)(2) opt out

rights, "rhetoric aside, Plaintiffs with only direct claims are not being "[j]amm[ed]," "sacrificed"

or "caught" in any class action against their will."); *see also Murray*, 434 F.3d at 952-53 ("Only

when all or almost all of the claims are likely to be large enough to justify individual litigation is

it wise to reject class treatment altogether.").

## III. TYPICALITY AND BREADTH OF CLASS DEFINITION.

### The FCRA's Statute of Limitations Applies Equally to the Plaintiff and the Class Members

GCS argues that Plaintiff's claim is not typical of those of other putative class members

because she faces an earlier statute of limitations period than some class members.  Even if the

assertion were true – and it is not, particularly in view of the change in the class definition that

Plaintiff now is proposing – the only result would be to narrow the certified class definition.

17

GCS' argument goes to the question of class membership – who is in the class – rather than typicality.

GCS cites and relies on the unremarkable tolling doctrine of *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), to construct a statute of limitations argument that has no application to this case and is no bar to certification of the class as now proposed. GCS asserts that the claims of the class members cannot have arisen until two years prior to the filing of the Second Amended Complaint, purportedly because the Second Amended Complaint was "the first time plaintiff attempted to assert a class claim" and because the *American Pipe* tolling doctrine cannot apply in the absence of a class action that has already commenced. (Defendant GC Services' Memorandum in Opposition to Plaintiff's Motion for Class Certification, Docket No. 185, pp. 28-29). No such class action was pending, and thus GCS says that the Plaintiff's claim is as a result not typical of the class members' claims and that the proposed class definition is overinclusive. *Id.*, at 15-16 and 28-29.

Two principal flaws undermine GCS' argument. The first is its assumption that Plaintiff is relying on *American Pipe* and its tolling doctrine. She is not. There is absolutely no basis for *American Pipe* tolling in this case nor any need to assert it. GCS' objection to class certification because of the inapplicability of *American Pipe* is in short a red herring, a diversion of its own making.

The other critical flaw is GCS' unexamined linchpin assumption that the FCRA statute of limitations for the class claims commenced two years before the filing of the Second Amended Complaint. *Id.*, at 16 and 29. GCS' stated basis for this assumption is that the Second Amended Complaint was "the first time plaintiff attempted to assert a class claim." *Id.*, at 28. While it is of course true that Plaintiff raised the class claims for the first time in the Second Amended

18

Complaint, GCS' assumption that the class limitations period is measured from that filing is simply incorrect.

The established principles of Rule 15(c) recognize that an amended pleading "relates back to the original pleading." These tenets apply equally here: "an individual plaintiff may be permitted to amend his complaint to include a class of plaintiffs under the relation back theory [of] Rule 15(c) of the Federal Rules of Civil Procedure." *Sokolski v. Trans Union Corp.*, 178 F.R.D. 393, 395 (E.D.N.Y. 1998) (Rejecting the defendant's statute of limitations defense since the amended class complaint related back to the original complaint raising only individual claims); *see also, Paskuly v. Marshall Field & Co.*, 646 F.2d 1210, 1211 (7th Cir. 1981), *affirming* 494 F.Supp. 687 (D.C.Ill. 1980) (same).[7]

The statute of limitations is not necessarily measured from the time when class claims are asserted. To the contrary, Rule 15(c) establishes the rule applicable to the class claims here, and it is on this basis that Plaintiff is proposing the current class definition commencing two years prior to the filing of the First Amended Complaint, which provided Defendant with the notice required by Rule 15(c). The relation back doctrine defeats Defendant's arguments that the class definition is overinclusive and that the plaintiff's claims are not typical of the class claims.

## IV. PREDOMINANCE

**A.    A theoretical possibility of an AMEX implied contract claim against some authorized users does not raise individual issues that predominate over the larger common questions of fact and law.**

---

[7] By not addressing Rule 15(c), Defendant may believe that *American Pipe* tolling and the relation back doctrine are co-extensive or otherwise linked. However, an amended class action complaint is not time-barred and may relate back to the initial pleading even if *American Pipe* class tolling is not available. *Immigrant Assistance Project of Los Angeles County Federation of Labor (AFL-CIO) v. I.N.S.*, 306 F.3d 842, 856-59 (9th Cir. 2002) (Finding that tolling could not continue once class certification was denied, and thus the new claims would be time-barred, but that the claims in the amended complaint were nevertheless timely because they related back to the original complaint).

GCS proffers a string of hypothetical litigation threats to which it claims entitlement if a class is certified.   ("At trial, GC Services would be entitled to call every single putative class member as a witness and ask them whether they used their card or not." Def. Mem. p.19; "GC Services would be entitled to introduce evidence from American Express as to each and every individual charge made by putative class members." *Id*.; "GC Services will be entitled to collect and present information at trial concerning whether each putative class member had previously made payments on the underlying debt or had represented to a GC Services or American Express representative that he or she was responsible for the debt." *Id*. at p.20.)  Of course GCS is incorrect.  This Court will decide what evidence is admissible and relevant.   And the Court would certainly determine that none of these postured trial plans would offer either admissible or relevant evidence.   GCS' predominance theories fail for several reasons.

First, the simplest and most obvious reason that such evidence need not be considered for either manageability or predominance concerns is that GCS has never produced or disclosed any of it.  As Plaintiff argues in her pending Motion for Sanctions, Rule 37(c)(1) bars a party's use of documents and witness testimony not properly or timely disclosed.  Plaintiff has been reading about and listening to GCS' position as to the hypothetical obligations of some authorized users for nearly a year now.  And despite significant discovery litigation, GCS still has never produced any evidence to support its claim.   In fact, only the Plaintiff has served a subpoena upon and taken a deposition of American Express.   GCS has done and has disclosed almost nothing in these regards.  Discovery is closed.   It was closed for GCS in May 2009.   This case is set for trial.   Certification briefing is now completed.   Contrary to GCS' optimism, it will not "be entitled to collect new evidence for trial".  Plaintiff has given GCS every chance in the world to provide tangible evidence to support its claim.   It has not done so.

Second, GCS's argument also fails as a matter of law.  The American Express credit card agreements here make no claim that anyone other than the cardholder is liable for payment of the account.  Such contract provisions are binding and are enforced pursuant to, and limited by, their terms. *Barrer v. Chase Bank USA, Inc.*, 566 F.3d 883, 885 n. 1 (9th Cir. 2009) ("Cherly Barrer was an 'Authorized User,' and therefore not legally responsible for the account"); *First Nat. Bank of Findlay v. Fulk*, 566 N.E.2d 1270, 1274 (Ohio App. 1989) ("Since Maudie was an authorized user, we hold that she is not liable for any purchases made by her on Donald's Visa account."); *Cleveland Trust Co. v. Snyder*, 380 N.E.2d 354, 360 (Ohio Ct.App. 1978) (Spouse was not the cardholder and therefore was not liable for her husband's account); *Sears Roebuck & Co. v. Ragucci*, 495 A.2d 923, 926 (N.J.Super. 1995) (same).

To be sure, an authorized user may be liable to pay for charges under various state law claims other than as the account obligor.  Thus, in *Ragucci*, the court allowed that the authorized user may be liable for her own charges on a quasi-contract or *quantum meruit* theory. *Id.*, 495 A.2d at 926.  In some states and some circumstances, a card user may be liable for certain charges which qualify under a necessaries statute. *See e.g. N.A.R., Inc. v. Elmer*, 141 P.3d 606 (Utah App. 2006) (Husband liable for payment for wife's medical bills but not for attorney's fees and interest); *North Shore Community Bank and Trust Co. v. Kollar*, 710 N.E.2d 106, 107 (Ill.App. 1 Dist. 1999) (State Rights of Married Persons Act excluded spouse's liability for payment of bank loan).  But in all such cases, the state law-imposed liability is not because the authorized user is an account obligor on a contract claim, *but only because of the equitable claim.*

This distinction between liability for a debt as the account obligor and liability under statutory or equitable theory is dispositive.  The FCRA permits a party to obtain and use a consumer's report for the purpose of collecting of a debt under specific circumstances and no

21

others. Section 1681b(a)(3)(A) states that a consumer report may be obtained by "a person [who] intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving ... <u>collection of an account of [] the consumer</u>." (Emphasis added). The use of the term "the consumer" at the end of the sentence unambiguously is "the consumer on whom the information is to be furnished" described in the previous clause. No other meaning is suggested, and any other meaning would be nonsensical. Congress imposed this condition in order to prevent debt collectors and others from claiming a permissible purpose to obtain a consumer report on virtually anyone whom they theorize could be liable to pay money. This conclusion was underscored recently by the Ninth Circuit in *Pintos v. Pacific Creditors Assoc.*, 565 F.3d 1106 (9th Cir. 2009). Under the Defendant's theory, it could obtain a consumer report regarding any individual in the country, as long as it could hypothesize that the information in the report might eventually lead to the successful collection of another person's account. Congress and the *Pintos* court recognized the fallacy of this logic.

Thus, while it is possible that some authorized users could be liable to American Express under some legal or equitable theory, their liability would not be based on their <u>account</u>. In fact, both American Express's contract with GC Services, as well as the American Express cardholder agreement, explicitly and unambiguously informed GC Services that authorized users do not have accounts with American Express:

> **"Any such litigation against Additional Cardmembers must allege liability on the basis of a breach of an implied agreement, recognizing the fact that such Additional Cardmembers are authorized users on the Basic Cardmember's Account and do not have independent accounts or written contracts with American Express."**

22

*AMEX-GCS contract.*[8]   Additionally, the AMEX Cardmember Agreement expressly states:

"**Additional Cardmembers do not have accounts with us.**" This language could not be

clearer.

Third, even if for some reason a supplemental were indebted to American Express, this

fact by itself would not excuse GCS' access to and use of class member consumer reports.   Such

debts would not have been owed to GCS, but instead to AMEX.   And while it would no doubt

have been permissible for AMEX to task GCS to collect those authorized user charges, the

uncontroverted evidence is that AMEX did not direct GCS to collect them, GCS was not entitled

to do so, and AMEX in fact prohibited GCS from doing so.  If it did so, it was acting outside the

scope of its agency relationship with AMEX.  Indeed, AMEX's management witness testified:

> Q.      GC Services is not permitted to collect from supplemental cardholders any
> amounts that it does not know were charged by the supplemental cardholder; is that
> correct?
> A. Yes.

(Exhibit "__", Rule 30(b)(6) Deposition of American Express, Edmond Garabedian, p.30, lines

17-22) (emphasis added).   GCS' acknowledgment in its memorandum that it would still need to

discover whether a supplemental authorized user is actually indebted to AMEX is proof itself

that "it does not know" which supplementals could owe AMEX money and which ones could

not. It has refused to answer an Interrogatory in this case calling for that very information.  In

fact, the only reason AMEX even provided the supplemental information to GCS is for its use in

locating and communicating with the actual cardholder.  GCS's corporate designee and

executive employee testified:

> A.  American Express tells us at the time of placement if there is a supplemental
> cardholder on an account and who that supplemental cardholder is.

---

[8] While this text has already been made public, the full contract is itself still designated as
confidential by GCS.   To avoid additional filings, Plaintiff makes this representation by counsel
pursuant to Rule 11.  If GCS contests this representation, Plaintiff will file the unredacted
contract.

Q.  Right. But American Express doesn't tell GCS to collect from the supplemental?
A.  No, sir. … It is for location information or contact information.

(Deposition of Eric Bernhagen, p.34, lines 4-12).[9]

This discussion and GCS' objection is also moot because collection from supplementals

was never the purpose for which GCS claims it used the Experian reports.  Its Rule 30(b)(6)

witness (and General Counsel) testified as recently as July 2009:

Q.  I want to have an aggregate list of each purpose that has ever existed for your use of a full address update report on an AmEx supplemental or on an AmEx account of other non-obligors. You've listed location information of the general obligor. Are there any other purposes that your company claims it used these address update reports for?
A.  I think the company policy is and the company position is that the reason that we're accessing this information is, once again, to find and locate the primary. And that is the primary purpose of obtaining these – any information regardless of whether it's a primary, secondary. But we're looking at obtaining location information so that we can contact the principal basic cardholder.
Q.  Is there any other purpose?
A.  Not that I'm aware, but I do think that there's -- I think we look at the information and, once again, that's the primary purpose of it, that's the intent.

(Rule 30(b)(6) Deposition of GCS, Joe Van Nest, p.68, line 18 – p.69, line 16) (emphasis added).

GCS' suggestion of individual issues necessary to determine whether it used class

member Experian reports for a purpose provided in the FCRA thus fails for each of these

reasons:  It has not disclosed any evidence that it knew which supplementals owed money to

American Express; American Express did not authorize GCS to collect from supplementals

under these circumstances; and the purpose GCS actually claims it made of the reports – using

the private information of supplemental, family members and neighbors as a means to locate the

actual accountholders – is uniformly not a permissible purpose under the statute.

Finally, GCS' contention is minimized for another reason.  If GCS were somehow

correct and some supplementals owed to AMEX a debt which the creditor had authorized GCS

---

[9] Plaintiff has cited the deposition questions and answers verbatim and this does not now attach the Transcripts.  She does so in order to reduce additional filings.  However, if GCS informs Plaintiff's counsel that it believes the cited text is incorrectly reproduced, Plaintiff will provide the full deposition pages to the Court.

to collect, and if the use of their reports were determined lawful, this issue would not predominate the more significant common issues in this case.   In fact, the solution would be to narrow the class definition to exclude the supplemental cardholders who were listed in GCS' records as having made charges on the subject account.[10]  And in any event, such a discrete and narrow question − whether a supplemental made charges on the primary's account − could not conceivably overwhelm the more complex and dominant classwide issues and could be resolved by the Court prior to trial. *See e.g. Williams*, 2007 WL 2439463, *8.  ("The only individual issue of proof would be whether an individual plaintiff sent two forms of identification with their original reinvestigation request, and whether LexisNexis refused to conduct an investigation until the consumer provided two forms of identification. This is a question susceptible to ready judicial determination, and therefore is not an individual issue that would threaten to overwhelm the class litigation."); *Chisolm v. TranSouth Financial Corp.*, 184 F.R.D. 556, 565 (E.D.Va. 1999) ("Here, the Court finds that common questions of fact predominate over questions affecting only individual members. Subsection (b)(3) of Rule 23 requires only that the common questions outweigh the individual questions; they need not be dispositive of the entire litigation. … Importantly, the sole individualized issue of legal import, reliance, will be resolved as a predicate to class.")

**B.    Willfulness.**

GCS' second predominance argument addresses the "willfulness" element in Plaintiff's § 1681n claim.  Plaintiff alleges that GCS not only violated the FCRA, but did so in a manner that was at least in "reckless disregard of [its] obligations under the FCRA." *Saunders v. Branch*

---

[10] "Q.  [T]he manner in which GC Services was supposed to learn what charges, if any, were made by a supplemental cardholder, is by reviewing -- requesting, obtaining and reviewing the monthly card member statement archived; right?  A.  Correct." (Deposition of Eric Bernhagen, p.30, line 24- p. 31, line 4).  As of today, GCS has not disclosed or produced even a page of such AMEX account statements regarding any putative class member.

*Banking and Trust Co. Of VA*, 526 F.3d 142, 151 n.4 (4th Cir. 2008) ("The Supreme Court has since held that willful violations of FCRA include violations committed in reckless disregard of a company's obligations under FCRA. *Safeco Ins. Co.*, 127 S.Ct. at 2208-10 [551 U.S. 47 (2007)].") This threshold is important – Plaintiff must prove willfulness at trial[11] in order to obtain statutory or punitive damages. 15 U.S.C. §1681n. GCS attempts to deny that proof of willfulness raises common issues of proof that predominate over individual questions.

Defendant's argument is largely based upon the same issues suggested in its "supplementals may owe money" argument addressed above. GCS does not offer any authority or even argument as to how a consideration of its uniform conduct would or even could vary between one case or another. Plaintiff has alleged, and the evidence developed to date shows, that GSC acted with regard to every class member in accordance with its express and unlawful policy to access Experian Full Address Update consumer reports on persons other than the account-holder. The "willfulness" element measures a defendant's conduct and its state of mind. The facts necessary to establish GCS' reckless adoption and maintenance of its unlawful policy will not be individualized.

In this case, there are no individual issues of damages. As explained in Plaintiff's opening Memorandum, and ignored entirely in GCS in response, the determination relating to the amount of statutory damages does not raise any individual issues. Class members "would not be required to prove causation or actual damages in order" to obtain statutory damages. *Acosta*, 240 F.R.D. at 564.. Far from raising any individual questions, the statutory damages determination is itself an issue that is common to the class as a whole, and the availability of

---

[11] Summary Judgment is "seldom appropriate" on whether a defendant's FCRA violation was willful since the question is based on whether a party possessed a particular state of mind. *Dalton v. Capital Associated Industries, Inc.*, 257 F.3d 409, 418 (4th Cir. 2001) (Granting summary judgment under pre-*Safeco* standard because evidence of willfulness "was wholly lacking.")

such damages would "weigh[] in favor rather than against class certification." *In re Napster Copyright Litig.*, 2005 WL 1287611, *10 (N.D. Cal. June 1, 2005).[12]

With Plaintiff's apologies for repetition, as with most of GCS' positions, again Judge Payne has considered and rejected an identical predominance challenge in *Williams*, 2007 WL 2439463, *6:

> LexisNexis argues that a "willfulness" claim requires individual proof. It bases this argument on the Supreme Court's recent decision in *Safeco Insurance Co. v. Burr*, No. 06-84 (June 4, 2007). In *Safeco*, the Supreme Court held that "willfulness" under the FCRA is "conduct ... entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." Slip op. at 19. LexisNexis draws from this that *Safeco* requires two-step analysis-whether the violation occurred, and whether the violation was reckless-and that this analysis requires a court to examine the circumstances of each individual. Accepting *arguendo* LexisNexis' characterization that *Safeco* requires a tiered inquiry, the Court nonetheless fails to see why recklessness requires inquiry into individual circumstances. ... LexisNexis adopted a standard procedure [.] The Plaintiffs' class allegations charge that these standard procedures violated the FCRA, and that, in adopting these procedures, LexisNexis willfully violated the FCRA. It is not readily apparent how an inquiry directed at LexisNexis' state of mind in adopting standard procedures is affected by any particular case in which those standard procedures were applied.

Consideration of the similar and linked claims of the putative class will best assure a uniform remedy. The appropriate and primary measures of damages in this case, upon a showing of willfulness, will be those for statutory and punitive damages. 15 U.S.C. § 1681n(a)(1)(A) and (B). The appropriate amount of such damages within the $100 and $1,000 statutory range will not vary among different class members. The measure of the appropriate size of this remedy will be set by factors tied to GCS rather than to individual consumers. *See e.g. Thornton v. Equifax*, 467 F.Supp. 1008 (E.D. Ark. 1979), *rev'd on other grounds*, 619 F.2d

---

[12] *See also Six Mexican Workers, v. Arizona Citrus Growers,* 904 F.2d 1301, 1306 (9th Cir. 1990) ("concerns . . . about the impermissible circumvention of individual proof requirements are not at issue where the underlying statute permits awards without a showing of actual damage"); *Bonner v. Home123 Corp.*, 2006 U.S. Dist. LEXIS 54418, at *19 (N.D. Ind. Aug. 4, 2006); *Hernandez v. Midland Credit Mgmt.*, 236 F.R.D. 406, 412 (N.D. Ill. 2006); *Cavin*, 236 F.R.D. at 395; *In re Farmers Ins. Co., FCRA Litig.*, 2006 WL 1042450, (W.D. Okla. Apr. 13, 2006); *Ashby v. Farmers Ins. Co.*, 2004 WL 2359968 at *14 (D. Or. Oct. 18, 2004).

700 (8th Cir. 1980). "[T]he exemplary damage statute is addressed to restraining the malefactor. Thus the Plaintiff is only an accidental beneficiary of the jury's decision as to the amount necessary to impose an adequate restraint on the malefactor." *Id.* at 1012.

A determination of federal statutory damages is linked only to the amount necessary to achieve deterrence and may be awarded on a uniform per plaintiff basis without the need for any "fact specific calculations of actual injury." *Six (6) Mexican Worker v. Arizona Citrus Growers*, 904 F.2d 1301, 1309-10 (9th Cir. 1990)(directing district court to modify its judgment based on panel's "own assessment of the proper level of statutory damages," which provided for uniform per plaintiff awards). Accordingly, Plaintiff's statutory damage claims raise no individual questions in relation to the amount of damages. *See, e.g., Acosta v. Trans Union, LLC,* 243 F.R.D. 377, 385 (C.D.Cal. 2007). (noting that any distinction among claims of class members relating to the damages they suffered "is immaterial here where the FCRA awards statutory damages"); *Bonner v. Home123 Corp.*, 2006 U.S. Dist. LEXIS 54418, at *18-19 (N.D. Ind. Aug. 4, 2006) ("Each class member . . . need not prove individual actual damages or provide proof of causation to obtain statutory damages [under the FCRA]."); *White v. Imperial Adjustment Corp.*, 2002 WL 1809084, *15 (E.D. La. 2002) (finding predominance requirement met where "focal point of these proceedings will undoubtedly be the defendants' course of conduct in" allegedly failing to maintain reasonable procedures to prevent improper dissemination of credit reports in violation of FCRA); *In re Farmers Ins. Co., FCRA Litig.*, 2006 WL 1042450 (W.D. Okla. Apr. 13, 2006) (finding predominance requirement met in action seeking statutory damages for defendants' alleged violation of the FCRA).[13]

---

[13] *See also Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387, 393 (N.D. Ill. 2006) (Each class member need not prove individual actual damages or provide proof of causation to obtain statutory damages under the FCRA.) ; *Ashby v. Farmers Ins. Co.*, 2004 WL 2359968 at *14 (D. Or. Oct. 18, 2004) (same); *Braxton v. Farmer's Ins. Group*, 209 F.R.D. 654, *661 (N.D. Ala. 2002) (same)*; *Six Mexican Workers*, 904 F.2d at 1306 ("concerns . . . about the impermissible

**C.     This Court Previously Considered and Properly Rejected GCS' Renewed Arbitration Argument.**

GCS originally opposed Plaintiff's motion to file the Second Amended Complaint because of the purported futility of its class action claims.  It argued then, as it does again now, that class treatment is inappropriate because "many, if not most, of the American Express accounts appear to have arbitration provisions wherein it is agreed that claims arising from or relating to any accounts created under the account agreement will be resolved in arbitration." (Defendant's Memorandum in Opposition to Plaintiff's Renewed Motion for Leave to Amend, p. 9).  This Court specifically rejected that argument when it granted the motion to amend: "Moreover, Defendant's argument that the cardholder agreement contains a binding arbitration clause that applies to the instant parties ignores the plain language of the agreement."  Order, May 15, 2009, Docket No. 145,  pp. 1-2).

GCS now disclaims any intention of requesting this Court to disavow its previous ruling: "GC Services is not asking this Court to revisit that decision at this juncture…" (Defendant GC Services' Memorandum in Opposition to Plaintiff's Motion for Class Certification, Docket No. 185, p. 24).  This disclaimer is of course understandable since, as this Court has stated, the earlier ruling is the law of this case and thus "continue[s] to govern the same issues in subsequent stages in the same case.")  *Briggs v. Waters*, 455 F.Supp.2d 508, 516-17 (E.D.Va. 2006).  However, GCS then proceeds to ignore its own disclaimer and apparently is requesting reconsideration of that ruling allegedly because a new "standard to be applied here was announced by the Supreme Court within two weeks of this Court's previous arbitration decision." (Defendant GC Services' Memorandum in Opposition to Plaintiff's Motion for Class Certification, Docket No. 185, p. 24-25).

circumvention of individual proof requirements are not at issue where the underlying statute permits awards without a showing of actual damage"); *Hernandez v. Midland Credit Mgmt.*, 236 F.R.D. 406, 412 (N.D. Ill. 2006) .

This supposed new standard is the Supreme Court's holding in *Arthur Andersen LLP v. Carlisle*, ___ U.S. ___, 129 S.Ct. 1896 (2009), that traditional principles of state contract law allow a written arbitration agreement to be enforced by or against nonparties to the agreement. *Id.* at 1902. On that basis, the Court reversed the Sixth Circuit's "categorical[]" refusal to apply the underlying arbitration agreement there to those who were not parties to it. *Id.*, at 1901-02. Presumably, GCS believes that this holding constitutes a qualifying "unusual circumstance[], as where the Supreme Court of the United States has decided the same matter differently during the interim," that warrants abandonment of the earlier decision here. *Maryland Cas. Co. v. City of South Norfolk*, 54 F.2d 1032, 1039 (4th Cir. 1932).

This rule from *Arthur Andersen* did not, however, create a new standard in this Circuit, did not alter the legal framework within which this Court analyzed the arbitration argument, and did not modify the precedent on which this Court based its May 15 arbitration ruling. The Fourth Circuit already had adopted the identical rule in a published opinion (coincidentally, also in an FCRA case) that arbitration agreements are enforceable with regard to nonsignatories to the agreement in accordance with applicable state contract law. *Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392, 395 (4th Cir. 2005) (applying principles of equitable estoppel to a nonsignatory to determine the application of the subject arbitration agreement). The Supreme Court accordingly did not decide the arbitration issue "differently during the interim," and the *Arthur Andersen* opinion therefore provides no basis to revisit this Court's May 15 decision.

Admittedly, none of GCS, Plaintiff, or the class members are signatories to the arbitration agreement that Defendant believes is applicable here. However, that fact was not the basis for this Court's May 15 ruling, nor of course could it have been in view of the *Brantley* precedent. Indeed, implicit in this Court's May 15 decision is the recognition that third parties may indeed be subject to an arbitration agreement when appropriate and specifically that a nonsignatory such

30

as GCS may enforce an arbitration clause that so provides. Accordingly, issuance by the

Supreme Court of the *Arthur Andersen* opinion is beside the point.

The defect in GCS' arbitration argument is and continues to be, as this Court held, that

the plain language of the arbitration agreement explicitly excludes its coverage to GCS under the

current circumstances. The agreement states in pertinent part as follows:

> "Claim" also includes claims by or against any third party using or providing any
> product, service or benefit in connection with any account (including, but not
> limited to, credit bureaus, third parties who accept the Card, third parties who use,
> provide or participate in fee-based or free benefit programs, enrollment services
> and rewards programs, credit insurance companies, debt collectors and all of their
> agents, employees, directors and representatives) if and only if, such third party is
> named as a co-party with you or us (or files a Claim with or against you or us) in
> connection with a Claim asserted by you or us against the other.

(Defendant GC Services' Memorandum in Opposition to Plaintiff's Motion for Class

Certification, Docket No. 185, Ex. B, p. 3) (emphasis added). This language is clear that a

qualifying claim subject to arbitration applies to a third-party debt collector providing collection

services on American Express accounts, precisely defining GCS and its role here, "if and only if"

American Express is a co-party. American Express is not a party in any manner to this action.

As this Court stated on May 15, "Defendant's argument...ignores the plain language of the

agreement."

This condition that American Express and its debt collector be co-parties to the claim in

order to invoke arbitration is based on a model provision used in other credit card company's

arbitration agreements and, as might be expected, has been the subject of federal court

interpretation confirming its plain meaning. In *Feil v. MBNA America Bank, N.A.*, 417

F.Supp.2d 1214 (D.Kan. 2006), the plaintiff sued both his credit card company, MBNA America

Bank, and its debt collector, Wolpoff & Abramson (W&A). The court ordered the claims to

arbitration under the same plain meaning as identified by this Court:

31

The credit card agreements further provide that the arbitration clauses encompass a "third party providing ... services ... in connection with the account (including ... debt collectors ...) if, and only if, such a third party is named by you as a co-defendant in any Claim you assert against us." Thus, because the plaintiffs joined W & A in their action against MBNA, even the plaintiffs' state law claims against W & A must be submitted to arbitration.

417 F.Supp.2d at 1218.

Conversely, where only the collector was sued, Judge Payne reached the identical result

in *Karnette v. Wolpoff & Abramson, L.L.P.*, 444 F.Supp.2d 640 (E.D.Va. 2006), as this Court did

on May 15 and refused to order arbitration because of the failure of the co-party condition:

MBNA wrote a clause into the arbitration agreement that required arbitration where MBNA was joined as a co-defendant in a suit against a third party. However, for obvious reasons, MBNA had less reason for concern about suits against third parties where MBNA was not a co-defendant. Thus, given its plain meaning and accorded a common sense construction, the arbitration clause does not operate here because MBNA is not a co-defendant in this action.

444 F.Supp.2d at 645; accord, *Bontempo v. Wolpoff & Abramson, L.L.P,* 2006 WL 3040905, *6

(W.D.Pa.) ("By the terms of the arbitration agreement, there is no agreement to arbitrate the

claim against W & A under the FDCPA because the plaintiffs' action does not name MBNA as a

co-defendant.")

This Court's May 15, 2009 ruling remains controlling, both as the law of this case and

independently on its merits. The illusion of arbitration is no bar to class certification.

### CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Class Certification should be granted.

Respectfully submitted,
PAMELA G. CAPPETTA,


_____/s/_____
Leonard A. Bennett, VSB#37523
Counsel for the Plaintiff
CONSUMER LITIGATION ASSOCIATES, P.C.

32

12515 Warwick Boulevard, Suite 100
Newport News, Virginia 23606
Tel:    757-930-3660
Fax:    757-930-3662
lenbennett@cox.net

CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of August, 2009 I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification to the following:

Brian Brooks
bbrooks@omm.com
O'Melveny & Myers LLP (DC-NA)
1625 Eye Street NW
Washington, DC 20006

Charles Michael Sims
charles.sims@leclairryan.com
John MacDonald Robb, III
jack.robb@leclairryan.com
LeClair Ryan PC
PO Box 2499
Richmond, VA 23218-2499

David Matthew Schultz
dschultz@hinshawlaw.com
Hinshaw & Culbertson LLP
222 N LaSalle St
Suite 300
Chicago, IL 60601

_____/s/_____
Leonard A. Bennett, VSB#37523
Counsel for the Plaintiff
CONSUMER LITIGATION ASSOCIATES, P.C.
12515 Warwick Boulevard, Suite 100
Newport News, Virginia 23606
Tel:    757-930-3660
Fax:    757-930-3662
lenbennett@cox.net

33