```
 1              N THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA
                       RICHMOND DIVISION
 3   -------------------------------------------

 4   PAMELA G. CAPPETTA,

 5
                                  Plaintiff;
 6   v.                                      Civil Action

 7                                      3:08CV288

 8   GC SERVICES LIMITED PARTNERSHIP,

 9
                                  Defendant.
10   -------------------------------------------

11                   September 1, 2009
                     Richmond, Virginia
12                      9:00 a.m.

13

14   BEFORE:        HONORABLE JAMES R. SPENCER
                    Chief United States District Judge
15

16   APPEARANCES:   LEONARD A. BENNETT, ESQ.
                    MATTHEW J. ERAUSQUIN, ESQ.
17                  12515 Warwick Boulevard - Suite 100
                    Newport News, Virginia  23606
18
                         Counsel for Plaintiff;
19

20                  BRIAN BROOKS, ESQ.
                    CHARLES M. SIMS, ESQ.
21                  100 Shockoe Slip
                    Richmond, Virginia  23219
22                       Counsel for Defendant.

23

24

25                    JEFFREY B. KULL
                    OFFICIAL COURT REPORTER
```

```
1                    P-R-O-C-E-E-D-I-N-G-S
2            THE CLERK:  Case Number 3:08CV288:  Pamela G.
3    Cappetta versus GC Services Limited Partnership.  The
4    plaintiff is represented by Leonard Bennett and Matthew
5    Erausquin.  The defendant is represented by Charles Sims
6    and Brian Brooks.  Are counsel ready to proceed?
7            MR. BENNETT:  Plaintiff is.
8            MR. BROOKS:  Defense is.
9            THE COURT:  We are here on defendant's motions.
10   I'll hear from you.
11           MR. BROOKS:  Good morning.  Brian Brooks for
12   defendant GC Services.  Your Honor, when this case was
13   filed in mid-2008 it was a straightforward single
14   plaintiff case alleging debt collection violations.  So
15   far so good.  But with the filing of the second amended
16   complaint new claims are added which raise unique merits
17   issues.  That's why we have responded with Rule 12.  These
18   issues have never been addressed by this Court before and
19   we think an examination of these claims demonstrate that
20   the plaintiff's claims at this juncture have to be
21   dismissed for failure to state a claim.
22           There are four counts, and I think our arguments
23   are straightforward, but let me begin by talking about the
24   most important claims, the claim asserted as a nationwide
25   under the Credit Reporting Act.  There are two cases in
```

1   the brief which essentially frame the standard of review

2   here.  One is cited by Mr. Bennett, one is a case cited by

3   us.  Mr. Bennett's case is STERGIOPOULOS @ IVELISSE v.

4   FIRST MIDWEST BANCORP, Seventh Circuit, and it makes clear

5   what the FCRA prohibits.  The quote from the case is that

6   "A user of a credit report cannot troll for reports nor

7   can it request reports on a whim."  That's the prohibition

8   in the case that Mr. Bennett cites.

9           Now, our case from the Fourth Circuit called

10  KOROTKI frames the other side of the issue.  That is that

11  a defendant, a user of consumer reports, need not know

12  that the person on whose part a report is pulled is in

13  fact an obligor on a debt.  It instead needs only have a

14  reasonable basis for thinking that is so.  So what you

15  will hear me say this morning like a mantra is that there

16  are three allegations in the complaint that make clear

17  this plaintiff can't satisfy that standard.

18          Here is what the three allegations are, Your

19  Honor.  First, the plaintiff alleges that there was in

20  fact a delinquent American Express account.  That's in

21  Paragraph 5 of the second amended complaint.  Second, the

22  plaintiff affirmatively alleges that she was listed as a

23  supplemental cardholder on that account.  And third,

24  plaintiff alleges in Paragraph 31 of the amended complaint

25  that American Express reported that account to the credit

1    bureaus under her name.  All of those facts are

2    affirmatively alleged in the complaint.

3         Now, what the case is really about is the

4    allegation that notwithstanding all of those facts, this

5    plaintiff never actually had the account.  She was abused

6    by her estranged husband, who duped her, who opened an

7    account in her name without telling her.  That all may be

8    true, and for purposes of today's Rule 12 motion we will

9    assume that's true.  But as long as those other three

10   facts are correct, under governing law GC Services can't

11   be held liable for a violation of the Fair Credit

12   Reporting Act.  That is because, Your Honor, the FCRA is

13   an intent-focused statute focusing not on an ex post

14   analysis of what the plaintiff actually owed, but on an ex

15   ante analysis of what a reasonable person could have known

16   about the debt based on publicly available information at

17   the time.

18         And as I say, what those three points are is

19   that there was a delinquent account, this plaintiff was

20   listed as a supplemental cardholder on that account, and

21   it was reported to the bureaus by the credit card company

22   in her name.  As long as those three facts are alleged and

23   assumed true for these purposes, we satisfy the standard.

24         Now, essentially what the plaintiff says in this

25   case is that because GC Services made a mistake, because

1    it later turned out that this $10,000 debt reported in her

2    name wasn't actually owed by her, that GC Services must

3    have violated the FCRA and must have lacked a permissible

4    purpose because this plaintiff didn't actually initiate

5    the credit transaction at issue.  But respectfully, Your

6    Honor, that's not the law, as the cases we cite

7    demonstrate.  Two very good examples are the TRIKAS case

8    out of the Eastern District of New York and the KENNEDY

9    case from the federal court in New Orleans.

10             TRIKAS is very, very close on the facts, a

11   federal district court case from just a couple years ago.

12   What happened in that case was you had a bank that had no

13   consumer relationship with the plaintiff.  The bank

14   thought it did because in the past the plaintiff had been

15   an account holder at the bank but that account had been

16   closed months ago.  The bank just made a mistake by

17   forgetting to code the account as closed.  So for more

18   than a year after the account was closed the bank

19   continued to pull credit reports on that putative account

20   holder.  Later, when the account holder came forward and

21   made clear that he in fact had no account and in fact had

22   no customer relationship that would support the requesting

23   of a consumer report, he filed a claim nearly identical to

24   the case at issue here.

25             What the bank said is, "Listen, we don't dispute

1   for purposes of these claims that this individual no

2   longer is a customer.  But our case is that we had every

3   reason for thinking he was because he once was and our

4   computer systems continued to tell us that he was."  And

5   on that basis judgment was entered in favor of the bank

6   and against these claims on the basis that even if wrong,

7   the bank had a reasonable basis for thinking that this

8   person was in fact a customer.

9          An even better example is the KENNEDY case,

10  KENNEDY v. VICTORIA'S SECRET.  What happened in this case

11  was that an identity thief stole the plaintiff's credit

12  card information and used that information to apply for a

13  store credit account at Victoria's Secret.  Victoria's

14  Secret didn't do a special investigation to see whether

15  the account applicant really was the person he purported

16  to be.  Instead, they took the application at face value,

17  ran the application through the credit bureaus, and pulled

18  a consumer report and issued the credit card.  The victim

19  of the identity theft then sued Victoria's Secret for its

20  trouble saying, "Listen, I didn't apply for the account."

21  Rule 12 dismissal was entered in that case in favor of

22  Victoria's Secret on the ground that even though it was

23  wrong in its belief that the identity theft victim was

24  actually the account applicant, it had a reasonable basis

25  for thinking that the person was, and that is sufficient

1       in that case to absolve the defendant of an FCRA claim.

2              Under those standards, we think it is clear that

3       GC Services satisfies the permissible purpose requirement

4       in this case.  What we know from the Fourth Circuit's

5       KOROTKI case is that a reasonable basis is what is

6       required, not correctness, not accuracy in fact, but an ex

7       ante reasonable basis.  As I said, those three allegations

8       in the complaint, the existence of the account, the

9       account in her name, the reporting of the account to the

10      bureaus in her name, shows that there was an objective

11      reasonable basis on the face of this pleading sufficient

12      to permit dismissal under Rule 12.

13             Now there is a separate point we make in the

14      briefing, and I won't trouble the Court long on this, but

15      I will point it out, which is in addition to those three

16      affirmative allegations that by themselves bring us within

17      TRIKAS and KENNEDY and cases of that ilk, in addition to

18      that fact, it is relevant for purposes of this motion that

19      the plaintiff here is the spouse of the actual obligor and

20      she affirmatively so alleges in her complaint.  We cite to

21      Your Honor a number of cases, including the Fourth

22      Circuit's decision in SMITH v. GSH RESIDENTIAL REAL

23      ESTATE, which hold that there are a wide variety of

24      circumstances in which even a spouse who isn't even a

25      putative obligor can be the subject of a consumer report

1    pull.  None of those circumstances is exactly on all fours

2    in this case, but I think it is relevant, as the SHORT v.

3    ALLSTATE CREDIT BUREAU court said a couple years ago.

4    Under Section 1681b(a)(3)(A), I'm quoting here, "A

5    creditor may request information on an applicant's spouse

6    in a number of circumstances."  We have cited cases that

7    show the general framework within which that is the case.

8    Some of those circumstances are, as the Fourth Circuit

9    said, where the spouse may use the account.  Well, from

10   the perspective of an ex ante user of the consumer report

11   here, Ms. Cappetta was certainly such a person.  But for

12   the fact of her husband's apparent fraud, she was a

13   supplemental cardholder on the account; she was entitled

14   to use the account had she known about it; and so far as

15   GC Services could have been aware based on the complaint

16   allegations, she would fit within that framework.

17           Of course, there are other circumstances as

18   well, such as when the spouse is a guarantor, when the

19   spouse shares other common accounts, when the spouse lives

20   in a community property state, et cetera.  As I say, none

21   of those facts are quite exactly right here, but because

22   the KOROTKI standard is reasonable basis, the fact that

23   Ms. Cappetta is the spouse of the actual account holder is

24   yet another reason why there was a reasonable basis for GC

25   Services to think ex ante that it was proper to pull the

1   credit report here.

2            Your Honor, under these cases, we think it is

3   clear that Rule 12 dismissal is appropriate.  Frankly, the

4   plaintiff doesn't cite a case in circumstances anywhere

5   like this that would deny dismissal here.  The truth of

6   the matter is, the real facts might have supported the

7   debt collection claim, they might have supported the claim

8   as originally pled in the first complaint.  But when the

9   plaintiff reaches out to hold my client liable for pulling

10  a report where she was the reported debtor and her name

11  was all over the account, that's enough to dismiss that

12  claim today.

13           Your Honor, let me turn now to the three other

14  claims in the case which I think we can dispense with

15  relatively quickly.

16           As you know, we argue in our briefing that the

17  voluntary payment doctrine precludes all three of the

18  remaining claims.  Those are claims under the federal Fair

19  Debt Collection Practices Act, under the Texas state Debt

20  Collection Practices Act, and under the federal Credit

21  Repair Organizations Act.  All you need to know about the

22  voluntary payment doctrine is it is essentially a waiver

23  principle.  What it says is you can't clog up the courts

24  by paying a debt that you dispute at the time only to buy

25  yourself a lawsuit and a ticket into the courthouse.

1  That's essentially what the principle is.  That doctrine

2  has been applied in Virginia to bar all manner of claims.

3  It has been used to bar negligence claims.  It has been

4  used to bar statutory claims.  It has been used to bar

5  breach of contract claims and others.

6          THE COURT:  It hasn't been used to bar federal

7  statutory claims.

8          MR. BROOKS:  We cite a number of cases, and the

9  most recent and best example is a case called --

10          THE COURT:  Answer my question first.

11          MR. BROOKS:  The answer is in the class action

12  context, yes.  The way the issues mostly come up is that

13  class certification defendants argue that state voluntary

14  payment doctrine defenses will bar some of the plaintiff's

15  claims.  Typically what happens is that the courts

16  acknowledge that the voluntary payment doctrine will

17  apply, and either conclude it is sufficiently

18  individualized to preclude class treatment, which is what

19  the case we cite says, a 2009 New Jersey federal case -- I

20  apologize, I don't have the name in front of me -- or

21  sometimes they argue that the voluntary payment doctrine

22  defense will be common as to all of the class members so

23  the case can go forward.

24          But the most recent case we could find from

25  February of just this year was a federal FDCPA case which

1    ruled that voluntary payment doctrine defenses would apply

2    and the Court denied class certification.  So yes, we

3    think it applies.

4          The plaintiff admittedly cites two cases from at

5    least five years ago from district courts outside this

6    Circuit that have held that the FDCPA preempts the state

7    voluntary payment doctrine.  Here is what's wrong with

8    that argument, apart from the fact that the cases are old

9    and outside this district.  The problem is this:  The

10   federal FDCPA has about as close to an anti-preemption

11   principle as you can imagine in federal law.  Typically,

12   where Congress wants to preempt state law, it does so

13   expressly.  It says, "Notwithstanding any provision of

14   state law to the contrary," or vests an agency with the

15   power to promulgate regulations that will be preempted.

16   Lots of federal statutes have similar provisions.  The

17   Fair Credit Reporting Act would be a good example of a

18   statute with such a provision.  But here, what the FDCPA

19   says, and CROA, the other federal claim has a very similar

20   provision, it says those statutes, quoting, "do not annul,

21   alter, or affect, or exempt any persons subject to the

22   provisions of this subchapter from complying with the laws

23   of any State with respect to debt collection practices,

24   except to the extent that those laws are inconsistent with

25   any provision of this subchapter, and then only to the

1    extent of the inconsistency."  That is about as broad a

2    savings clause as one can imagine in a statute that might

3    have a very narrow preemption provision.

4            What we know from WYETH v. LEVINE, which is a

5    2009 Supreme Court decision all about conflict preemption,

6    is that conflict preemption is to be interpreted very

7    narrowly.  States, when exercising their police powers in

8    areas like debt collection, are entitled to regulate

9    except insofar as Congress expressly says to the contrary.

10   That's the command of WYETH which rejected a preemption

11   defense and very narrowly construed conflict preemption.

12           The question here for purposes of the

13   plaintiff's argument is, is there something about the

14   Virginia voluntary payment doctrine that would in some way

15   nullify the FDCPA, something that would be inconsistent

16   with one of the substantive commands of the FDCPA.  I

17   think the answer on analysis is no.  Here is why.  What

18   the FDCPA does, Your Honor, is it prohibits harassment and

19   it prohibits false statements with respect to the nature

20   or amount or status of a debt.  There is nothing about the

21   voluntary payment doctrine that says otherwise.  All of

22   those things are plainly and clearly impermissible both

23   under Virginia state law as they would be under federal

24   law.  All the voluntary payment doctrine says is, as a

25   procedural matter of waiver and just for that purpose, you

1    can't pay a debt knowing the basis for a dispute and then

2    later file a lawsuit on it.  And nothing about that is

3    inconsistent with any of the substantive commands of the

4    FDCPA.

5            One of plaintiff's arguments here is to cite

6    somewhat mysteriously a Texas case for the proposition

7    that in Texas the voluntary payment doctrine doesn't apply

8    to statutory claims.  The case they cite is not even

9    actually an FDCPA claim.  But that's cold comfort in a

10   state where we are bound to apply Virginia choice of law

11   rules.  Under KLAXON, this Court sits in diversity with

12   respect to the state law claims, and what we know is that

13   the Virginia voluntary payment doctrine applies generally

14   to statutory claims.  That's COMMONWEALTH v. CONNER, which

15   we cite in our briefing.  We think there is no basis for

16   saying on the basis of two five-year-old unpublished

17   District Court cases from other jurisdictions that the

18   weight of authority holding that the FDCPA and CROA no

19   less than state law claims are barred by the voluntary

20   payment doctrine.

21           One thing that bears noting here is that

22   preemption, which their principal argument, obviously

23   doesn't apply to their Texas statutory claim.  That's a

24   state claim.  So at a bare minimum, it becomes clear that

25   there is this state law claim that would be governed by

1    voluntary payment principles.  Their argument about that

2    state law claim, since they have no preemption argument,

3    is that well, Ms. Cappetta paid the money under duress and

4    so it would be unfair to bar her based on the voluntary

5    payment doctrine here.  But on that point the Virginia

6    Supreme Court has spoken explicitly and clearly and

7    repeatedly, the most recent example being WILLIAMS v.

8    CONSOLVO.  But we cite four other earlier cases on which

9    that case is based.

10            What Virginia says is it isn't duress for

11   someone to threaten legal action to enforce a debt and it

12   isn't duress for someone to tell you that they will report

13   you negatively to the credit bureaus if you don't pay.

14   Duress in Virginia under this doctrine is defined as the

15   imminent loss of property.  And nothing like that is here.

16   All that is alleged in the complaint is that someone from

17   GC Services told Ms. Cappetta on the phone that if she

18   didn't pay they would report her to the bureaus and that

19   would negatively affect her credit.  Footnote:  Her own

20   complaint notes that American Express had already reported

21   the account as delinquent on her credit report.  The idea

22   there would have been any unique threat posed by GC

23   Services threatening to report this delinquent account as

24   delinquent is probably belied by the complaint

25   allegations.

1         Let me turn briefly and conclude, Your Honor,

2    moving on from the voluntary payment doctrine, to talk

3    about the other two claims.  Specifically, one being the

4    Texas statute, the other being the Credit Repair

5    Organizations Act.  We don't think plaintiff really even

6    seriously tries to defend these claims here.  I think what

7    is almost common ground in this case is that those two

8    claims will have to fall away.

9         On the Texas debt collection statute, our

10   argument is choice of law.  Plaintiff in an earlier

11   version of her complaint had a Virginia statutory claim.

12   She has abandoned that claim.  Plaintiff, a Virginia

13   resident who got a debt collection phone call in Virginia

14   and allegedly suffered damages in Virginia, is trying to

15   take advantage of a statute in Texas because that's where

16   GC Services has one of its offices.  That can't be done in

17   Virginia, which applies lex loci delicti, the law of the

18   place of the wrong.  The Fourth Circuit in WITHERS looked

19   at a very similar case, a debt collection claim involving

20   a woman who lived in Maryland but received her debt

21   collection call at her place of business in Washington,

22   D.C.  She brought a claim under Maryland law and the

23   holding was no, because Maryland, like Virginia, is a lex

24   loci state.  The law where the phone call was received

25   applied.  That would be Washington D.C.  The Maryland

1   claim must be dismissed.

2          So, too, this plaintiff has no connection with

3   Texas.  We are in Virginia.  Everything relevant to the

4   claim happened in Virginia.  That claim plainly must be

5   dismissed.

6          Finally, we have the Credit Repair Organizations

7   Act, which again is really scarcely even defended, I

8   think, in the plaintiff's briefing.  There are two

9   theories on CROA just to be clear.  One of them, the

10   original one outlined in the complaint, is that somehow GC

11   Services is a credit repair organization.  And the theory

12   for that is when the GC Services telephone rep said to

13   Ms. Cappetta on the phone that if she didn't pay it would

14   negatively impact her credit, that was somehow advice for

15   a fee designed to protect Ms. Cappetta's credit rating.

16   We have explained in our brief why we think that's

17   invalid, and the plaintiff essentially abandons that

18   theory.

19          Plaintiff moves to a second theory different

20   from that asserted in the complaint, and that is that CROA

21   covers not only credit repair organizations but also

22   persons.  On that basis, they argue that GC Services is a

23   person.  The problem with that theory is, as the cases we

24   cite make clear, CROA doesn't apply to persons; it applies

25   to persons associated with credit repair organizations.

1    We cite a number of cases in identical circumstances where

2    people have tried to invoke this theory against debt

3    collectors.  All of those have resulted in Rule 12 or

4    summary judgment dismissal.

5            For those reasons, Your Honor, we ask that the

6    complaint be dismissed in its entirety.  And obviously, we

7    will be happy to answer any questions you have.

8            THE COURT:  Thank you very much.

9            MR. BENNETT:  Please the Court, good morning,

10   Judge.

11           THE COURT:  Mr. Bennett, so we can save some

12   time, let me give you some direction.  I suggest you not

13   waste any time on the Credit Repair Organization Act and

14   the state law claim.

15           MR. BENNETT:  Yes, Judge.  I follow your advice.

16           THE COURT:  Thank you.

17           MR. BENNETT:  Judge, the Fair Credit Reporting

18   Act claim is certainly the most contentious, the most, or

19   at least the most significant by number of alleged

20   plaintiffs at issue.  Let me spend just a moment as an

21   overview here.  As you step back, it is difficult when you

22   litigate, at point/counterpoint, not to get drawn into a

23   false debate or false argument.  And I want to make sure

24   that we, the plaintiffs, don't do that and that we ask

25   Your Honor to not walk down that same path.

1        There are two false premises or castings of this

2   argument that Your Honor doesn't need to go to.  I think

3   we win even if you do, and I can debate the minutiae

4   within those.  But the two big points that Your Honor

5   should not be tempted to go down because they don't matter

6   here are as follows:  First, this defendant, GC Services,

7   is not American Express.  That is, this is a debt

8   collector that is following the instructions of its

9   principal, American Express.  The question of whether or

10  not an authorized user who never used an account, or who

11  used an account, or any other person that American Express

12  may think owes it money, whether American Express can use

13  a consumer's report is a debate that you don't need to

14  referee.  Because in this case, I'm getting beyond the

15  pleadings, the simplest answer is that the complaint

16  alleges plausibly that this defendant with respect to

17  Pamela Cappetta did not have a permissible purpose.  The

18  allegations in the complaint allege a plausible cause of

19  action and this is a Rule 12(c)(1) posture.  But the

20  defense's attempts to explain, well, they could have owed

21  American Express money because that is what was really

22  going on, is a moot point if this defendant is not

23  American Express, if there is not factual evidence that

24  this defendant was ordered or instructed or requested by

25  its principal to attempt to collect from supplementals.

1    And so whether or not GC Services accessed a report is

2    not -- lawfully accessed a report is not a question Your

3    Honor can answer by looking at the separate factual

4    question of whether a supplemental could owe American

5    Express money.

6            This is a Rule 12 posture, but in the class

7    certification briefing we actually have evidence that's

8    offered, and there won't be a response to it, the

9    defendant has testified, American Express has testified,

10   that it was never -- American Express never asked GC

11   Services to collect from supplementals by pulling consumer

12   reports or otherwise.  And so the first red herring or

13   false path to avoid is combining GC Services and American

14   Express in terms of whether or not a creditor has a

15   permissible purpose to access the consumer reports.

16   Because even if Your Honor ruled contrary to what we think

17   the law of the case is or the law is as we have argued it

18   is or the facts we allege with respect to whether American

19   Express could pull a consumer report about

20   non-account-holder obligors, that is, the claim that some

21   people owe it money even if not on an account, is

22   irrelevant to the question of whether GC Services could do

23   so.

24           Now, the second false path to avoid is this:

25   And Your Honor doesn't know Mr. Brooks, but he and I have

1  been responsible for most of the large FCRA class actions

2  in the country on the other side.  He is a fantastic

3  attorney by reputation outside of this Court.  But he is

4  incorrect, and I'm sure misspoken, when he casts to Your

5  Honor this case as confusion about fraud by a husband or

6  identity theft.  That's not what this case is about.  And

7  there isn't an allegation of identity theft.

8         Mr. Cappetta, the philandering Mr. Cappetta, the

9  facts that are simply alleged, he actually used this

10  American Express Card for that purpose, but he had an

11  American Express account.  He applied for it, got it.  It

12  was in his name.  American Express doesn't have

13  co-obligors.  He didn't lie to anybody.  He didn't forge

14  Ms. Cappetta's name.  He didn't use her identity.  I don't

15  know where this comes from.  But this is not a case in

16  which a defendant tried to go after the identity theft

17  victim mistakenly.  That's not this case at all, not in

18  any regard.

19         This is a case in which American Express has

20  only one obligor on its accounts.  It is different than

21  most every other credit card company.  It never has

22  co-obligors.  And it calls it authorized users, in which

23  the husband would have said, "Here is a credit card that I

24  am responsible for.  If you want to charge on it, you can.

25  But it is my account."

1          We cite in the certification reply the actual

2    language from American Express.  And again, our

3    allegations are plausible in a Rule 12 motion, but the

4    American Express says, "Additional card members do not

5    have accounts with us."  American Express instructs GC

6    Services, in fact, that additional card members are

7    authorized users on the basic cardmembers' agreements and

8    do not have independent accounts or written contracts with

9    American Express.

10          So the second false path would be one in which

11   Your Honor could be tempted to believe this scenario,

12   would be that isn't present in any evidence in this case

13   at all, that our client was an identity theft victim or

14   otherwise.  I don't know where that comes from.  But

15   that's not the case.

16          With respect to the allegations that are

17   actually pertinent:  The second amended complaint alleges

18   a plausible cause of action, which is where we are right

19   now.  We recognize the need, both sides, to flesh this out

20   because, of course, Your Honor could decide at some later

21   point as well, and frankly, with the mediation set now on

22   September 11th, Your Honor's feedback, both sides are

23   seeking it.  But the second amended complaint, amongst

24   other allegations, at a minimum in Paragraphs 18 through

25   22, say the plaintiff was never an obligor, never applied

1    for the account, never had the plastic.  American Express

2    never represented to the defendant that the plaintiff was

3    obligated.  American Express never provided the Social

4    Security Number, any information to the defendant.

5              So at a minimum, just a glance, and there are

6    additional allegations, in Paragraphs 18 through 22 it is

7    alleged in the second amended complaint a cause of action;

8    this defendant accessed the consumer's report knowing she

9    had no obligation whatsoever.  So this theory about the

10   confusion of GC Services is only that.

11             Now, to give away the end of the story, to be

12   the spoiler here, the end of this, if we don't settle it

13   in the two mediations this month, and Your Honor

14   ultimately has to resolve a fact question, you will learn

15   that the defense in the case, unquestionably, the defense,

16   the general counsel 30(b)(6) testimony, will be "We did

17   not know it was a consumer report."  That's the defense.

18   All the other testimony that you ultimately will hear from

19   all the deposition testimony, everything, Your Honor, if

20   you get deep into the law believing the parties have

21   framed the actual factual issues here and legal issues

22   that resolve those facts for you, you will be, I think,

23   disappointed in the parties because this is not the case

24   as the defendant has cast it that you ultimately will see.

25             There is no evidence that this defendant was

1   trying to collect. And that, I think, is the first

2   argument in this transition beyond the false paths. That

3   is, GC Services says, "Judge, you do not look to whether

4   or not we were correct in believing we had a permissible

5   purpose. You just look to whether or not we had a

6   reasonable belief that we had a permissible purpose. The

7   second amended complaint says they didn't have that

8   belief. For this posture that would end. The big picture

9   is, and again we actually cite the deposition testimony in

10   the cert briefing, but the big picture is that this

11   defendant will testify that it was never accessing these

12   reports for the purpose of collecting from Pamela

13   Cappetta. So this idea that it was mistaken in believing

14   Cappetta may have owed the money and that's why it is

15   pulling, there will not be one shred of evidence. I am

16   not exaggerating. There is not a shred of evidence that

17   it ever thought, believed in any regard that Pamela

18   Cappetta owed or that the supplementals owed. The

19   testimony will be that it accessed the information of

20   Pamela Cappetta, of supplemental cardholders, of

21   neighbors, of co-workers, family members, of children, of

22   people that had no connection at all, for the single

23   purpose of collecting from the single cardholder. And so

24   accessing these Experian reports was never, as defendant

25   suggests, because of a mistaken belief of a supplemental

1    owing the money.

2          The facts that defendant says make out its

3    defense, the first is that there was a delinquent account.

4    But we have cited the statute, the actual, the collection

5    is -- I mean the statute, 1681b(a)(3)(A) allows the access

6    of a consumer's report for, quote, collection of an

7    account of the consumer.  And the PINTOS case, a Ninth

8    Circuit decision -- I cite the Ninth Circuit because it is

9    a recent case, it is analytically strong and it is also

10   the only circuit decision amongst our eleven on this

11   issue -- the PINTOS case addressed the circumstance in

12   which the consumer could be alleged to owe a debt, but not

13   on a credit account.  In this circumstance, theoretically,

14   a spouse could owe, I guess, American Express.  Again,

15   that's not GC Services.  It was never trying to collect

16   from spouses by its testimony, but the spouse would not

17   have had an account.  The American Express documents we

18   cite verbatim, we quote verbatim, and the briefings show

19   this, there was never an account for supplementals, the

20   neighbors, family members, others.

21          And so the purpose, the question of whether

22   there was a delinquent account, is an incomplete fact.

23   The question would have had to be there is a delinquent

24   account of the consumer.

25          The second fact asserted is that the consumer

1    was a supplemental, which is an authorized user.  We cite

2    the law that authorized users are not responsible,

3    contractually, under the contracts.  The American Express

4    contract says they are not responsible contractually under

5    the contracts.  And I don't know where that fact or how

6    that fact makes the next connection.  And the last is that

7    American Express had reported this on our client's credit

8    report.  And this is another false fact.  And again, I'm

9    sure it is a mistaken representation.  Because American

10   Express never reported our client as obligated, ever, on

11   her credit report.  In fact, to the contrary, American

12   Express only reported her, and this is in the second

13   amended complaint, as an authorized user, somebody not

14   responsible.  It wouldn't have hit her credit score.  The

15   delinquency doesn't affect her.  She was reported simply

16   as an authorized user.

17          And so if the defendant believes that it would

18   have to show in these three facts that would help its

19   defense help prove our complaint as plausible, that a

20   fact, I don't know how it would be relevant, but that if a

21   fact was necessary, that the American Express had told the

22   defendant through the reporting in my client's credit

23   report that she was obligated, that's not pled and it is

24   not true.

25          On top of that, Judge, there isn't an

1   allegation, and there isn't an allegation because it
2   doesn't exist, from the defendant that it ever would have
3   seen our client's credit report prior to accessing her
4   report.  That is, the irony of this is defendant would be
5   saying, "We had a reason to believe that this consumer was
6   obligated, and thus go out and access her consumer report,
7   and we had that reason to believe because we went out and
8   accessed her consumer report and we would have seen
9   something in it."  The violation would be -- the
10  defendant's representation to Your Honor here is that it
11  believed our client was obligated before it accessed her
12  report.  And to argue that, it is saying to Your Honor,
13  "We learned the basis for the belief to start the process
14  of accessing the report at the end of this after we saw
15  that report."  Not only illogical, but factually
16  incorrect, and legally irrelevant.

17           It is not the account of the consumer.  The
18  purpose for which the defendant theorizes it could have
19  used the report was not the purpose it used the report.
20  The complaint allegations are clean.  And the KOROTKI
21  case, I'm surprised the defendant cites it, because that
22  case was a case in which the account holder, the obligor,
23  I mean, that is the identity theft fact pattern that's
24  described.  The creditor believed that there was an
25  obligation.  And the question then was whether that belief

1  was incorrect.  That's not what we deal with here.  There

2  was no allegation the defendant believed supplemental was

3  obligated.  There is no obligation the defendant had, and

4  there won't be any evidence, that that's the reason that

5  it pulled, that it was mistaken.  That's not the case

6  before you

7         I think, Judge, we have significant briefing and

8  I would be happy to answer any other questions with

9  respect to the Fair Credit Reporting Act claim.

10         THE COURT:  I don't have any further questions

11  related to that claim.  I would like you to speak to the

12  voluntary payment doctrine and its application to the

13  FDCPA claim.

14         MR. BENNETT:  Yes, Judge.  The defendant is

15  mixing apples and oranges here.  The Fair Debt Collection

16  Practices Act claim says if you take certain types of

17  action, then those actions which Congress has declared

18  unlawful can be remunerated.  You can be sued and recovery

19  is available under the Fair Debt Collection Practices Act.

20  So the defendants' assumption is that a necessary element

21  of that would have been proving whether or not the debt

22  was owed or not.  The defendant also implicitly is arguing

23  the voluntary payment doctrine applies to a circumstance

24  in which if someone pays a debt and sues after the fact to

25  recover that debt.  The Fair Debt Collection Practices Act

1    claim, and certainly the SCOTT v. FAIRBANKS case addresses

2    this as well, in fact every FDCPA has found in our favor.

3    Your answer to Your Honor's question, I think, whether

4    your question was rhetorical or inquisitive, there isn't a

5    federal statutory claim like the FDCPA in which the

6    voluntary payment doctrine has ever prevailed.  But the

7    FDCPA has other measures of damages.  So that in the FDCPA

8    a consumer can actually owe the debt.  Those

9    circumstances, somebody can owe the debt and certain types

10   of conduct is still unlawful and there are other measures

11   of damages under the FDCPA.  And this is addressed in one

12   of the footnotes in the briefing, but it is hard to answer

13   because it is trying to fit a square peg in not a round

14   hole, but a no hole at all.  But Your Honor, the case law

15   is clean on this.

16          In addition to the out of Virginia cases, the

17   FDCPA cases, Judge Wilson, who Your Honor I'm sure is

18   acquainted with in the Western District, considered the

19   BOVA decision, and as with all the questions really here

20   before you, said these are all factual inquiries.  The

21   application of the voluntary payment doctrine, if it

22   somehow even did apply, and I don't think it did, it would

23   be a question for the jury to determine whether the

24   NEWTON, the Virginia Supreme Court's theory of whether it

25   was voluntary is present in order for this affirmative

1    defense to apply.  And there is no way on a Rule 12

2    posture that Your Honor could so rule.

3          Your Honor is our Chief Judge.  This case had

4    been set before a Magistrate Judge by this Court's consent

5    order.  But these issues had been addressed.  Pretty much

6    all of the claims that are present here have been

7    addressed through briefing, have been ruled on, at least

8    on one occasion.  And the law of the case, I think, should

9    bar the continuing rearguing or multiple attempts to make

10   the same argument.  But the voluntary payment doctrine is

11   an affirmative defense, requires proof of facts.  There is

12   not a sufficient basis in the second amended complaint for

13   Your Honor to determine that there is not a plausible

14   claim under the Fair Debt Collection Practices Act because

15   of this, and every Court to consider its application to

16   Fair Debt Collection Practices Act claims has ruled as the

17   plaintiff asks and contrary to as the defendant prays.

18         So Judge, Your Honor has endured significant

19   briefing in the case, and I would be happy to answer any

20   other questions.

21         THE COURT:  I don't have any questions.  Thank

22   you very much.  Brief rebuttal.

23         MR. BROOKS:  Your Honor, thank you.  Just two or

24   three points by way of rebuttal.

25         Mr. Bennett begins by announcing what he

1    contends are some false arguments.  And let me go through

2    a couple of those just to explain the debate.  His first

3    point has to do with the idea that GC Services is not

4    American Express.  And to the extent I'm able to

5    understand that argument, I think what counsel seems to be

6    saying is that whatever GC Services could have known,

7    American Express knew that this person was not in fact an

8    obligor and did not in fact use the account and somehow

9    American Express, the principal, has its knowledge imputed

10   to GC Services, the agent.  That seems to be the context.

11        This is not an argument ever raised in the

12   briefing, but I will just say there is a Fourth Circuit

13   case on this point, again not discussed in the briefing,

14   but it responds to counsel's argument, called YOHAY v.

15   CITY OF ALEXANDRIA CREDIT UNION, a 1987 Fourth Circuit

16   case.  What that case talks about is the agency analysis

17   under the FCRA.  What it says is that counsel's recitation

18   of the law is exactly backwards.  What it says is under

19   the FCRA, a principal is liable for the FCRA violations of

20   its agent, not the other way around.  What seems to be the

21   suggestion here is that because American Express had the

22   ability to know other facts about card usage beyond what

23   GC Services is alleged to have known, therefore, GC

24   Services can be held to account for millions of dollars of

25   FCRA damage.  That under YOHAY isn't the way the statute

```
 1    works.
 2              Counsel gives a characterization of the facts
 3    based on what he contends are the deposition transcripts
 4    and other facts that have nothing to do with the
 5    pleadings.  If you read the second amended complaint and
 6    the particular three paragraphs I'll point Your Honor to,
 7    I think they give the lie to what has been argued.  First
 8    of all, counsel says that the case is not about fraud by
 9    the plaintiff's husband.  The husband didn't forge his
10    name, didn't steal anybody's identity, didn't do anything
11    wrong here that would be the basis for the argument.
12    Paragraph 23 of the second amended complaint says, it says
13    and I quote:  "Plaintiff's ex-husband, Robert Cappetta,
14    had opened the American Express account using a Post
15    Office Box the plaintiff had no knowledge of and that her
16    husband had previously told her that he had closed."
17    That's what that paragraph said.  Then counsel says that
18    American Express has only one obligor and did not report
19    Ms. Cappetta's name to the credit bureaus.  But of course
20    what Paragraph 31 of the second amended complaint says,
21    and I quote, "Plaintiff has learned a few days earlier in
22    conjunction with a mortgage application that American
23    Express was reporting that she was an authorized user on
24    an unknown account within her credit file.
25              Then he says that GC Services did not have a
```

1    reasonable belief, as we have argued in our motion,

2    because GC Services had no intention to collect from

3    Ms. Cappetta; it knew it was only collecting from

4    Mr. Cappetta.  Yet Paragraph 38 of the second amended

5    complaint purports to recite an alleged conversation

6    between GC Services and Ms. Cappetta in which, if the

7    allegation is to be believed, GC Services tried to

8    harangue Ms. Cappetta into paying a debt it said she owed.

9    I believe the quote from the complaint is GC Services

10   said, quote, "Paying the amount demanded immediately would

11   allow plaintiff to retain her good credit standing."

12   These are the allegations of the complaint.  It may be

13   that counsel believes the facts to be otherwise, but

14   that's not the issue on this motion.

15          At the end of the day, what we think the law is

16   is fairly straightforward under Fourth Circuit law.

17   KOROTKI says we could well be wrong about the fact she

18   owed the amount.  What we needed was a reasonable basis,

19   and that is established by the existence of the account

20   and the reporting of the account in her name.  The Fourth

21   Circuit also says that spouses, even if they are only

22   authorized users, may well be proper participants in a

23   credit report pull.  That is the SMITH v. GSH case.

24   Finally, counsel says that every FDCPA case has come out

25   in his favor, although he has cited only two cases that he

1    mentioned.  The cases, the 2009 New Jersey case denying

2    class cert. because of the need to evaluate state

3    voluntary payment defenses in an FDCPA case is called

4    AGOSTINO v. QUEST DIAGNOSTICS INC, a 2009 U.S. District

5    Court from New Jersey, Lexis 10451, from February of 2009.

6    Thank you, Judge.

7            THE COURT:  All right.  Let me give you a bottom

8    line so that you all know where you stand going forward.

9    It seems relatively clear, and frankly, simple that the

10   Credit Repair Organization Act as well as the state law

11   claim will be dismissed.  We will write a little bit about

12   this to explain, but I don't think there is very much

13   explanation required, it is so clear.

14           The Federal Credit Reporting Act, the motion for

15   judgment on the pleadings will be denied.  I think the

16   Fair Debt Collection Procedures Act is a little closer,

17   but I'm also going to deny that motion.

18           Now, there were a number of motions outstanding.

19   And we don't have any dates for hearings.  And we are a

20   little bit off track on these things, and I want to get

21   back on track.  There's a motion for sanctions, motion for

22   reconsideration.  I probably can deal with those things.

23   If you all haven't worked it out, I can deal with that on

24   the pleadings.  Essentially what we have here, one side

25   says what I asked them to do, or what you requested them

1    to do which I ordered them to do, is basically impossible,

2    or as close to impossible as it can get.  And I don't see

3    really any great need for additional argument on those

4    motions.  I will hear from both sides if you have another

5    view.  If you don't, I'll resolve that on the papers.

6           MR. SIMS:  If I may, Your Honor, I just briefly,

7    to comment on that, what I do have is I do have a CD that

8    has -- we have had six employees and through Friday we

9    have been able to gather 2,000 of the accounts.  So if we

10   had 600 employees, we would still only be about halfway

11   through the 500,000 accounts.  So what I would at least

12   ask, Your Honor, I agree with you, I think it has been

13   well briefed.  If we could at least have relief right now

14   from continuing to go through this process, which is just

15   not going to get anybody to where they need to get to, and

16   then I'm happy to go ahead and wait on the Court's order.

17   I do have Ms. Walberg here, Vice-president of IT, if you

18   have any questions that remain outstanding about what we

19   are doing.

20          THE COURT:  I understand your position.

21          MR. SIMS:  Okay.

22          THE COURT:  Mr. Bennett?

23          MR. BENNETT:  If the Court please, I would say

24   that we would submit on the pleadings except if the Court

25   would provide me the discretion to just answer that one

```
 1    comment.
 2              THE COURT:  Go ahead.
 3              THE ATTORNEY:  Judge, Ms. Walberg originally
 4    testified that they could never access the 1221 screen at
 5    all.  It was impossible.  And similarly, they testified
 6    before the May order that Your Honor issued that they
 7    could not produce the account records.  In fact, they made
 8    exactly the same argument, that they would have to sit
 9    down at a terminal.  The briefing we have offered Your
10    Honor, and continuing our obligations under Rule 37 to
11    meet and confer, I probably have had more meet and confer
12    attempts in this case than my entire docket for the last
13    year.  The attempt to meet and confer that was most
14    recently offered is, "Listen, GC, you are contending the
15    possibility that some supplementals could have owed the
16    debt.  Provide the 1221 screens only for that, that
17    subset."
18              And number two, the defendant is producing, in
19    order to build up its burden in this argument, a lot more
20    than what Your Honor ordered or that we asked for.  They
21    are not simply producing the 1221 screen, which is one
22    screen having the supplemental spend data, but every other
23    contact.  In fact, non-supplementals on the family
24    members' friends and everybody else, not simply the 1221's
25    and not simply 1221's or obligated or asserted obligated
```

1    supplementals.  We have offered that.  There is always an

2    obligation, whether or not Your Honor orders it or

3    otherwise, for us to try to reduce docket congestion.  We

4    briefed it and that's all else I can say.

5             I would also suggest, Judge, that Your Honor, we

6    are going to lose the CROA and Texas claim.  If Your Honor

7    has written anything on it, that's fine.  If Your Honor

8    chooses to, of course you can.  But we would, I would move

9    here, and Your Honor doesn't have to accept the motion

10   because Your Honor has telegraphed Your Honor's decision,

11   but I would move to voluntarily dismiss with prejudice

12   under Rule 41 those two claims to save Your Honor the need

13   to write on it.  We wouldn't appeal Your Honor.  We would

14   move for that basis.  The Court can accept our motion or

15   not accept our motion.  But there's a lot of work in the

16   case, Your Honor.

17            A further status update, the parties have

18   scheduled with the jams mediator, retired D.C. Superior

19   Court Judge that does professional mediation in

20   Washington, two mediation sessions, one on September 11th

21   and one September 22nd, to the extent that Your Honor is

22   attempting to come up with dates surrounding that.  I

23   think since Mr. Brooks, and since LeClair Ryan has gotten

24   in, there has been a different tone in their dealings with

25   us and the possibility that the carrier could participate.

1    THE COURT:  All right.  If you want to have a

2  response to that, I'll give you the last word.

3    MR. SIMS:  I would, Your Honor.

4    THE COURT:  The ongoing technology fight about

5  production.

6    MR. SIMS:  We have been trying to do what the

7  Court asked.  We are not trying to create a burden.  But I

8  will say if you look at the Cappetta account, she is not

9  even identified and there is a sub spend.  So in order to

10  get -- I would ask the Court, if he could just identify

11  100, 300 accounts, he has the data, we've got it on the

12  screen.  We can print those screens down and give it to

13  him and he can just use that with the jury.

14    THE COURT:  All right.  And Mr. Bennett, that's

15  probably -- we are going to have to do a sampling here.

16  You can't get everything.  I just don't --

17    MR. BENNETT:  Last time we sent our expert down.

18  We can do that again.  They made exactly the same

19  argument.  We spent 16 grand to prove it was false.  But

20  we will do whatever Your Honor wants.  We don't need this

21  evidence, Judge.  We are simply saying if they want to use

22  the evidence they have got to produce it.  We would be

23  willing to accept a Rule 37(c)(1) exclusion.  To the

24  extent this defendant is claiming the supplementals --

25    THE COURT:  All right, I understand.  Okay.

1   What about a date for the class certification, a hearing

2   on that issue?  It would be after you all's mediation

3   attempts, I guess.  But let's try to get something firm

4   here now if we can.

5                MR. BROOKS:  We had understood from Your Honor's

6   Clerk that September 28th or 29th might be available on

7   your calendar.  And our thinking was that would give us

8   plenty of time to make progress if we are going to make

9   progress on the mediation.

10               THE COURT:  Are you available, Mr. Bennett?

11               MR. BENNETT:  Both those days.  Our concern is

12  the defendant had asked us to put off that time.  We

13  agreed with their intent of mediation.  Our concern is if

14  we prevail on that motion, it will be, by the time the

15  defendant gives us the completed class lists we will be

16  bumping up against our fixed date for trial for class

17  notice.  It is possible we could do it, but tight.

18               THE COURT:  What about 9:30 on the 29th of

19  September?

20               MR. BROOKS:  That works for us, Your Honor.

21               MR. BENNETT:  It does for the plaintiff, Judge.

22               THE COURT:  All right, we will put it down.

23               MR. BENNETT:  Do you have a sense of how long

24  you will set aside for that hearing?

25               THE COURT:  I would say an hour.  One hour for

1    all concerned.

2              MR. BROOKS:  We will talk quickly.

3              THE COURT:  All right.  Thank you all very much.

4              MR. BENNETT:  There is a briefing response would

5    be due, but our motion to enlarge page limits for our

6    reply brief.  We had three people.  I'm not -- I'm long on

7    talking but not on paper.  We did what we could to cut it

8    out.  We stayed within the Local Rules for font and

9    margins and so forth.  But there are significant arguments

10   in the cert. motion that -- a lot of significant arguments

11   that the defendant raised that we addressed, and

12   officially our reply isn't filed until Your Honor accepts

13   it.  We filed the motion for enlargement of page limits at

14   the same time.  I don't usually do that, but it was

15   necessary here.

16             THE COURT:  Are you all objecting to his

17   additional pages?

18             MR. BROOKS:  We would just --

19             THE COURT:  I'll rule on that today.  We will

20   decide it.  Thank you very much.

21             (Proceedings adjourned at 10 o'clock a.m.)

22                  CERTIFICATE OF REPORTER

23        I, Jeffrey B. Kull, Official Reporter, certify that

24   the foregoing is a correct transcript from the record of

25   proceedings in the above-entitled matter.

1

2

3 _____/s/_____

4 Jeffrey B. Kull,
Official Federal Reporter

5

6 _____/s/_____

7 Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25