1

```
 1             IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      RICHMOND DIVISION

 3   ------------------------------------------

 4   PAMELA G. CAPPETTA,

 5
                            Plaintiff;
 6   v.                                     Civil Action

 7                                       3:08CV288

 8   GC SERVICES LIMITED PARTNERSHIP,

 9
                            Defendant.
10   ------------------------------------------

11                    November 4, 2009
                     Richmond, Virginia
12                       9:20 a.m.

13


14   BEFORE:       HONORABLE JAMES R. SPENCER
                   Chief United States District Judge
15

16   APPEARANCES:  LEONARD A. BENNETT, ESQ.
                   MATTHEW J. ERAUSQUIN, ESQ.
17                 12515 Warwick Boulevard - Suite 100
                   Newport News, Virginia  23606
18
                            Counsel for Plaintiff;
19

20                 CHARLES M. SIMS, ESQ.
                   JOHN M. ROBB, III, ESQ.
21                 951 East Byrd Street - 8th Floor
                   Richmond, Virginia  23219
22
                            Counsel for Defendant.
23

24

25                    JEFFREY B. KULL
                   OFFICIAL COURT REPORTER
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2           THE CLERK:  Case Number 3:08CV288:  Pamela G.
 3   Cappetta versus GC Services Limited Partnership.  The
 4   plaintiff is represented by Leonard Bennett and Matthew
 5   Erausquin.  The defendant is represented by Charles Sims
 6   and John Robb.  Are counsel ready to proceed?
 7           MR. SIMS:  We are, Your Honor.
 8           MR. BENNETT:  We are, Judge.
 9           THE COURT:  We are here on the defendant's
10   motion for sanction.  I will hear that.  And after that we
11   will have a status conference.
12           MR. SIMS:  Good morning, Your Honor.  I'm going
13   to be brief today.  This matter has been fully briefed
14   before the Court.  And I think it is really relatively
15   straightforward in connection with the letter that was
16   sent out to over 3,400 people identified in confidential
17   information that was produced in this case.
18           But I think what's important for the Court to
19   understand is, in essence, something that really is hard
20   to convey in the papers.  And that's really the
21   disappointment that our client has.
22           In this case, there has been a dispute going
23   back and forth with respect to discovery.  And I think the
24   Court is aware, our client has always believed that it was
25   required to produce a whole lot more information that
```

| | |
|---|---|
| 1 | wouldn't have any conceivable relevance to this case.  But |
| 2 | it did so with the view that there was a protective order |
| 3 | entered in place that would protect the confidentiality of |
| 4 | this information.  It never envisioned that the |
| 5 | information we were disclosing on 566,000 American Express |
| 6 | accounts that had been submitted to GC Services for |
| 7 | collection, that out of that sampling of 566,000 people, |
| 8 | that the plaintiffs could send out a mass mailing of over |
| 9 | 3,400 letters to those individuals.  And as far as we can |
| 10 | tell from the papers we got in response, there was really |
| 11 | no science to that other than that these people happened |
| 12 | to be located in Virginia and they were basic cardholders. |
| 13 | Well, this is a case involving a supplemental |
| 14 | cardholder, not a basic cardholder.  And the message the |
| 15 | letter that goes out to these 3,400 people is not a |
| 16 | request for information; it is an indictment on GC |
| 17 | Services.  The opening sentence is an indictment.  You |
| 18 | know, "We are a law firm currently litigating a federal |
| 19 | case against GC Services.  We have learned that you were |
| 20 | also one of the individuals from whom GC Services |
| 21 | attempted to collect American Express."  That is |
| 22 | information learned, that's confidential information |
| 23 | learned from those 566,000 accounts.  So they are |
| 24 | disclosing that information to these folks.  They say in |
| 25 | the next sentence:  "Over the course of this case we have |

```
 1   learned that GC Services regularly contacts family members
 2   and neighbors."  Then it goes on to say they make false
 3   statements.  "GC Services makes false statements to entice
 4   you or to encourage you to pay the debt."  And then in the
 5   penultimate sentence at the very end, Your Honor, there
 6   is -- they finally, after a full paragraph, ask, "I would
 7   like to speak with you in further detail about the conduct
 8   of GC Services."
 9            Well, Your Honor, if that was their main intent,
10   I think that could have been said in the first sentence.
11   It could have been "We believe you might have information
12   pertinent to a case that we are litigating in the Federal
13   District Court in the Eastern District of Virginia.  We
14   would like to contact you.  Would you be agreeable to
15   that?"  But that's not really what their purpose is in
16   this letter, shown by the first paragraph.  And then if
17   you read, continue on reading, what they say in here is,
18   after that sentence, in that same sentence where they are
19   asking that they would like to speak with you about
20   detailing the conduct, they say, "and to address any
21   particular concerns you may have."
22            They invited the recipients -- they have told
23   the recipients the concerns they should have.  They then
24   invited that recipient to call them back so this law firm
25   could address those concerns.  That's not a request for
```

1  information.  That's a solicitation for me to go represent
2  you to address and correct your concerns that we have
3  just -- that you ought to have which we have just
4  outlined.
5          Well, Your Honor, we have a protective order in
6  place here.  And these protective orders are used, and I
7  know this Court is familiar with them, in just about every
8  case now, protective orders are entered.  And you do that
9  so that you can produce information.  And you have to arm
10 twist your clients but you say, "Look, you can produce
11 this information, but it is going to be protected.  They
12 can only use it in this litigation."
13         Well, this is an abuse of that.  And you cannot,
14 as you read these protective orders, it is impossible to
15 go through and outline every negative, every circumstance
16 that you should not use this information.  So the parties
17 do the opposite.  They tell the Court and each other in
18 these protective orders what you can use the information
19 for.  And it is pretty clear what the purpose of this
20 protective order is.  The purpose of the protective order
21 is to say to the litigants, "We are going to hand over
22 confidential information but you can only use it for
23 purposes of this case."  That's the overriding purpose
24 behind this protective order.
25         And it is made clear in Paragraph 4, where it

```
 1   says, "It shall not be used directly or indirectly by any
 2   person for any business, commercial, or competitive
 3   purposes or for any purpose whatsoever other than solely
 4   for the preparation of trial."
 5           Even if this Court were to believe that this
 6   letter could be conceived as a request for information
 7   from these 3,400 recipients, it is not solely a request.
 8   It is not solely for the purpose of gaining information
 9   relative to this case.  It is more than that.  They used
10   the information in breach of the protective order, Your
11   Honor.  Because what they are really trying to get is more
12   clients.
13           And in their responsive papers, I think a fair
14   assessment of what they respond is they are making
15   excuses.  The basic excuse for what they are doing, Your
16   Honor, is, "Well, this is to our client's advantage."
17   That's not an excuse.  That doesn't get you around the
18   protective order.  We can't have litigants out there
19   saying, "Well, it is to my client's advantage to take this
20   course of action irrespective of what the protective order
21   states."  That makes a mockery of the protective order.
22           And I would suggest to the Court that this is a
23   serious and important issue, because litigants every day
24   are entering into these protective orders and they have to
25   believe that there are limitations on what you can do with
```

```
 1    this information.  And I don't think any litigant walking
 2    into this Court having a protective order, which this is
 3    pretty basic similar language, would ever believe that the
 4    other litigant would take the information and do mass
 5    mailings that skewer your client and then invite the
 6    recipient to call back so that they can be address their
 7    concerns.
 8              So Your Honor, we ask this Court to find that
 9    there has been a breach of the protective order.  We
10    struggled as to what is the appropriate remedy here.  We
11    believe that the only appropriate remedy is for this
12    counsel not to be class counsel.  They have shown a
13    disregard for this Court's protective orders.  It is too
14    difficult to dig into each individual person who may have
15    contacted them -- like I said, they have 60 clients -- to
16    find out whether in fact that person invited themselves to
17    be a client or whether it was in response to this letter.
18    It gets into attorney/client privilege.  It gets into
19    issues that creates an overriding morass.  So we think
20    this is the only appropriate remedy to rectify this breach
21    and that's what we have asked for.
22              THE COURT:  That's assuming there is a class
23    certification.
24              MR. SIMS:  That's right. Because otherwise,
25    Your Honor, and I think it is telling that at no time has
```

```
 1   counsel ever supplemented their discovery to identify any
 2   person who responded to these letters, to say, "Oh, this
 3   person has information relevant to this case."  There is
 4   no supplementation.
 5           THE COURT:  All right.  Mr. Bennett?
 6           MR. BENNETT:  Judge, the latter is not true.  We
 7   actually did supplement to include these individuals.
 8           THE COURT:  What were you doing, Mr. Bennett?
 9   Really, this is kind of irritating to me.  Because I reach
10   out, I stretch out to give you as much discovery as I
11   think you are entitled to, and then you turn around and do
12   this mass mailing.  And you have got to be a blind man not
13   to read this letter and see the undercurrent to it.  Go
14   ahead.
15           MR. BENNETT:  Judge, I understand that.  The
16   question is what happened from that.  That was done before
17   the discovery cutoff, and I understand the argument that
18   we would be farming new cases.  But we didn't.  In fact,
19   we have sought to move to consolidate, to add these
20   individuals.  The defendant has taken the position
21   throughout the case that there was nobody else exposed in
22   the same way that Ms. Cappetta has.  What was done here
23   was telegraphed when we were arguing before Judge Lauck
24   why we needed this information, was to contact these
25   individuals.  The reason that we used Virginians was they
```

```
 1   were individuals that we could subject to subpoena.  These
 2   individuals have been disclosed as potential witnesses.
 3            And the question is, Judge, if there were
 4   circumstances where we said, "All right, we have that
 5   information, we are moving on," that's a different
 6   circumstance than in this case in which we have sought to
 7   take these additional reps, who already would fit within
 8   the original proposed class definition in the Cappetta
 9   case, the original class definition before the defendants
10   said it was only supplementals, these individuals have fit
11   within that definition.  It is part of that action.  We
12   have sought to consolidate the actions in part because the
13   reasons related to settlement with the insurance policy is
14   limited in the definition of what is a claim.  We have not
15   increased the demand.  We have not changed our posture or
16   position in the litigation with respect to these
17   individuals.  We are not taking this in a new path.  They
18   are for the single prosecution of this action.
19            That's it, Judge.  And I understand, we are not
20   solicitors.  That's not what we do.  I'm not in the phone
21   book.  We are inundated, as Your Honor knows, from our
22   docket.  But in order to prosecute the case and refute the
23   arguments that the defendant is making and has made again
24   and again that this is an aberration, that Pamela
25   Cappetta's facts and circumstances are novel, unique,
```

1    and -- I mean, in December of '08 when we were arguing
2    much of these same matters the defendant wrote in its
3    pleading, in its opposition to our motion to amend, quote,
4    "Plaintiff admits that she has not identified any other
5    putative plaintiff that has suffered the alleged injury as
6    she under the FCRA."  This was repeated in arguments and
7    pleadings in May before this Court of this year, and it
8    was repeated even in the motion opposing certification.
9    The defendant says that we have failed to identify a
10   single other person who allegedly was named and reported
11   as the supplemental cardholder without his or her
12   knowledge.
13           The defense in this case has always been that
14   this did not happen in this fashion to other individuals.
15   Now, I absolutely get it, Judge.  And I appear before Your
16   Honor and I appear before this Court, and my background
17   and my integrity is at issue here.  We have never had a
18   Rule 37(c) conference, the rule under which this is
19   prosecuted, in which any of these things could be issued.
20   And the defendant prosecutes this for the very reason and,
21   based on Your Honor's initial reaction, successfully in
22   that regard, for the attempts to shift the Court's
23   perception of us.
24           THE COURT:  The protective order has to mean
25   something.

```
 1          MR. BENNETT:  The order says we can only use
 2   this information in furtherance of this case.  That's what
 3   we have done.  We have not done anything else at all.  In
 4   fact, we have proven, Your Honor, by our motions to
 5   consolidate, in our status order when we first filed these
 6   additional cases, that it is that single purpose.  When we
 7   filed our motion for class certification, we represented
 8   to Your Honor two alternate proposed class definitions.
 9   And the defendant has taken the position initially that it
10   was just supplementals, and even then it was an
11   aberration.  We can prove now, we have evidence, we can
12   prove, and we have disclosed these individuals, that
13   that's not in fact so.
14          But I would not do this, Judge.  I wouldn't do
15   it in my practice, and it is not what was done here.  And
16   in fact, it was only done with individuals within subpoena
17   of Richmond and it was only done until the close of
18   discovery.  That's it.  Nothing else since.
19          I would suggest, Judge, that again in terms of
20   candor, we have never hidden the purpose of doing this
21   from the defendant.  We have told the defendant and we
22   told Judge Lauck that; we argued that we needed these
23   witnesses.  We need them to show willfulness, to show not
24   bona fide error, and we need them to show it certainly is
25   not an aberration, Judge.
```

1                I would not do it, we did not do it, and the
2       best, the most objective evidence you have of that is that
3       no use has been made of these individuals other than
4       prosecuting this case.
5                THE COURT:  All right.
6                MR. SIMS:  If I may briefly, Your Honor, the
7       second amended complaint, the class, proposed class in the
8       second amended complaint was "All natural persons with
9       addresses within the United States who are listed only as
10      non-obligor supplemental cardholders on any account."  So
11      I disagree with counsel that as proposed in the second
12      amended complaint, the class, the purported class,
13      encompassed basic cardholders, which is to whom all 3,400
14      letters were sent.
15               But I would suggest to the Court that what
16      counsel seems to be arguing is he had good reason to
17      breach the protective order.  But if he had good reason,
18      Your Honor, he could have come into this Court and sought
19      a modification of the protective order.  He could have
20      come into this Court and said, you know, "Your Honor, we
21      are just not getting the information from the defendants
22      that we think we ought to get, so we are proposing to go
23      out with a mass mailing of 3,400 letters and we are going
24      to ask people for any information they may have."  And I
25      think he could have gotten that order.

|   |   |
|---|---|
| 1 | But he didn't do that, Your Honor.  We didn't |
| 2 | know, we found this letter searching blogs.  It is on a |
| 3 | blog out there.  So not only has that letter been mailed |
| 4 | to 3,400 people; it now has worldwide publication because |
| 5 | it is sitting on the Internet, Your Honor.  And it clearly |
| 6 | is used, was used as an abuse of the protective order |
| 7 | because it used confidential information to go out and |
| 8 | solicit clients, Your Honor. |
| 9 | THE COURT:  All right.  I will take that motion |
| 10 | under advisement and try to figure out how to resolve it, |
| 11 | what I am going to do about it.  We need to talk about the |
| 12 | case itself.  I think we are scheduled for what, the 17th |
| 13 | or thereabouts.  And I really have to apologize to you |
| 14 | all, because the certification ruling hasn't come down.  I |
| 15 | would have preferred to have done that by now.  You all |
| 16 | need that information, and that's clear. |
| 17 | I don't think we are going to be able to make |
| 18 | this trial date.  I'm working now, we will try to get it |
| 19 | to you as soon as we possibly can, a resolution on the |
| 20 | class certification.  It is a little bit more complex than |
| 21 | I initially thought.  And let me suggest this:  Let's keep |
| 22 | that 17th date as another status hearing date.  I'm going |
| 23 | to try to get this class certification done.  Obviously, |
| 24 | if it goes one way we will be able to proceed in a more |
| 25 | swift fashion.  If the class is certified, then we have to |

```
 1    expand the number of days for trial and might have to take
 2    a little bit more time with it.  But I think that's the
 3    best that we can do here.
 4              Plaintiff has apparently a motion for sanctions
 5    also outstanding.  Mr. Bennett?
 6              MR. BENNETT:  Judge, we have actually three sets
 7    of motions or three motions outstanding, and we
 8    would -- I'm not big on suggesting delay, but in terms of
 9    judicial economy, part of what's sought in the motion
10    for -- our motion for sanctions is exclusion of evidence.
11    And so that it would probably make sense if Your Honor
12    sorted out everything else for much of that being moot and
13    saving the Court judicial resources in that interim.  Your
14    Honor certainly knows your job better than me.
15              THE COURT:  We will get it all off the docket
16    sheet.  But I think this is the best that we can do at
17    this point.  By taking it off the trial calendar, that
18    will release you all from the trial preparation deadlines
19    and give you time to do something else.  But again, I
20    apologize for this, because it is our fault for not being
21    able to get to it in a timely fashion.
22              MR. BENNETT:  We provided you with hundreds of
23    thousands of total documents, Judge.  May I be heard on
24    one related matter?  In terms of simplification, and the
25    hesitation we had in filing our motions to consolidate
```

```
 1    that we telegraphed on the claims of the two other
 2    complaints that fit within the proposed definition in our
 3    motion for certification, the broader of the two, but not
 4    within the second amended complaint definition, and what
 5    I -- my hesitation in moving -- we wanted to move to
 6    consolidate so it was clear to Your Honor what our plan
 7    was with respect to the issue that we have just addressed
 8    so that it wouldn't -- we think it to be a false
 9    accusation -- wouldn't be there or linger.
10              But the hesitation was that it could complicate,
11    depending on the -- if you rule against us on the sort of
12    macro issues of certification, then it would apply to all
13    of them.  But if ultimately you rule in our favor on the
14    Cappetta motion for certification, then, or rule against
15    us on the Cappetta specific, the individualized issues
16    argument, then we are left with these two additional cases
17    that to say that they are related is a dramatic
18    understatement.  They are really subsets of the same
19    litigation.  And so I don't mean to add additional
20    complexity to Your Honor's already complex ruling on
21    certification, but at least if Your Honor wants us to act
22    in a certain way with respect to those, our intent had
23    been to file an immediate motion for certification.  But
24    we have deferred doing that because we don't want to pile
25    on the Cappetta matters.
```

```
 1            THE COURT:  All right.  Thank you all very much.
 2   You you will hear from me.
 3           (Proceedings adjourned at 9:44 a.m.)
 4                    CERTIFICATE OF REPORTER
 5      I, Jeffrey B. Kull, Official Reporter, certify that
 6   the foregoing is a correct transcript from the record of
 7   proceedings in the above-entitled matter.
 8
 9
10   _____/s/_____
11   Jeffrey B. Kull,
     Official Federal Reporter
12
13   _____/s/_____
14   Date
15
16
17
18
19
20
21
22
23
24
25
```